SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

LEGACY RESTORATION, LLC,

                Plaintiff,

           - against -

OSWALDO "JUNIOR" BARAJAS, JOHN
DOE ENTITY 1, LEAH RAFFLES, and
BRIAN WOLFF.

             Defendants.

---

**COMMERCIAL DIVISION**
Index No. _____

 

**PLAINTIFF LEGACY RESTORATION, LLC'S MEMORANDUM OF LAW IN
SUPPORT OF ITS ORDER TO SHOW CAUSE FOR INJUNCTIVE RELIEF AND
<u>TEMPORARY RESTRAINING ORDER</u>**

 

Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Phone: (212) 839-5300
*Attorneys for Plaintiff*

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

    I.    Barajas Received Millions of Dollars in Exchange for the Sale of Southern. ................... 4

    II.    Barajas Agreed to Certain Restrictive Covenants in the Purchase Agreement. .................. 4

    III.    The Handbook Protects the Company's Trade Secret and Confidential Information. ..... 5

    IV.    Legacy Discovers Barajas and Other Southern Employees are Conspiring to Start a
Competing Business in Violation of the Purchase Agreement. .................................................. 5

    V.    Text Messages Reveal Barajas' Solicitation of Company Employees. .............................. 6

    VI.    Evidence of Theft of Company Property, Proprietary Information and Trade Secrets ... 9

    VII.    Barajas and His Co-Conspirators Have Tried to Hide His Violations and Destroy
Evidence ................................................................................................................................. 10

LEGAL STANDARD ......................................................................................................... 12

ARGUMENT ..................................................................................................................... 12

    I.    Legacy Will Suffer Irreparable Harm Absent Temporary and Preliminary Injunctive
Relief. ..................................................................................................................................... 13

    II.    Legacy Is Likely to Prevail on the Merits. ...................................................................... 15

        A.    Legacy Is Likely to Demonstrate It Is Entitled to Relief as to Its Breach of Contract
Claims. ................................................................................................................................. 16

        B.    Legacy Is Likely to Demonstrate It Is Entitled to Relief as to Its Misappropriation of
Trade Secrets Claim. ........................................................................................................... 18

    III.    The Balance of Equities Favors Legacy. ........................................................................ 20

CONCLUSION ................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIN Leasing Corp. v. Peat, Marwick, Mitchell & Co.*,
    636 N.Y.S.2d 584, 166 Misc.2d 902 (N.Y. Sup. Ct. 1995) ...................................19

*Ashland Mgmt. Inc. v. Altair Inv. NA, LLC*,
    59 A.D.3d 97, 869 N.Y.S.2d 465 [1st Dep't. 2008] ..............................................17

*Bank of Am., N.A. v. PSW NYC LLC*,
    918 N.Y.S.2d 396 (N.Y. Sup. Ct. 2010) ...............................................................13

*Barbes Rest. Inc. v. ASRR Suzer 218, LLC*,
    140 A.D.3d 430, 33 N.Y.S.3d 43 [1st Dep't 2016] .............................................20

*BDC Mgmt. Sers., LLC v. Singer*,
    144 A.D.3d 597 [1st Dep't 2016] ........................................................................12

*Brintec Corp. v. Akzo, N.V.*,
    514 N.Y.S.2d 18, 19 [1st Dep't 1987] .................................................................17

*Chrysler Corp. v. Fedders Corp.*,
    63 A.D.2d 567 [1st Dep't. 1978] .........................................................................13

*Cliff v. R.R.S., Inc.*,
    207 A.D.2d 17 [2d Dep't. 1982] ..........................................................................16

*Deborah Hope Doelker, Inc. v. Kestly*,
    87 A.D.2d 763, 449 N.Y.S.2d 52 [1st Dist. 1982] ..............................................17

*Eric Woods, LLC v. Schrade*,
    998 N.Y.S.2d 306 (N.Y. Sup. Ct. 2014) ..............................................................16

*Four Times Square Assoc., L.L.C. v. Cigna Invs., Inc.*,
    306 A.D.2d 4 [1st Dep't 2003] ............................................................................15

*Frank May Assocs. Inc. v. Boughton*,
    281 A.D.2d 673 [3d Dept' 2001] ...................................................................12, 13

*Gasoline Heaven at Commack, Inc. v. Nesconset Gas Heaven, Inc.*,
    191 Misc.2d 646, 743 N.Y.S.2d 825 (N.Y. Sup. Ct. 2002) .................................20

*Gerges v. Koch*,
    62 N.Y.2d 84 (1984) ...........................................................................................12

iii

*Hay Grp., Inc. v. Nadel,*
    170 A.D.2d 398, 566 N.Y.S.2d 616 [st Dep't. 1991] ................................12, 13, 14

*Ikon Office Sols., Inc. v. Usherwood Office Tech., Inc.,*
    875 N.Y.S.2d 820 (N.Y. Sup. Ct. 2008) ................................14

*Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt Am., Inc.,*
    74 A.D.3d 696 (N.Y. App. Div. 2010) ................................15

*JTH Tax, LLC v. Agnant,*
    62 F.4th 658 (2d Cir. 2023) ................................13, 14

*Manhattan Real Est. Equities Grp. LLC v. Pine Equity, NY, Inc.,*
    16 A.D.3d 292 [1st Dep't 2005] ................................3, 13

*Medidata Sol., Inc. v. Veeva Sys., Inc.,*
    No. 17 Civ. 589 (LGS), 2021 WL 467110 (S.D.N.Y. Feb. 9, 2021)................................19

*Nobu Next Door, LLC v. Fine Arts Hous., Inc.,*
    4 N.Y.3d 839 (2005) ................................12

*NYSARC, Inc. v. Syed,*
    747 N.Y.S.2d 327 (N.Y. Sup. Ct. 2002) ................................17

*Photonics Indus. Int'l, Inc. v. Xiaojie Zhao,*
    185 A.D.3d 1064, 127 N.Y.S.3d 569 [2d Dept 2020] ................................18

*Pontone v. York Grp., Inc.,*
    No. 08 Civ. 6314 (WHP), 2008 WL 4539488, at *5 (S.D.N.Y. Oct. 10, 2008)................................16

*Ricca v. Ouzounian,*
    51 A.D.3d 997 (N.Y. App. Div. 2008) ................................16

*Silberstein v. Aetna, Inc.,*
    No. 13 Civ. 8758(AJN), 2014 WL 1388790 (S.D.N.Y. Apr. 9, 2014)................................12

*Spinal Dimensions, Inc. v. Chepenuk,*
    847 N.Y.S.2d 905 (N.Y. Sup. Ct, 2007) ................................13

*Town Line Repairs, Inc. v. Anderson,*
    90 A.D.2d 517 (N.Y. App. Div. 1982) ................................16, 17

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.,*
    73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014) ................................17

**Other Authorities**

CPLR § 6311................................1

CPLR § 6313 ..................................................................................................1

CPLR § 6301 ..............................................................................................1, 12

Uniform Rule 202.8 .....................................................................................23

v

Plaintiff Legacy Restorations, LLC ("Legacy") respectfully submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction, pursuant to CPLR §§ 6301, 6311, and 6313, to enjoin Defendant Oswaldo "Junior" Barajas ("Barajas") and his competing company (the name of which remains unknown due to his efforts to keep it secret).[1]

## PRELIMINARY STATEMENT

This emergency action for preliminary and injunctive relief arises out of Barajas's violation of certain restrictive covenants to which he agreed in connection with the sale of his business to Legacy. Legacy seeks emergency injunctive relief to prevent Barajas's continued violations of his agreement not to compete with, solicit employees from, or misappropriate the confidential information of Legacy.

Barajas founded SNR Global, LLC d/b/a Southern Roofing and Renovations and its affiliates ("Southern"), which is an exterior remodeling company. In January 2024, Legacy purchased Southern for over $50 million, and Southern became part of Legacy's family of companies (the "Company"). Barajas was paid over $4 million in cash and received additional rollover equity as part of the sale. After the sale, he stayed on as a full-time employee in Southern senior management, and in January 2025 he was named Regional Sales Director. In or around April 2025, Legacy learned that Barajas had attempted to start a competing company, and terminated his employment along with other Southern employees (including David Knight) who were conspiring with him. After terminating Barajas' employment, Legacy as since discovered evidence that:

---

[1] The Complaint, which is filed concurrently herewith, contains claims against Barajas and his unknown entity, as well as Leah Raffles and Brian Wolff. At this time, Legacy does not seek temporary relief against Raffles or Wolff.

1

- **Texts show that Barajas has actively solicited Southern's employees.** Texts with Mr. Knight show that he was planning to travel to Nashville at Southern's expense to meet with Barajas to plan the competing company. Texts with another Southern employee, Leah Raffles, show that Barajas promised her an equity interest in the new competing company.

- **Barajas has used those employees to steal Southern's confidential information and trade secrets in aid of his new competing business.** Raffles' texts show that she and Barajas were stealing Southern's training content and simply "rebranding" it to use with the new company. Raffles and Barajas further told another Southern employee that Raffles was helping Barajas's new company by drafting the standard operating procedures ("SOPs") and sales documents – and Company records show that she downloaded over 20 company files since March 2025, including multiple Southern SOPs and sales training documents.

- **Barajas and his co-conspirators are actively trying to hide his involvement and destroy relevant evidence.** Text messages show that Barajas has actively attempted to conceal his involvement in his new competing company by leaving his name off of the organizational documents until his non-compete clause expires. Another employee, Raffles, deleted her browser history on her work computer _**the same day**_ that she realized she was going to be questioned by the Company. Mr. Knight has refused to return his two company-owned laptops.

2

Legacy seeks a preliminary injunction and temporary restraining order to prevent Barajas and his competing company from further causing irreparable harm to Legacy. This relief is warranted here for three reasons:

**First**, Legacy is likely to prevail on the merits of its underlying breach of contract and misappropriation of trade secrets claims. The restrictive covenants at issue are enforceable and reasonable, and the complaint sets out a *prima facie* claim for breach of those covenants as a result of Barajas's conduct. Additionally, the facts as alleged demonstrate that Barajas exploited Legacy's protected trade secret information and intended to use it for his own gain, repackaging it for use at his new competing business.

**Second**, Legacy has suffered and will continue to suffer irreparable, unquantifiable harm as a result of Barajas's actions. Such irreparable harm is presumed where, as here, restrictive covenants are entered into as consideration for the purchase of a business in order to protect the purchaser's interest in the goodwill of that business. *Manhattan Real Est. Equities Grp. LLC v. Pine Equity, NY, Inc.*, 16 A.D.3d 292, 292 [1st Dep't 2005].

**Third**, the balance of equities weighs in Legacy's favor. The parties bargained for a specific exchange, and Barajas was paid over $4 million for entering into the Purchase Agreement. Equity compels holding Barajas to his end of the bargain, and there is no harm that will be thrust upon Barajas as a result of doing so. Legacy, on the other hand, will continue to suffer irreparable harm if Barajas's actions are not curtailed by this Court.

For these reasons, explained in more detail below, the Court should grant temporary injunctive relief and order Barajas to show cause as to why a preliminary injunction should not be issued.

## STATEMENT OF FACTS

The relevant facts to this motion are set forth in the Complaint, the accompanying Affirmations of Brad Hadamik, Mike McComas, and Melissa Colón-Bosolet and their accompanying exhibits, and are summarized below.

### I.    Barajas Received Millions of Dollars in Exchange for the Sale of Southern.

Barajas founded SNR Global, LLC d/b/a Southern Roofing and Renovations ("Southern"), a roofing and renovations business operating throughout the southern United States. McComas Aff. ¶ 4. In January 2024, Legacy purchased Southern pursuant to the parties' Contribution and Securities Purchase Agreement (the "Purchase Agreement"). McComas Aff. ¶ 4. The total purchase price was over $50 million. McComas Aff. ¶ 4. Barajas himself received over $4 million in cash in exchange for his equity. McComas Aff. ¶ 5.

### II.    Barajas Agreed to Certain Restrictive Covenants in the Purchase Agreement.

In the Purchase Agreement, Barajas agreed to several restrictive covenants. McComas Aff. ¶ 4 at Ex. A.  Barajas agreed to a non-disclosure and confidentiality covenant to protect the confidential information of Southern (the "Nondisclosure Covenant"); a non-competition covenant, which prohibits him from participating in any "business of exterior residential and multi-family restoration (including but not limited to the repair or replacement of roofing, siding, gutters and windows), residential and multi-family renovations, interior and exterior residential and multi-family maintenance and related services, sales and lead generation activities" for a period of five years[2] after the closing of the transaction (the "Noncompete Covenant"); and to a non-solicitation

---

[2] The Noncompete Covenant and Nonsolicit Covenant (defined below) are subject to temporal limitations. Specifically, they are each limited to the "Restriction Period" applicable to each individual Seller as defined in the Purchase Agreement. As a "Major Seller," as that term is defined in the Purchase Agreement, Barajas was obligated to comply with the Noncompete Covenant and Nonsolicit Covenant for a period of five years following the closing of

4

covenant, which prohibits him for soliciting Southern employees, as well as suppliers and customers, for the same five-year period (the "Nonsolicit Covenant"). *See* McComas Aff. ¶ 4 at Ex. A. Collectively, these three covenants are referred to herein as the "Purchase Agreement Covenants."

### III.     The Handbook Protects the Company's Trade Secret and Confidential Information.

Following Legacy's purchase of Southern, Barajas remained an employee.  McComas Aff. ¶ 5.  Like all Company employees, Barajas and Raffles were subject to Legacy's employee handbook (the "Handbook").  McComas Aff. ¶ 6 at Ex. C.  The Handbook contains a section about the "Protection of the Company's Trade Secrets and Confidential Information" that provides that confidential information and trade secrets are always the property of the Company, and that employees may not engage in impermissible conduct such as forwarding that information to their personal email accounts. *See* McComas Aff. ¶ 6 at Ex. C at Pages 40-41.  In the Handbook, Employees are admonished to avoid disclosing the information except in furtherance of their duties at the company, to refrain from using personal email accounts, and to return all records and other information upon termination.  McComas Aff. ¶ 4 at Ex. C at Pages 41-42.

### IV.     Legacy Discovers Barajas and Other Southern Employees are Conspiring to Start a Competing Business in Violation of the Purchase Agreement.

In or around April 2025, a Southern employee reported that he had overheard the drunken conversations of Barajas and several other Southern employees at a bar. McComas Aff. ¶ 7.  The employee revealed that Barajas and three Southern employees—Alex Skelton, David Knight, and

---

the transaction evidenced by the Purchase Agreement, which occurred on January 5, 2024. Accordingly, Barajas is obligated to comply with the Noncompete Covenant and Nonsolicit Covenant until January 5, 2029.

Leah Raffles—were discussing leaving Southern and starting their own company that would directly compete against Southern. McComas Aff. ¶ 7.

Based on this information, Southern interviewed Barajas. McComas Aff. ¶ 8. During his interview, Barajas did not deny that he had started a competing company. McComas Aff. ¶ 8. As a result of his interview, Southern terminated Barajas's employment on April 10, 2025. McComas Aff. ¶ 8. Southern terminated Knight and Skelton's employment on April 18, 2025. McComas Aff. ¶ 8.

## V.    Text Messages Reveal Barajas' Solicitation of Company Employees.

Legacy engaged a consultant at FTI to conduct a forensic analysis of Raffles' laptop. Hadamik Aff. ¶¶ 1, 4. Raffles' laptop contained copies of her text messages. Hadamik Aff. ¶ 5. Copies of these text messages are attached as Exhibit B to the Hadamik Affirmation.

These recently obtained text messages show that Barajas has solicited Raffles to join his new competing business. In this regard, Raffles' text messages further show that she intends to "sit for [her] [general contractor ('GC')] license" and that she "secured [herself] something that will make [her] indispensable with Barajas and protect [her] tenfold." Hadamik Aff. ¶ 5 at Ex B.

| Sender | Recipient | Date | Message |
|---|---|---|---|
| Leah Raffles | XXXXXX2743[3] | 3/28/25 5:49 PM | it's all right I just secured myself something that will make me indispensable with Barajas and protect me tenfold we'll talk about it later |

---

[3] Upon information and belief ,and based on Raffles' contact list pulled from her work computer, the phone number ending in 2743 is Raffles' mother.

6

| Leah Raffles | Barajas | 3/28/25 3:42 PM | I'm looking into it and I could probably take my GC in a few weeks and pass that bitch but there's one big thing is that I would need to be listed on the LLC for me to test. So what if you guys figured out a situation where like every branch I was a 10% equity partner so it's minimal but I can be listed on the LLC or partnership documentation and then everybody could use my license? Something to think about, but I'm looking at this right now and I could take this bitch and pass it and I would also be fueled by the fact that Kirtis failed it. |

When asked if Barajas has asked Raffles to obtain her GC license, Raffles responds that Barajas was "venting" about problems relating to GC licensure. Hadamik Aff. ¶ 5 at Ex B. Raffles then offered to obtain her own GC license, and Barajas indicated that he would be amenable to Raffles doing so and then procuring a small equity interest in "every business that operated under [her] license." Hadamik Aff. ¶ 5 at Ex B.

Other texts show that Barajas was soliciting Raffles away from Southern with promises to "have her back" and pay her a lump sum up front:

| Sender | Recipient | Date | Message |
|---|---|---|---|
| Leah Raffles | XXXXXX2743 | 6/6/25 5:20 PM | I do love Barajas.he just said dont stress, if they try and push you out or under Christina, I will make it work for you over here.  I'll just pay you 3 months upfront of your current salary and by the time you push these guys to perform me in those three months I'll be able to afford your salary. I just dont want you to worry |

| | | | because me and Brian have your back. |

Hadamik Aff. ¶ 5 at Ex B.

And on June 11, 2025—the day before Raffles was interviewed as part of the Company's internal review process—Raffles sent a text reflecting that Barajas told her to "start planning her exit" and that he had just "sweetened the deal" to bring her on at the competing company:

| Sender | Recipient | Date | Message |
|---|---|---|---|
| Leah Raffles | XXXXXX2743 | 6/11/25 3:32 AM | junior just called me and said "start planning your exit" …, they need me sooner than he thought and he just sweetened the deal that he's gonna figure out how to pay me the salary that I want and he's also going to give me profit share in every company that I have to put my hands on |

Hadamik Aff. ¶ 5 at Ex B.

The employee who initially reported the conspiracy to Southern also provided screenshots of text messages further evidencing Barajas' solicitation of Company employees. McComas Aff. ¶ 7. In one message from a group string between Skelton, Knight, and the employee, Skelton writes that Knight should plan to be in Nashville for two days for "sales and leadership meetings." McComas Aff. ¶ 7 at Ex. E. This message referred to meetings that Barajas had with Skelton and Knight to plan the operations at Barajas's new company. McComas Aff. ¶ 7. Another text message from this group string indicates that Skelton and Knight had appointments scheduled with

8

"someone," which was code for Barajas, and Skelton states that he was "extremely excited about the next few weeks." McComas Aff. ¶ 7 at Ex. E.

## VI. Evidence of Theft of Company Property, Proprietary Information and Trade Secrets

Barajas, Raffles, Knight, and Skelton have also taken actions to try to steal Southern's property and trade secrets:

- Raffles' text messages show that Barajas and Raffles intended to steal Legacy's and Southern's confidential, proprietary information and "rebrand" it for use at their new competing business. Hadamik Aff. ¶ 5 at Ex B.

- In March 2025, Barajas told a Company employee that he had instructed Raffles to begin drafting standard operating procedures, pay structures, and similar administrative documents for the new company. McComas Aff. ¶ 7. In or around March 2025, Raffles herself admitted to that same employee that she was creating documents for the new company. McComas Aff. ¶ 7.

- The Company also discovered that, in late 2024 and early 2025, Raffles downloaded numerous Southern documents, such as training videos and scripts. McComas Aff. ¶ 9 at Ex. G.

- Raffles' texts with Barajas show that, while employed by the Company, she was working on a "vendor packet" for Brian Wolff and Barajas:

9

| Sender | Recipient(s) | Date | Message |
|---|---|---|---|
| Leah Raffles | Barajas | 5/14/25  12:38 AM | I need that picture of you and Brian together that you used in ChatGPTT so that I can finish this damn vendor packet |

- Raffles continued to download Southern files after business hours even after Barajas, Skelton, and Knight had been terminated. McComas Aff. ¶ 9 at Ex. G.

- Since being fired, Knight has refused to return his two company-issued computers. McComas Aff. ¶ 10.  Legacy is concerned that Knight intends to help Barajas misappropriate company information and property, destroy evidence of his involvement in the conspiracy that is the subject of this complaint, or otherwise misuse the data and information on Knight's work laptops while they remain in Knight's possession illicitly.

## VII.    Barajas and His Co-Conspirators Have Tried to Hide His Violations and Destroy Evidence

Evidence exists that Barajas knows he is violating his restrictions and is actively hiding his actions.

- In March 2025, Barajas told a Southern employee that he intended to keep his name off of any company formation documents for the competing company, such as the limited liability company agreement, in order to avoid detection.  McComas Aff. ¶ 7.

- Raffles' text messages with Barajas and others confirm that it was Barajas', Raffles', and Wolff's plan that Wolff would be the partner of the new company at first, since Barajas was subject to a non-competition covenant.  Hadamik Aff. ¶ 5 at Ex. B.  Wolff intended to sign over equity to Barajas "as soon as his noncompete runs out."  Hadamik Aff. ¶ 5 at Ex B.

| Sender | Recipient(s) | Date | Message |
|---|---|---|---|
| Leah Raffles | XXXXXX2743 | 3/28/25 5:57 PM | I was gonna ask you because we can just rebrand your training content and sell it to them when they quit and start their own roofing thing They're gonna start a roofing business as Brian is the partner because the other guys don't have a noncompete. Only Barajas does so we're just gonna do it as Brian [Wolff] be in the partner and then he'll sign over equity to Barajas as soon as his noncompete runs out. |
| Leah Raffles | Barajas | 3/28/25 6:47 PM | Bc once you're outside of your non compete we can get you added to the LLC and then we can do gov contracts…minority veteran and a woman listed on the company….WE GETTING THEM ALLLLLLLLLL |

- Evidence exists that Raffles intentionally deleted her web browser history the night before she was scheduled to be interviewed by the Company.  *See* Hadamik Aff. ¶ 6.

11

## LEGAL STANDARD

Preliminary injunctive relief is appropriate where a party demonstrates "a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor." *Nobu Next Door, LLC v. Fine Arts Hous., Inc.*, 4 N.Y.3d 839, 840 (2005); *see* CPLR 6301. Pursuant to New York CPLR § 6301, "[a] temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss or damage will result unless the defendant is restrained before the hearing can be had." In evaluating whether preliminary relief is warranted, courts consider the broader circumstances in which that relief is sought, rather than applying a bright-line rule. *See Gerges v. Koch*, 62 N.Y.2d 84, 95 (1984) ("The determination of the availability of [injunctive] relief depends not alone of the right of the party seeking it but as well on the appropriateness of its issuance in the circumstances in which it is sought."); *see also Silberstein v. Aetna, Inc.*, No. 13 Civ. 8758(AJN), 2014 WL 1388790, at *3 (S.D.N.Y. Apr. 9, 2014). New York courts routinely grant preliminary injunctive relief in cases involving the breach of restrictive covenants entered into as consideration for the sale of a business. *See, e.g.*, *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 566 N.Y.S.2d 616 [st Dep't. 1991]); *Frank May Assocs. Inc. v. Boughton*, 281 A.D.2d 673 [3d Dept' 2001]); *BDC Mgmt. Sers., LLC v. Singer*, 144 A.D.3d 597 [1st Dep't 2016].

## ARGUMENT

Injunctive relief is appropriate here because Defendants Barajas and Wolff have actively conspired to violate, and Defendant Barajas has actually violated, certain covenants with which Defendant Barajas is legally obligated to comply. In doing so, Defendants Barajas and Wolff have caused and, in the absence of emergency relief, will continue to cause irreparable injury to Legacy.

I.     **Legacy Will Suffer Irreparable Harm Absent Temporary and Preliminary Injunctive Relief.**

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Bank of Am., N.A. v. PSW NYC LLC*, 918 N.Y.S.2d 396 (N.Y. Sup. Ct. 2010) (quoting *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001)). A harm is irreparable if it is "a continuing harm resulting in substantial prejudice caused by the acts sought to be restrained if permitted to continue …" *Chrysler Corp. v. Fedders Corp.*, 63 A.D.2d 567, 569 [1st Dep't. 1978]). And an irreparable injury is typically one "for which a monetary award alone cannot be adequate compensation." *Spinal Dimensions, Inc. v. Chepenuk*, 847 N.Y.S.2d 905 (N.Y. Sup. Ct, 2007).

"Irreparable injury is presumed from the breach of a non-competition agreement entered into to protect a buyer's purchase of a business and accompanying goodwill." *Manhattan Real Est. Equities Grp. LLC v. Pine Equity, NY, Inc.*, 16 A.D.3d 292, 292, 791 N.Y.S.2d 418 [1st Dep't. 2005] (N.Y. App. Div. 2005). This is because "non-compete and non-solicitation covenants strive to protect various difficult-to-quantify interests." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 673 (2d Cir. 2023). As a result, several New York courts have found irreparable injury where a restrictive covenant "was part of the consideration for the sale of an existing business with its goodwill." *Hay Grp.*, 170 A.D.2d at 399 (holding irreparable injury existed and granting preliminary injunction where plaintiff purchased defendant's company and continued to employ defendant until defendant quit and, in violation of non-competition covenant, accepted job with competitor); *Frank May*, 281 A.D.2d at 673; *see also JTH Tax*, 62 F.4th at 673 (noting that "[c]ourts across the country share [the] views" that "a loss of prospective goodwill that is both imminent and non-quantifiable can constitute irreparable injury").

Here, as in *Hay Group*, Legacy purchased Barajas's company and its coincident goodwill and continued to employ Barajas. As consideration for that sale, Barajas entered into the Purchase Agreement Covenants in order to safeguard the goodwill of the company that he had sold to Legacy. This is precisely the kind of injury that New York courts have recognized is irreparable and cannot adequately be remedied by a monetary award. *Hay Grp.*, 170 A.D.2d at 399.

Additionally, the Purchase Agreement contains a clause providing that each Seller agreed "that any breach or threatened breach by such Seller … will result in irreparable and continuing damage to [Legacy and Southern] for which there is no adequate remedy at law." *See* Purchase Agreement at § 6.12. In this regard, the Purchase Agreement expressly contemplates that Legacy "shall be entitled to seek injunctive relief, including a temporary restraining order, temporary injunction, preliminary injunction and/or permanent injunction, without first posting a bond and without proof of actual damages, to restrain any such breach or threatened breach." *See id.* Although such clauses are not dispositive as to the issue of irreparable injury, they are entitled to some weight in the analysis. *JTH Tax*, 62 F.4th at 674 (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)); *see also Ikon Office Sols., Inc. v. Usherwood Office Tech., Inc.*, 875 N.Y.S.2d 820 (N.Y. Sup. Ct. 2008) (noting that a contractual clause acknowledging that breach of a covenant will cause irreparable harm does not entitle a plaintiff to "a *per se* finding of irreparable harm," but may "arguably be viewed as an admission" that such harm would result). The presence of this clause therefore bolsters the conclusion that Legacy will suffer irreparable harm if Defendants' conduct is not enjoined.

The misappropriation of Legacy's trade secrets also presents an imminent threat of irreparable injury. "[W]here there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value

14

Case 1:25-cv-05319-LJL    Document 2-14    Filed 06/26/25    Page 20 of 28

of those secrets," irreparable injury may exist. *Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt Am., Inc.*, 74 A.D.3d 696, 697 (N.Y. App. Div. 2010) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Here, Barajas directed a co-worker to "rebrand" Legacy's proprietary and highly valuable training materials, such as videos and scripts, and Legacy's extensive standard operating procedures for reuse at Barajas's and Wolff's new business. Those efforts are likely to continue, and dissemination of those materials will continue to cause irreparable harm to Legacy, if not curtailed by this Court. This is especially the case since Raffles' text messages show that Barajas has continued his efforts to solicit Raffles even after Legacy terminated his employment.

For these reasons, Legacy will suffer irreparable and unquantifiable harm if Barajas's conduct is not enjoined.

## II. Legacy Is Likely to Prevail on the Merits.

To obtain a preliminary injunction, a plaintiff need only "set forth a prima facie case on the likelihood of success on the merits." *See Four Times Square Assoc., L.L.C. v. Cigna Invs., Inc.*, 306 A.D.2d 4, 6 [1st Dep't 2003]. Accordingly, a party seeking preliminary injunctive relief need not demonstrate that it is certain to prevail on the merits of its underlying claim; rather, courts are afforded the discretion to grant temporary relief even where questions of fact exist. *See id*. at 5, 6 ("It is well settled that a likelihood of success on the merits may be sufficiently established even

where facts are in dispute and the evidence is nonconclusive."). Legacy's significant likelihood of success on each of its claims against Barajas satisfies this burden.

### A. Legacy Is Likely to Demonstrate It Is Entitled to Relief as to Its Breach of Contract Claims.

"Covenants not to compete will be enforced if reasonably limited as to time, geographic area, and scope, are necessary to protect the employer's interests, not harmful to the public, and not unduly burdensome." *Ricca v. Ouzounian*, 51 A.D.3d 997, 998 (N.Y. App. Div. 2008). In the context of the sale of a business, however, the standard courts apply to determine whether a covenant is reasonable is relaxed. *See, e.g.*, *Town Line Repairs, Inc. v. Anderson*, 90 A.D.2d 517, 517–18 (N.Y. App. Div. 1982) ("As a general rule, … covenants not to compete pursuant to the sale of a business are not treated as strictly as those whose sole purpose is to limit employment."); *Cliff v. R.R.S., Inc.*, 207 A.D.2d 17, 19 [2d Dep't. 1982] (contrasting covenants in the sale-of-a-business context with those in a traditional employment agreement and noting that a restrictive covenant in the employment context must be intended to protect an employer's confidential information). Indeed, in this context, courts "apply the more relaxed standard of reasonableness applicable to post-sale covenants, rather than the stricter post-employment standard." *Eric Woods, LLC v. Schrade*, 998 N.Y.S.2d 306 (N.Y. Sup. Ct. 2014).

Here, the Noncompetition and Nonsolicitation Covenants are reasonably limited as to time given that they were entered into as part of the consideration for the sale of a business. Specifically, they prohibit competition and solicitation for five years after the Closing Date for Legacy's purchase of Southern. *See* Purchase Agreement §§ 6.7, 6.8. This is a reasonable period in which to restrict an employee and business seller's ability to compete against his employer. *See Eric Woods*, 998 N.Y.S.2d at 306 (enforcing a five-year noncompetition covenant); *Pontone v. York Grp., Inc.*,

16

No. 08 Civ. 6314 (WHP), 2008 WL 4539488, at *5 (S.D.N.Y. Oct. 10, 2008) ("New York courts have found three to five year restrictions reasonable in the context of the sale of a business."). And, given this reasonable time period, a covenant not to compete that lacks any geographic limitations may be enforceable. *See, e.g.*, *NYSARC, Inc. v. Syed*, 747 N.Y.S.2d 327, 329 (N.Y. Sup. Ct. 2002) (enforcing a covenant not to compete that "contains no geographic restriction"); *Brintec Corp. v. Akzo, N.V.*, 514 N.Y.S.2d 18, 19 [1st Dep't 1987] (holding five-year covenant with no geographic restriction enforceable in context of sale of business). And in any event, the geographic limitation sought by the injunction is also reasonable, as Barajas possessed confidential and trade secret information of Legacy and Southern, and Southern has operations across Arkansas, Florida, Georgia, Kentucky, Mississippi, Missouri, and Tennessee.[4]  *See* McComas Aff. ¶ 4; *see also Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014) (enforcing, in the context of the sale of a business, a five-year covenant in "the territories in which the products of the Business are sold," where those territories included the entire United States).

The Nondisclosure Covenant is also reasonable. A nondisclosure and confidentiality covenant need not contain a time limitation. *See Ashland Mgmt. Inc. v. Altair Inv. NA, LLC*, 59 A.D.3d 97, 105, 869 N.Y.S.2d 465 [1st Dep't. 2008]. The Nondisclosure Covenant is reasonably related to the legitimate business interests of Legacy in safeguarding its protected trade secrets and confidential information such as its training materials and standard operating procedures.

---

[4] Although the Noncompetition and Nonsolicitation Covenants do not contain geographic limitations, courts exercise less-exacting scrutiny of restrictive covenants entered into in the context of the sale of a business, *see Town Line Repairs*, 90 A.D.2d at 517, in order to protect the good will that is integral to the purchase of an already-existing business. On this basis, New York courts have previously enforced narrowed versions of restrictive covenants in order to give effect to the parties' intent. *See, e.g.*, *Deborah Hope Doelker, Inc. v. Kestly*, 87 A.D.2d 763, 764–65, 449 N.Y.S.2d 52 [1st Dist. 1982].  Accordingly, if the Court deems the Noncompetition and Nonsolicitation Covenants unreasonable as to their geographic scope, they can be still be enforced and, even in their narrowest iteration, would cover the violative conduct in which Barajas has engaged here.

There is evidence demonstrating that Barajas has violated these covenants. For example, the text messages recovered from Raffles' computer show that Barajas solicited Raffles to come work for his new competing business, going so far as to offer her a specific pay structure and ask her to sit for her GC license so that she could own a small equity interest in any business established using in reliance on her license. *See* Hadamik Aff. ¶ 5 at Ex. B. The text messages provided by the Southern employee who initially reported Barajas's misconduct suggest that Barajas also solicited Skelton and Knight about working at his new company. *See* Hadamik Aff. ¶ 5 at Ex. B. Additionally, texts from Raffles suggest that she and Wolff were taking steps to establish a corporate entity, but were intentionally leaving Barajas's name off of any documents associated with that entity in an attempt to avoid the requirements of the Noncompetition Covenant. *See* Hadamik Aff. ¶ 5 at Ex. B. This demonstrates Barajas's violation of the Noncompetition Covenant. Finally, the fact that Raffles downloaded Southern documents and later indicated that she and Barajas intended to repackage those documents supports Barajas's misuse of Legacy's and Southern's confidential and trade secret information. *See* McComas Aff. ¶ 9 at Ex. G; Hadamik Aff. ¶ 5 at Ex. B.

For these reasons, Legacy is likely to prevail on its claim that Barajas's actions constitute violations of the restrictive covenants contained in the Purchase Agreement.

### B. Legacy Is Likely to Demonstrate It Is Entitled to Relief as to Its Misappropriation of Trade Secrets Claim.

Moreover, Legacy is likely to prevail as to its claim for misappropriation of trade secrets. "The elements of a cause of action to recover damages for misappropriation of trade secrets are: (1) possession of a trade secret; and (2) use of that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Photonics Indus.*

*Int'l, Inc. v. Xiaojie Zhao*, 185 A.D.3d 1064, 1067, 127 N.Y.S.3d 569 [2d Dept 2020]. "A trade secret includes any compilation of information which provides the company with an opportunity to obtain an advantage over competitors who do not know or use it." *Id*. Courts applying New York law have held that similar information to that misappropriated by Barajas here, such as internal operating manuals and training materials, constitutes protected trade secrets. *See, e.g.*, *AIN Leasing Corp. v. Peat, Marwick, Mitchell & Co.*, 636 N.Y.S.2d 584, 586, 166 Misc.2d 902 (N.Y. Sup. Ct. 1995) (in discovery context, accounting firm's auditing manuals and procedures constituted protected trade secret); *Medidata Sol., Inc. v. Veeva Sys., Inc.*, No. 17 Civ. 589 (LGS), 2021 WL 467110, at *9 (S.D.N.Y. Feb. 9, 2021) (suggesting, at the summary judgment phase, that information such as training materials may constitute protected trade secrets under New York law).

Importantly, Legacy and Southern diligently protect their trade secrets from unauthorized disclosure or other misuse. This vigilance is demonstrated by the Handbook requiring employees to maintain best practices in order to safeguard Legacy's and Southern's trade secrets. *See* McComas Aff. ¶ 6 at Ex. C. Accordingly, in addition to entering into confidentiality agreements such as the Nondisclosure Covenant here, Legacy and Southern take care to ensure that their trade secrets remain secret.

As to the first element, Barajas had access to Legacy's valuable trade secret information, such as its training materials and standard operating procedures, during his tenure at the company. McComas Aff. ¶ 5. Moreover, he and Raffles downloaded and intended to reuse those materials for their own gain at the new competing company that they were working to establish. *See* McComas Aff. ¶ 9 at Ex. G; Hadamik Aff. ¶ 5 at Ex. B. And the second element is clearly satisfied here: the Purchase Agreement's Nondisclosure Covenant clearly compelled Barajas to maintain the confidentiality of information such as Legacy's protected training materials and standard

19

operating procedures. *See* McComas Aff. ¶ 4 at Ex. A (Purchase Agreement § 6.6). Specifically, the Purchase Agreement required that Barajas "shall not … communicate, divulge, disclose, furnish or make accessible to any Person any aspect of the Confidential Information … *or use* (other than for tax, legal, compliance or reporting purposes) *the Confidential Information in any manner or use any of the Confidential Information other than for the benefit of [Legacy]*." *See* McComas Aff. ¶ 4 at Ex. A (Purchase Agreement § 6.6(a)) (emphasis added). The Purchase Agreement defines "Confidential Information" as "all privileged, proprietary or confidential information (including, without limitations, oral, written and electronic information) related to or concerning [Southern], including, without limitation, *confidential techniques, process, recipes, formulations, know-how*, … and *sales, operating, marketing, and business plans*." McComas Aff. ¶ 4 at Ex. A (Purchase Agreement § 6.6) (emphasis added).

In direct contravention of this provision, Barajas has retained Legacy's Confidential Information, and text messages demonstrate his intent to repackage and reuse that information at his competing business. Accordingly, Legacy has pleaded a *prima facie* claim of misappropriation of trade secrets adequate to demonstrate that it is likely to prevail on that claim.

### III.    The Balance of Equities Favors Legacy.

In balancing the equities, courts must "determine the relative prejudice to each party accruing from a grant or denial of the requested relief." *Barbes Rest. Inc. v. ASRR Suzer 218, LLC*, 140 A.D.3d 430, 432, 33 N.Y.S.3d 43 [1st Dep't 2016]. Accordingly, the moving party must establish that "the injury to be sustained without the injunction is more burdensome to it than any alleged harm caused to the defendant through the imposition of the injunction." *Gasoline Heaven at Commack, Inc. v. Nesconset Gas Heaven, Inc.*, 191 Misc.2d 646, 743 N.Y.S.2d 825, 828 (N.Y. Sup. Ct. 2002).

20

Here, Legacy purchased Barajas's business in exchange for millions of dollars. As part of that transaction, Legacy expected to receive important benefits such as the goodwill, customer base, and employee know-how of the business and Barajas, who would remain employed by the newly formed subsidiary of Legacy. To that end, Legacy included the Purchase Agreement Covenants in the Purchase Agreement. Now, Barajas has intentionally violated clear contractual provisions. He bargained for the provisions contained in the Purchase Agreement, and he received a substantial benefit in exchange for agreeing to certain reasonable, standard provisions such as the Purchase Agreement Covenants. But Barajas wishes to take that promise back and flagrantly compete directly against Southern and Legacy, poach key Southern employees, and exploit and plagiarize Southern's protected training materials and standard operating procedures. To make matters all the worse, Barajas was doing all of this while actively working to conceal his involvement in these efforts, demonstrating his full awareness of the fact that this conduct violates the provisions to which he is bound under the plain terms of the Purchase Agreement. Equity weighs in favor of Legacy because curtailing Barajas's unabashed contractual violations and misappropriation of trade secrets would provide both parties with the deal they bargained for when they executed the Purchase Agreement.

The only alleged harm to Barajas of enjoining his conduct is holding him to the promises he made in the Purchase Agreement—in other words, there is no independent harm that would be imposed on Barajas. By contrast, Legacy will continue to suffer irremediable harm if Barajas's conduct is not enjoined. Accordingly, the equities weigh in favor of granting injunctive relief.

## **CONCLUSION**

For all of the foregoing reasons, Legacy respectfully asks this Court to issue a temporary restraining order and preliminary injunction against Barajas.

21

Dated: New York, New York                Respectfully submitted,

June 25, 2025                             /s/ *Melissa Colón-Bosolet*

Melissa Colón-Bosolet
mcolon-bosolet@sidley.com
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Phone: (212) 839-5300
Fax: (212) 839-5599
*Attorneys for Plaintiff*
*Legacy Restoration, LLC*

22

Case 1:25-cv-05319-LJL    Document 2-14    Filed 06/26/25    Page 28 of 28

## CERTIFICATE OF COUNSEL PURSUANT TO UNIFORM RULE § 202.8-B

I, Melissa Colón-Bosolet, hereby certify in accordance with Uniform Rule 202.8-b that the foregoing memorandum of law contains 5,963 words (exclusive of any caption, table of contents, table of authorities, and signature block), and complies with the applicable word count limit set forth at Rule 202.8-b(a).

In accordance with Rule 202.8-b(c), I have relied upon the word processing system's word count function in preparing this certification.

/s/ *Melissa Colón-Bosolet*

Melissa Colón-Bosolet

23