P6QDLegH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

LEGACY RESTORATION, LLC,

                Plaintiff,

          v.                              25 CV 05319

OSWALDO JUNIOR BARAJAS, ET
AL.,

                Defendants.
                                          Hearing
-------------------------------x

                                          New York, N.Y.
                                          June 26, 2025
                                          5:00 p.m.

Before:

                    HON. LEWIS J. LIMAN,

                                          District Judge

                         APPEARANCES

SIDLEY AUSTIN LLP
     Attorneys for Plaintiff
BY:  MELISSA COLON-BOSOLET
     MARGARET ALLEN

SAGE LEGAL LLC
     Attorney for Defendants
BY:  EMANUEL KATAEV

KUSHMAKOV LAW, P.C.
     Attorney for Defendants
BY:  EDUARD KUSHMAKOV

P6QDLegH

(Case called)

THE COURT:  Good afternoon.  This is Judge Liman.

Do I have counsel for the plaintiff, Legacy Restoration, on the line?

MS. COLON-BOSOLET:  Yes, your Honor.  Melissa Colon-Bosolet, and my colleague, Margaret Allen, one of my partners in our Dallas office, is also on.  Her pro hac vice will be also forthcoming.

THE COURT:  Do I have counsel on for the defendant, Mr. Barajas?

MR. KATAEV:  Good afternoon, your Honor.  Emanuel Kataev, Sage Legal LLC, as well as Edward Kushmakov.

MS. KUSHMAKOV:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

Can you help me with the pronunciation of your client's name?

MR. KATAEV:  I believe it's Barajas.

THE COURT:  Barajas.  So, the case was assigned to me. I have an application for show cause with a temporary retraining order.  I'll hear first from the plaintiff.

The first question that I've got is whether there's any dispute here, from the plaintiff's perspective, with respect to diversity jurisdiction.  The plaintiff is an LLC. The sole member of the plaintiff is alleged to be an LLC. There's no allegation with respect to the citizenship of the

P6QDLegH

member who is a member of the plaintiff LLC.  Maybe plaintiff can address that.  Then, assuming that there is diversity jurisdiction here, I'll hear from the plaintiff.

One question I'm going to have for all parties is whether there's any objection to me entering some form of the TRO that's been presented to me pending the submission of further briefings, so that we don't have to do this on an urgent basis.  Maybe I'll start with the diversity jurisdiction, then I'll hear from defense counsel whether we need to go through the exercise of hearing from plaintiff now or whether we can agree on a TRO and then schedule this out for next week or the week after.

Let me hear from plaintiff with respect to jurisdiction.

MS. COLON-BOSOLET:  Thank you, your Honor.

There is no dispute on the diversity jurisdiction.

THE COURT:  All right.  So let me hear from counsel for Sage.  It appears to me, from looking at the TRO, that it's asking for me to embody in a Court order the obligations that the plaintiff says that Mr. Barajas has under the employee handbook and under the purchase agreement.

Is there any problem with agreeing to that on a temporary basis, so that we can --

MR. KATAEV:  There are, in fact, a plethora of problems, your Honor.  I'm prepared to address some of them,

but I wish to note to the Court that I was only retained early this morning after receiving a call yesterday evening, and I have not been able to do a deep dive on the papers, because I was before Judge Locke this morning. But I am able to address a few reasons why I believe temporary interim relief is not warranted.

THE COURT: Okay. So, why don't I then hear from the plaintiff, and then I'll hear from defense counsel.

MR. KATAEV: That sounds good, your Honor.

MS. COLON-BOSOLET: Thank you, your Honor.

We believe that the evidence in this case has shown that Mr. Barajas violated certain provisions in a securities purchase agreement that he entered into with our client. Specifically, there are non-compete, non-disclosure, and non-solicit covenants, and we believe that Mr. Barajas's continued violation of those covenants has caused and will continue to cause irreparable harm to my client. And that's why we're seeking the relief we've sought today.

I'll provide a brief summary of the facts here, your Honor, and obviously answer whatever questions you may have.

Mr. Barajas founded a roofing and exterior restoration business called Southern in January of 2024. My client allegedly purchased Southern for more than 50 million from Mr. Barajas and certain other individuals. Mr. Barajas received more than $4 million in cash, and he also received

equity as part of that transaction.

And in connection with the sale and the purchase, Mr. Barajas agreed to several standard "non" covenants: Non-competition, non-solicitation, and non-disclosure.  In April of this year, a Southern employee reported to one of the executives at Southern that Mr. Barajas and the other named defendants, Leah Raffles, and Brian Wolff, as well as two other then current Southern employees, were planning to start a competing business.

Based on that information, Southern --

THE COURT:  You say a competing business.  There is a definition of what a competing business is from the agreement. What is it that you say that the defendant can't do in terms of a competing business, and what is it that you say he is doing?

MS. COLON-BOSOLET:  Sure.  There's a few aspects of that.  On the non-compete, it's section 6.7 of the agreement, and --

THE COURT:  Which that refers to business under the agreement.

MS. COLON-BOSOLET:  Correct.  And the scope is the agreement -- the scope is the type of business of the company that was sold, which is Southern.  And based on the text messages and related information that we have seen, your Honor, there's a few things.  The information that has been taken from -- confidential and trade secret materials that have been

P6QDLegH

taken from Southern are going to be used to form the basis for what appears to be a new company.  And based on the text messages, it appears to be in the same kind of business.

They're soliciting Southern employees and taking that knowledge of Southern's business to use it, including operating procedures and other documents, to form the basis for their formation documents for the new company.

THE COURT:  What exactly is the exterior residential and multi-family restoration business?  What does it do?

MS. COLON-BOSOLET:  What does Southern do?

THE COURT:  Well, I'm looking at the agreement, and the definition of business under the purchase agreement.  So just give me what, from plaintiff's perspective, what those words mean.

MS. COLON-BOSOLET:  Sure.  It's essentially a construction company, your Honor.  So, a renovations and remodeling kind of company.

THE COURT:  Okay.  I take it residential locations and not commercial locations; is that fair?

MS. COLON-BOSOLET:  I believe that is right.

THE COURT:  All right.  Continue.

MS. COLON-BOSOLET:  So, like I said, in April of 2025, a Southern employee reported this information.  Based on that information, Southern confronted Mr. Barajas.  He did not deny the allegations at the time.  Mr. Barajas was subsequently

P6QDLegH

terminated, along with the two other Southern employees that it appears were a part of this conspiracy to create a new business.

Earlier this month, the company spoke with Ms. Raffles and obtained permission to conduct an analysis of her company-issued computer for work, and those text messages, which were included as exhibits to our submissions here, showed that Mr. Barajas solicited Ms. Raffles to work for a new company.

There was a discussion about the new structure, the competing business, as well as Ms. Raffles using Legacy's confidential information to form an entity that kind of uses those documents as a basis of that.  Those discussions also talked -- all those text messages also reflect a reference to the non-compete at issue and waiting to include Mr. Barajas on certain documents or trying to evade detection, because of his non-compete.

We submit, your Honor, that we meet the elements for preliminary injunctive relief pending further briefing and a full hearing.  I'll start with irreparable harm, your Honor, which, as you know, is the single most important prerequisite here.

Irreparable harm is presumed when there's been a breach of a non-competition covenant that's executed pursuant to the sale and purchase agreement of a business, which is our

situation here.  There is ample evidence that Mr. Barajas did, in fact, breach those covenants, including the text messages in the Hadamik affirmation, as well as download logs from Ms. Raffle's laptop, which are also attached to the Hadamik affirmation, and the declaration from the company's chief operating officer, Nicole Smith, who talked about the inquiry and the additional documents taken from Southern.

The purchase agreement, your Honor, also contains a clause acknowledging that breach of those covenants would cause irreparable harm.  I know that issue is not dispositive on the issue of irreparable harm, but it is entitled to some weight, we submit, especially here in New York.

Similarly, the danger that Mr. Barajas will continue to misappropriate Legacy's trade secrets also poses a threat of irreparable harm.  Here, the forensic evidence shows that Ms. Raffles has downloaded company files to her computer and intentionally deleted her web browser history the day before she was to be interviewed by company counsel.  So text messages that were referred to on the company laptop show that Mr. Barajas and Ms. Raffles have taken those Southern documents, and it appears to be with an intent to rebrand them for the new company.  Additionally, David Knight, who was one of the employees who was terminated, is refusing to return his two company-issued work laptops at this time.

The second element, probability of success, we think

P6QDLegH

we will succeed on the merits of both of our claims.  I'll start with the breach of contract claims.  The non-competition covenant and on location covenant should be enforced here against Mr. Barajas.  They are both reasonably restricted in terms of time.  They're limited to five years, and courts have routinely held that covenants of this duration are reasonable and can be upheld, particularly, your Honor, in this context, the sale of a business, where the person who agrees to the non-solicit, non-competition is a seller and agreed to, essentially, protect the good will of the company by not competing and soliciting from the company that he sold and received money from.

Similarly, the non-disclosure covenant is also reasonable and limited to the company files and documents that the company had taken lengths to protect.  And it appears Ms. Raffles has downloaded with the intent to use it for the new company.  There's specific evidence, your Honor, that Mr. Barajas had violated these covenants.  As I said, we have offered the affirmation texts that we referred to from Ms. Raffles to Mr. Barajas that showed he was soliciting her, for instance, by offering her a certain payment structure. They talk about her getting the general contract license, which would be indispensable to the new business.  They also indicated that they would be amenable to Ms. Raffles getting a percentage of that, operating under her own license until it

P6QDLegH

was time that he can kind of come in on the papers given his non-compete.

Texts from Ms. Raffles to Mr. Barajas also show that they were taking steps to establish the corporate entity, as I said, intentionally omitting Mr. Barajas's name, and trying to find ways to avoid detection while he was working to start it up with Ms. Raffles.  As I indicated, there's also the record with the analysis of Ms. Raffles' laptop that shows the documents that contain confidential and trade secrets of the company, and text messages that show how these documents would be used.

In terms of the misappropriation, again, your Honor, as I said, there's the downloaded records and files, including the affirmation from the forensic investigator who retrieved the documents that showed the materials that were downloaded and discussed how those documents would be used.  We submit that that evidence, together, shows that Legacy is likely to prevail on misappropriation or trade secret claims at this time.

And then, finally, your Honor, I'll briefly address the balance of equities.  We think the balance of equity here is in our favor.  Here, Mr. Barajas received more than $4 million in cash in exchange for entering into these covenants to protect the good will of the company that he sold and that we paid, as I said, over 50 million for.  And, in this

instance, no harm would be done to Mr. Barajas if the Court is merely compelling him to comply with aspects of the agreement to which he voluntarily entered and is obliged to do. By contrast, the harm that will be suffered by Legacy, and the loss of good will and a misuse of it trade secrets would continue to harm Legacy beyond monetary damages, your Honor.

For those reasons, we are asking for injunctive relief at this time.

THE COURT: All right. Let me hear from defense counsel for Mr. Barajas.

MR. KATAEV: Thank you, your Honor.

So, first and foremost, it's important for me to stress, Mr. Barajas is the only one with a contractual restrictive covenant agreement. Ms. Raffles, as far as I understand, does not have such agreement. Neither does Mr. Wolff. Mr. Wolff was never an employee of Southern. So, to the extent that this order to show cause is issued, it is not being issued against anyone who is not under contractual obligations.

THE COURT: Let me interrupt you for a moment, because, as I understand the papers, and I'll ask them to clarify with respect to this, I think the only party that they are asking for relief against is Mr. Barajas. I'm not sure, frankly, how I can order relief against John Doe, entity number one. But I think it's just against Mr. Barajas.

Is that right, counsel for plaintiff?

MS. COLON-BOSOLET:  That's correct, your Honor.  The original relief sought was only against Mr. Barajas and the unknown entity.  I understand you don't think you can enjoin an unknown entity, and I think so long as the injunction includes Mr. Barajas and his inability to kind of solicit or create other companies that are competing, the scope of that would be fine and the order can reflect that.

THE COURT:  Okay.  Go ahead, counsel.

MR. KATAEV:  I'm looking at the language of docket entry 2.  On the bottom of page 1, it says, "preliminary enjoining defendants, their agents, et cetera."  It does not say Mr. Barajas.  That's why I raised that argument.

THE COURT:  That point is well taken, and I will make sure, if I issue an order, that the only order that I issue will be addressed to Mr. Barajas and not to the John Doe entity or to the other defendants.

MR. KATAEV:  Okay.  So, with that said, your Honor, my client, as conceded by the plaintiff, is not a shareholder, or officer, director of this new entity, which was, to my understanding, formed based on preliminary investigation.  It has only performed the one job so far in Minnesota.  It's my understanding that the lead and/or customer that the job was performed for had no relationship or contact with the plaintiff, which I refer to as Southern, because that's who was

P6QDLegH

bought, or Legacy.

So this is a very nascent business that was formed by my client -- Mr. Barajas's interest in the business, if any, is due to his completely separate business of owning and operating Airbnb rentals. He is looking for a way to affordably renovate his Airbnb rentals, working within his community in Nashville, Tennessee, to achieve those goals.

It's my understanding that the plaintiff, on the other hand, does not take small jobs such as that, and is, instead, focused on taking roofing jobs where insurance claims are involved and working with insurance adjustors and so on and so forth.

THE COURT:  So, explain that to me a little bit more. Is it your contention that Mr. Barajas would be using the bid -- the work of the nascent entity as a supplier to him?  I don't quite understand the point that you're now making, but you seem to think it's important, so explain it to me.

MR. KATAEV:  He wants to use it as a vendor, rather than being the founder or, you know, controlling individual of that entity.  It's an entity separate from him, and he has an interest in having it developed so that he can use it as a customer.  He is going to be the primary customer of this entity.

So, this is one aspect of things, but I also want to address the fact that, under New York law, which the parties

P6QDLegH

contractually agreed to was the choice of law provision for this, five years is considered unreasonable in temporal scope. New York codes typically limit these type of provisions to one year.

Moreover, there has to be reasonableness in both geographic scope and temporal scope, and unreasonableness in one is enough to void it altogether.  And, in this case, the geographic scope is worldwide.  Courts are reticent to grant, you know, injunctive relief in these circuits where it prevents a party from earning a living on its face, and, as a matter of law, these provisions for temporal and geographic scope are overly broad.

This is just a roofing industry.  It's nothing special or an upgrade to scientific needs, like a pharmaceutical company, where geographic scope is warranted, but, be that as it may, Mr. Barajas is not actually competing and is not soliciting in any way.  This is cobbled together by very thin evidence, based on hearsay statements made at a bar.  The actual individual who allegedly overheard the statements at the bar is not presented as a declarant, so that part of the evidence is hearsay.

As far as the deletion of information from the laptop, I spoke to Ms. Raffles 10 minutes before this hearing started. She reported to me that while she was an employee, in order for her to do her job, she had to connect her iCloud to -- her

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QDLegH

personal iCloud account to her work laptop in order to make things work, and because of that, her personal information was there.  So when she was asked to give her laptop over, she permissibly removed her personal information from it.  She did not delete -- based on what she told me, she did not delete any company information or anything of that nature.

The plaintiff, crucially, does not provide any evidence that any leads or customers have been diverted in any way.  It's basically a hodgepodge of circumstantial evidence, which does not lead to the conclusion that any violations were actually committed.

I want to point out that Ms. Raffles deleting her information is not a violation of Mr. Barajas's obligations under the contract, which are unenforceable as a matter of law. I will point out and will concede that there is a blue pencil provision, but I believe the application of the blue pencil provision would preclude relief.  So, potentially, plaintiff may proceed --

THE COURT:  So, explain that to me again, about why -- the point about the blue pencil provision.

MR. KATAEV:  So my understanding is that where there's a blue pencil provision, the Court has the authority to reduce a geographic and/or temporal scope to the least restrictive permissible scope, and the defendants --

THE COURT:  Counsel, you cut out.  You explained the

P6QDLegH

notion that -- the blue pencil provision, the Court has the authority to limit the non-compete.  Now you're going to explain to me why I can't order injunctive relief.

MR. KATAEV:  The defendants, respectfully, submit that the Court cannot do so without a fully developed record, in order to enable the Court to manifest the portents in the agreement.  The Court would need a fully developed factual record to determine what would be appropriate to limit the scope based on the law and on the facts, such as -- based on that alone, as a matter of law, the Court should not issue any interim relief, allow for full briefing -- if it's on an expedited schedule, so be it -- and then decide whether preliminary injunctive relief is warranted.

THE COURT:  Well, so, I understand the notion of, before I issue an injunction, that a full preliminary injunction -- that I should get more, perhaps, from the plaintiff, and certainly more from the defendant.  But the question for me now is why, based upon the records that I've got, with the response that you've given, I shouldn't issue a TRO that the duration of which can in no instance go beyond 14 days absent consent of the parties or some good cause.

Frankly, in this instance, what I would do is schedule a hearing for July 9th on whether either the TRO should be extended for good cause, or whether I should issue a preliminary injunction, giving you an opportunity to put in

P6QDLegH

papers.

Now, as I look at the document, the notion that your client was just going to be a customer seems to be contradicted by statements to the effect that he would get an interest in the business after the non-compete expired.  So it seems to contemplate him working with the business of which he would become an owner, and it also seems to be the case that there was some confidential information that was taken, and that he solicited Ms. Raffles to join this business.

So why, on the materials that I've got now, shouldn't I grant that limited relief?

MR. KATAEV:  I'll explain, your Honor.  The main aspect of this non-compete --

THE COURT:  Maybe point me to, also, why the text messages don't -- I should read them to say what they seem to be --

MR. KATAEV:  With respect to the first point, your Honor, the business --

THE COURT:  Ms. Raffles says, once you're outside of your non-compete, we can then get you added to the LLC, and then we can do gov. contracts, minority, veteran, and woman listed on the company, for getting them all.  It seems to me that Ms. Raffles thinks that this is a business that your clients otherwise, but for -- you know, your client, because of the non-compete, could not participate in.

MR. KATAEV:  I apologize, your Honor.  You cut out again.  If I understood correctly, you said that, based on the text messages, Ms. Raffles believes that Mr. Barajas is involved in the company.

Is that right?

THE COURT:  No.  What I'm saying is I'm responding to your argument that the business that Ms. Raffles is talking about engaging in did not compete with the plaintiff's business.

MR. KATAEV:  Correct, your Honor.  That's --

THE COURT:  That seems to be contradicted by the message from Ms. Raffles to your client to the effect of, once he is outside of his non-compete, he can be added to that business.  If it was not a competing business, there would be no reason to be concerned about the non-compete.  That I understand to be the plaintiff's argument in part.

MR. KATAEV:  Yes.  That's correct, your Honor, but the point remains that the main business of the new entity is not roofing, as it is the plaintiff's.  The main entity, my understanding is, has done roofing work, but not related to any insurance type of -- you know, paid for by insurance.  But the main business is HVAC, plumbing, water mitigation.  My client has been involved in this type of construction work mainly related to his property rentals, and so I don't -- I can't speak to text messages well enough, because, again, I did not

P6QDLegH

have a full opportunity to review everything, and it's on very short notice.  I only was retained officially this morning.  But what I understand is it's not a directly competing entity.

I think, if it's okay with the Court, I would like to address each subparagraph of the relief sought, starting with (A).

THE COURT:  Sure.

MR. KATAEV:  Okay.  So, for Mr. Barajas to induce or attempt to induce any individual away from the company, if the Court were inclined to grant that relief, I don't think that that would be an issue, as long as it's applicable only to Mr. Barajas, because he has a contractual obligation.

THE COURT:  Correct.

MR. KATAEV:  For (B) it would be the same thing, as long as it's limited to him.

For (C), it's the same thing.

THE COURT:  Okay.

MR. KATAEV:  (D), the same.

(E), the same.

THE COURT:  Okay.

MR. KATAEV:  (F), the same.  We would agree not to engage in illegal acts.

(G), same thing.

(H), would be the same, as would (I).

I think the problem we're going to run into is with

(J), your Honor.  My client is committed --

THE COURT:  Let's look at the language of (J), because I'm sure that there's some language that you'll suggest to me that your client could live with, and then I'll hear from the other side.  This is at least for the two-week period.

MR. KATAEV:  So, the one that is limited to the actual business that the plaintiff forms, which is roofing work, that's paid for by insurance proceeds from insurance companies, that's their bread and butter and pretty much the only thing they do.  Along with it doesn't -- as long as he is not prohibited from working with the company, to the extent that it performs HVAC, plumbing work, or water mitigation work, and so long as the order enjoining him from competing relates to the primary business, and my understanding the only business, of performing roofing work paid for through insurance proceeds, I think that, again, I could get my clients on board with something like that.

THE COURT:  All right.  Let me hear from plaintiff's counsel, and you might just limit yourself to (J).

MS. COLON-BOSOLET:  Thank you, your Honor.  Yes.  I appreciate the opportunity.

The language in (J) directly -- the same way the prior provisions come directly from the contract, so does (J).  The way we have defined the business in (J) is exactly the language used in the contract that Mr. Barajas signed.  So, the

P6QDLegH

definition of "business" in the contract is what we used here and what he already agreed to, and beyond just the scope of roofing and reading from it it says, the contract means the business of, and it includes everything -- and it includes everything we've included in (J), your Honor.

THE COURT:  Okay.  Just give me one second.

That does seem to be the language of the agreement, and the proposed TRO tracks the agreement in terms of the restrictions that it imposes on Mr. Barajas, so I am going to answer the TRO limited to Mr. Barajas.  It will not extend to the John Doe entity.  It doesn't extend to the other entities.

The TRO will last for 14 days.  In other words, it expires 14 days to the moment after I sign it.  I will date it and will put a time stamp on the TRO.

I'm also prepared to hear all of you on July 9th with respect to whether the TRO should be converted to a preliminary injunction or should be extended.  We're going to get a date -- a time from my deputy in a moment with respect to that.  I'm going to hop off of the call, and we'll get a time for you.

It seems to me -- a couple of things.  First of all, to the extent that the defendant wishes to oppose the preliminary injunction or an extension of the TRO for some period of time until after the issues can be more fully fleshed out, we need a date for the defendant to put in papers, and probably the day before July 9th for the plaintiff to put in

P6QDLegH

reply papers.

The second thing is that from my colloquy with the parties, it appears that there may be some room for compromise in this case so that -- the Court can enter a preliminary injunction that holds the defendant, Mr. Barajas, mostly to his contractual obligations, but if it turns out Mr. Barajas's business really is not in any way competing with the plaintiff, it may be that the plaintiff does not particularly care about it, or that there's a way for the parties to have some discussion so that, as frequently happens with non-competes, Mr. Barajas is permitted to do the business he wants to do, if it doesn't really compete, and he figures out some other way to make the plaintiff happy.  But I leave that up to all of you.

I'm going to put you all on hold right now, and I'll give you a time on --

MR. KATAEV:  Judge, I apologize, I just have two things briefly.

THE COURT:  Yes.  Go ahead.

MR. KATAEV:  Thank you, your Honor.

While the Court did address the temporal scope issue, in terms of this limited interim relief, I do want to address the fact that this is a worldwide injunction for geographic scope, and the contract also refers to the entire United States.  I would like this Court to take judicial notice, exercising the blue pencil provision, of the Legacy website.

P6QDLegH

It does not even list the State of Tennessee as an area that is served by Legacy.  Only Colorado, Illinois, Iowa, Minnesota, Missouri, and Nebraska.  The State of Tennessee is not listed.  Only those areas that are listed should be part of the geographic scope of the TRO.

Second, I haven't had an opportunity to talk with plaintiff's counsel, but of course we will endeavor to seek a compromise in a way that can relieve the burden on the Court to make these decisions.

And, finally, the Court cut out when it was discussing the deadlines for proposition -- I just wanted to clarify what is defendant's deadline to oppose preliminary injunctive relief.

THE COURT:  I have not set a deadline yet for that.  I will do that in a moment, once I get back on the line.

With respect to the geographic scope, I'm going to sign the TRO as it's drafted right now, but I hear the point that defendant is making with respect to a worldwide geographic scope.  I don't understand the defendant right now to be engaging in conduct that is worldwide.  I understand it to be simply Tennessee.  But I'm prepared to hear the parties on July 9th with respect to whether there should be some geographic limits with respect to any injunctive relief.

I'm also prepared to hear you with respect to the blue pencil issue, and whether there are problems with respect to

P6QDLegH

the non-compete that prevent me from issuing further injunctive relief at all with respect to it.  So that issue is entirely open to you.  But for the time, from now until July 9th, your client is going to be held to his contractual obligations as drafted.

I'm going to put you on hold for a moment.

MR. KATAEV:  Thank you.

(Pause in proceeding)

THE COURT:  All right.  I'm prepared to see you at 9:30 on July 9.

Does that work for defense?

MR. KATAEV:  I'm checking, your Honor.

Your Honor, I drop off my two young girls at summer camp at East Hills in Roslyn at 8:30.  I don't know if there's enough time to get there by 9:30.  If we could do it a little later in the day -- 10:30 would be fine, but anything later than 10:30 would also work.

THE COURT:  I think I can make 10:30 work.

Mr. Fishman, can we make 10:30 work?

THE DEPUTY CLERK:  10:30 is fine.

THE COURT:  Does that work for plaintiff?

MS. COLON-BOSOLET:  Yes, it does, your Honor.

THE COURT:  So, 10:30 on July 9, in my courtroom.

How quickly can defendants serve opposition papers?

MR. KATAEV:  I think July 3rd would be ideal.

P6QDLegH

THE COURT:  That's fine with me.  I'm going to order that the -- to the extent that there is a reply, can plaintiff reply by July 7?

MS. COLON-BOSOLET:  Yes.  That's fine, your Honor. Thank you.

THE COURT:  All right.  The TRO will issue.  It will issue only against Mr. Barajas.  I will have it filed on the docket and timestamped.

Is there anything else from plaintiff that we should address today?

MS. COLON-BOSOLET:  Nothing else, your Honor.  Thank you.

THE COURT:  Anything else from defendant?

MR. KATAEV:  Nothing further, other than thank you, your Honor.

THE COURT:  Thank you both for making yourself available and for your very helpful arguments on both sides. Have a good afternoon.  Thank you.

(Adjourned)