UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------- X
:
LEGACY RESTORATION, LLC,                      :
:
*Plaintiff*,                                  :
:        Case No. 1:25-CV-05319
v.                                            :
OSWALDO "JUNIOR" BARAJAS,                     :        **DECLARATION OF**
USA CONTRACTING CO, LLC, LEAH                 :        **MICHAEL MCCOMAS**
RAFFLES, AND BRIAN WOLFF,                     :
:
*Defendants*.                                 :
:
:
:
------------------------------- X

I, MICHAEL MCCOMAS, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am over 18 years of age and am employed as the Group President at Legacy Restoration, LLC ("Legacy").

2. The facts stated in this declaration are based on my personal knowledge and my review of relevant business records created or maintained in the ordinary course of Legacy's business activities.

3. I submit this declaration in support of Legacy's request for a preliminary injunction.

**A. Legacy's Purchase of Southern**

4. Oswaldo "Junior" Barajas founded SNR Global, LLC d/b/a Southern Roofing and Renovations and its affiliates ("Southern"), which is an exterior remodeling company. On January 5, 2024, Legacy purchased Southern for over $50 million pursuant to the Contribution and

1

Securities Purchase Agreement (the "Purchase Agreement"), and Southern became part of Legacy's family of companies (the "Company").

5.      The Purchase Agreement was entered into primarily for the purpose of acquiring the talent, business expertise, sales network, and customer goodwill of Southern's employees, including Barajas.

**B.  The Company's Business**

6.      The Company is a large company in the roofing and exterior renovation industry, with operations in the following states: Legacy operates in Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, and Wisconsin; Southern operates in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Mississippi, Missouri, and Tennessee.

7.      The Company is a full-service roofing and exterior renovation business.  It is in the business of exterior residential and multi-family restoration (including but not limited to the repair or replacement of roofing, siding, gutters and windows), residential and multi-family renovations, exterior residential and multi-family maintenance and related services, sales and lead generation activities.  It specializes in the assessment, repair, and maintenance of roofs, with a particular focus on residential and multifamily buildings.

8.      As part of its package of services, the Company will typically replace all component parts of a roof. This will typically include vents and components intended for drainage, such as gutters, downspouts, and other drainage components.

9.      With respect to roofing, some of the Company's customers pay using insurance proceeds, along with the payment of the insurance deductible by the homeowner.  Other of the

Company's customers do not use insurance coverage, and pay out of pocket; these customers are referred to in the industry as "retail." In addition, there are also customers who may pay a portion of the cost out of pocket, while insurance covers the rest. Legacy works on jobs involving each of these types of pay structures.

**C.  The Company's Proprietary Information and Trade Secrets**

10. The roofing and exterior renovation industry is unique because many practices that would, in other industries, be used to differentiate among different companies are standardized in the roofing and exterior renovation industry. For example, price is not typically a differentiator due to the standardizations imposed by insurance companies.

11. As a result, the key differentiating factors among roofing and exterior renovation companies are the training methodologies and sales processes that each company creates and the talented salesforce that is trained using those methodologies. Another differentiating factor is the training and methodologies of a company's personnel in terms of negotiating with insurance companies on behalf of homeowners.

12. Over its many years in the roofing industry, the Company has developed a number of unique, economically valuable processes, procedures, methodologies, and techniques that separate it from its competitors.  For example, our salespeople are specifically trained at selling add-on products that can increase the average revenue of a sale 10% or more.

13. The Company has also cultivated a unique and proprietary process for completing a job, involving splitting the process up between multiple teams of employees with expertise in a particular phase of the process. Each team is provided specialized training tailored to their role in the process, such as job origination, customer service, and insurance negotiations. This business

3

model is unique in the industry; the Company is the only provider in the industry to have developed and implemented it with such success. The Company has spent significant time and resources developing proprietary methods for maximizing the productivity of each step of this sales and servicing process.

14. In addition, the Company sets itself apart from other roofing businesses because it has established separate departments with expertise in particular nuances of the roofing industry. For instance, while most roofing companies expect their salespeople to complete steps such as negotiating with insurers, the Company has a separate department dedicated to that part of the process. This department has received specific training in order to optimize its efficacy. Similarly, the Company employs project coordinators who specialize in collecting all of the information for a job and working with suppliers to ensure all materials are procured. These separate departments are a critical part of the Company's singular approach to roofing and exterior remodeling work.

15. In general, an average salesperson working in the industry can expect to account for approximately $600,000 to $800,000 dollars' worth of revenue for his or her employer in a year.

16. At the Company, due to these proprietary methodologies and structures, our salespeople routinely exceed $1.5 million per salesperson per year, and some of our best salespeople can bring in more than $3 million in one year.

17. When insurance companies deny a claim for coverage for roof repair or replacement, the customer can appeal that decision. The Company can provide assistance in introducing customers to the appraisal process, and can leverage our relationships with appraisers to facilitate connections between customers and appraisers. Customers are then empowered to

make a decision whether to pursue the appraisal process. The Company also provides assistance at the appraisal meetings in identifying damage that should be covered by insurance. As a result of our unique approach, we are able to overturn approximately 30% to 40% of denials, which makes us a leader in the industry. The issuance of a denial letter therefore does not typically signal the end of the Company's involvement in a job.

18. Our competitive advantage in these areas, derived from the specialized and unique processes, procedures, and methodologies discussed above, has developed over many years and using a tremendous amount of resources, including time and money.

19. Those proprietary processes, procedures, and methodologies are embodied in the files that Raffles downloaded, many of which are Legacy files rather than Southern files, which Raffles had no part in creating and would have been of minimal value in performing her work at Southern.

20. When Legacy purchased Southern, Legacy began integrating Southern into its business model and is in the process of fully implementing these unique processes, procedures, methodologies, and techniques at Southern, such that the same proprietary information applied across the entire Company. In her roles, Raffles helped coordinate training of our salespeople, and was involved with all manner of customer contracts and relationships.

**D. Barajas' Knowledge of the Company's Trade Secrets and Confidential Information**

21. In his roles at Southern, Barajas had access to the Company's trade secrets and other confidential and proprietary information, especially in his capacity as a supervisor at the time that Legacy's unique methodologies were being introduced at Southern.

22. Barajas would have learned of the Company's unique processes, procedures, methodologies, and techniques, which are employed across the Company.

23. Another differentiating factor among companies in our industry is the cost of supplies. There are 3 to 4 major roofing suppliers, and the cost of supplies typically depends on the volume of supplies ordered. The Company is able to obtain a significant discount on the cost of supplies due to the large volume of its orders. Barajas, as a longtime player in the roofing industry and founder of Southern, would potentially be able to leverage his relationships with roofing suppliers to obtain favorable pricing for roofing supplies.

**E. Files Downloaded by Raffles Containing Legacy Trade Secrets**

24. Between December 2024 and June 2025, Raffles downloaded more than 50 unique files from the Legacy SharePoint.

25. In my experience, it is not typical for employees to download files from the Company's SharePoint file sharing system. It is also not recommended that employees save anything to the hard drives of their computers, because the Company provides each employee with their own Microsoft One Drive to use for saving and transferring files.

26. I have reviewed the audit logs reflecting these downloads and the files that were downloaded.

27. I have prepared a chart categorizing each of these downloaded files for the Court's reference. It is attached as **Exhibit 1**. A true and correct copy of the audit logs showing what was downloaded is attached as **Exhibit 2**.

28. Files that include "SRNR" in the file title are Southern-specific files.

29. Files that include "LRSR" in the file title are Legacy-specific files.

30. Raffles downloaded both Southern and Legacy files in several categories.

**(i)    Customer Contracts**

31. First, Raffles downloaded several customer contract documents from at least five different states. Because each individual state has different requirements for the information that must be collected when initiating a roofing job, Legacy has expended substantial resources to craft customer contract documents tailored to each state. At great expense, Legacy has engaged lawyers and compliance experts to ensure that each and every customer document reflects the requirements of the relevant state. Raffles downloaded documents for Alabama, Florida, Minnesota, Missouri, and Kansas. True and correct copies of these documents are attached as **Exhibits 3 to 8.**

**(ii)   Sales Team Employee Rosters**

32. Second, in one day, Raffles downloaded the employee rosters for every single one of Southern's five sales territories. Knowing the names, titles, and, in some cases, contact information for every single sales employee at Southern would be very valuable information for competitors, who could poach Legacy's best producers and take advantage of Legacy's unique techniques, which involve training employees in a specialized phase of the job pipeline. Separately, Raffles also downloaded SOPs and guidelines for onboarding personnel, as well an employee life cycle map. True and correct copies of these documents are attached as **Exhibits 9 to 15.**

33. Information about the Company's salesforce is the life blood of the Company. A competitor could use this information to poach the Company's top performers. Disclosure or misuse of this information would cause significant competitive harm to the Company.

**(iii)    Training Videos and Materials**

34. Third, Raffles downloaded a number of Legacy training videos and several training materials. Each of these training files were put together using substantial time and resources on Legacy's part. These training videos and materials could be used by a competitor to help train their salespeople on the Company's specialized sales and insurance negotiation methods. They are confidential and proprietary information of Legacy, and they are kept securely on Legacy's internal file sharing platform. True and correct copies of these files are attached as **Exhibits 16 to 32.**

**(iv)    SOPs**

35. Fourth, Raffles downloaded a number of operating procedures, pay structures, and similar documents detailing the Company's unique process for completing a job. This category also includes department-specific processes and procedures. The content of these files was not created by Raffles, and instead they contain information cultivated by Legacy personnel over many years of working in the roofing industry. True and correct copies of these files are attached as **Exhibits 33 to 58**. Specifically, they include:

- SOPs relating to Legacy's unique approach to dealing with specific insurance companies, which Legacy has developed through years of industry expertise and knowledge.

- SOPs relating to Legacy's unique methodologies for using critical digital platforms.

- SOPs relating to payroll and salary breakdowns.

- SOPs relating to the PC Department, a department within the Company that is the key to Legacy's unique techniques and procedures.

- SOPs relating to every type of customer payments remitted to the Company, accurately recording those payments, and invoicing.

- SOPs and template forms relating to the management of a job from origination to completion.

36.  These files reflect highly confidential trade secrets. They could not be generated by simply inputting a generic prompt in ChatGPT. Instead, they could only be created using the drafting assistance of artificial intelligence by crafting a detailed and specific prompt that in and of itself would contain proprietary information about the Company's unique processes and methodologies. Because this confidential information is not known to competitors and reflects processes and methodologies not employed by others in the industry, the drafter must teach the information to ChatGPT in order to elicit any kind of useful output. Alternatively, the drafter would need to input a generic prompt and rewrite the equally generic output to reflect the Company's sensitive information.

37.  As discussed above, Legacy has cultivated unique processes, procedures, methodologies, and techniques that separate it from its competition. They make Legacy more profitable because its salesforce is more effective and its track record of obtaining insurance coverage is stronger than those of competitors. The unique combination of information in these

files provides Legacy with a distinct competitive advantage in the roofing and exterior renovation industry.

38. This information is not generally known outside of Legacy. Legacy's competitors would benefit greatly from knowing this information and would have to expend significant time and resources to recreate it.

39. Together, these files represent the entire life cycle of a customer file at Legacy, and someone with access to this information could replicate Legacy's unique procedures and unfairly undercut Legacy in the industry.

40. Legacy maintains the secrecy of all of this information by maintaining it on a secure file sharing platform that requires users to log in and authenticate their identity before accessing it. Legacy also generally imposes confidentiality and nondisclosure obligations on employees and rigorously enforces those obligations, for instance by bringing this lawsuit.

41. Finally, Raffles downloaded a travel policy and the Southern branding guide. True and correct copies of these files are attached as **Exhibits 59 and 60.**

## F.  Barajas' Termination

42. Barajas was terminated due to his involvement in the events giving rise to this suit, as set out in Legacy's First Amended Complaint.

43. Barajas was not terminated due to any complaints he may have raised.

## G.  Raffles' Termination

44. The Company terminated Raffles' employment on June 25, 2025, the same day it filed this lawsuit.

10

45. Raffles was terminated due to the allegations set forth in Legacy's First Amended Complaint.

46. She was not terminated due to any complaints she may have raised.

47. At the meeting about her termination, the Company requested that Raffles return all Company property, including her Company-issued computer.

48. She did not return her computer until several days later, and only after another request was sent through legal counsel. The Company has incurred costs by retaining FTI Consulting to conduct a forensic investigation to analyze Raffles' Legacy-issued computer, both before and after her termination of employment.

49. Raffles also has failed to return her Company car. The Company requested that she return the vehicle through legal counsel on July 1, 2025. I understand through legal counsel that she is willing to relinquish the vehicle to Legacy.

**H. Publicly Available Information About Barajas' and Wolff's Business**

50. Attached as **Exhibit 61** is a true and correct copy of the Articles of Incorporation of USA Contracting Co, LLC ("USA Contracting").

51. Attached as **Exhibit 62** is a true and correct copy of an image of the Google Maps page for USA Contracting, located at 711 Providence Blvd., Clarksville, TN.

52. Attached as **Exhibit 63** is a true and correct copy of an image of Google reviews for USA Contracting.

53. Attached as **Exhibit 64** is an image of a news video from News Channel 5 Nashville available online. The article and video can be found at the following web address: https://www.newschannel5.com/news/madison-business-owners-say-theyre-facing-major-financial-losses-due-to-break-ins.

I. **Wolff's Rental Business Signs 9 Customer Contracts with the Company**

54. In or around March 2025, nine rental homes were referred to Southern to complete roofing work.

55. For each home, a Southern Customer Agreement was executed by a representative of the homeowner. True and correct copies of each of those customer agreements are attached as **Exhibit 65**.

56. Additionally, as part of the sales process, either a Hover or EagleView file was purchased by the Company for each home. Hover and EagleView are the two principal providers of satellite imaging for roofing companies, which roofing companies use to take measurements of a roof when evaluating what work will need to be performed. True and correct copies of those files for these homes are attached as **Exhibit 66**.

57. For several of these homes, the insurance company issued a denial letter denying coverage for the roof repairs. True and correct copies of images of pages of those denial letters are attached as **Exhibit 67**.

58. The customer representative stopped corresponding with Southern in or around April 2025. Southern never completed the work for these homes.

12

### J.  Alex Skelton and David Knight

59. During his time at Southern, Alex Skelton was the Director for all of Southern's territories, overseeing operations in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Mississippi, Missouri, and Tennessee. David Knight was a Regional Sales Director covering offices in Mississippi, Alabama, Georgia, and Tennessee. Upon information and belief, Skelton and Knight each reside in Mississippi.

60. A customer reported to Legacy that Knight directed the customer to drive to the bank and withdraw $9,692 in cash to satisfy the customer's payment due to the Company, while Knight accompanied the customer and waited in the parking lot of the bank. The customer reports that the customer gave Knight the cash.  Knight did not remit that cash to the Company, and the customer's account remains unpaid in the Company's system.  A true and correct copy of an image of a text message from that customer is attached here as **Exhibit 68**.

61. On April 25, 2025, the Company, through legal counsel, sent Skelton and Knight letters. True and correct copies of those letters are attached here as **Exhibits 69 and 70**.

62. The Company never received a response to those letters.

63. The Company, through legal counsel, sent a second set of letters to Skelton and Knight on June 27, 2025. True and correct copies of those letters are attached here as **Exhibits 71 and 72**.

64. True and correct copies of Skelton's and Knight's email correspondence with Company legal counsel are attached as **Exhibits 73 and 74**.

## K. Personnel Information

65.     Personnel information about Barajas, Raffles, Skelton, and Knight is reflected below.

| Name | Title at time of termination | Description of Role | Salary |
|---|---|---|---|
| Barajas | Regional Sales Director | Oversaw salespeople in Territory 1. | $150,000 |
| Knight | Regional Sales Director | Oversaw salespeople in Territory 4, including Mississippi, Alabama, Georgia, and Tennessee | $150,000 |
| Raffles | Director of Administration | Oversaw all office managers (12 reports) at each of Southern's offices and also helped create the Company's SOPs and training materials across the entire Company. | $145,000 |
| Skelton | Director of Sales | Oversaw all Regional Sales Directors | $160,000 |

I declare under penalty of perjury that the foregoing is true and current. Executed on this 7th day of July, 2025.

_____
Michael McComas