UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LEGACY RESTORATION, LLC,

                Plaintiff,

  -against-

OSWALDO "JUNIOR" BARAJAS, USA CONTRACTING CO, LLC, LEAH RAFFLES, and BRIAN WOLFF,

                Defendants.
------------------------------------------------------------------X

Case No.: 1:25-cv-5319 (LJL) (OTW)

**DECLARATION OF DEFENDANT LEAH RAFFLES IN SUPPORT OF DEFENDANTS' MOTION TO DISQUALIFY COUNSEL**

Leah Raffles declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am a Defendant in the above-referenced case.

2. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge.

3. I also respectfully incorporate by reference the facts set forth in my prior declaration dated July 3, 2025. See ECF Docket Entry 14-4.

4. I am a former employee of Southern Roofing and Renovations ("Southern"), whom I understand Plaintiff purchased in January 2024.

5. I was terminated from Southern on or about June 25, 2025.

6. Shortly prior to being terminated, I was misled by Plaintiff into a meeting with Margaret Hope Allen, Esq. ("Allen") and an associate attorney, both of Sidley Austin LLP ("Sidley"), for over two (2) hours, who I now recognize is Plaintiff's attorney in this case.

7. On June 2 or 3, 2025, I got an email from Gerry Greene ("Greene"), who controls compliance for Legacy, Southern, and a related company; Michael McComas ("McComas") and John Falls ("Falls") were copied on the email from Greene as well.

8. The email referenced an annual compliance meeting scheduled for June 5, 2025, where key stakeholders were being selected for individual meetings with Greene.

9. I found this odd because I was not a stakeholder of either Legacy or Southern.

10. Moreover, this conflicted with a scheduled training I was hosting for a critical production rollout that was going live on or about June 5, 2025.[1]

11. I asked to have this meeting rescheduled in furtherance of the production rollout, but Greene said it could not be rescheduled; Falls and McComas were each on that email, as well.

12. However, the day before the meeting, Greene abruptly cancelled it without explanation.

13. At some time between June 9 and June 11, 2025, I received an email stating that the meeting was rescheduled to June 12, 2025 at the Nashville office.

14. At or around the same time, I was told by an employee that she does not feel safe and may be retaliated against if she speaks up.

15. I was told by this employee that two individuals (not Barajas, Alexander Skelton, or David Knight) were conspiring to start their own roofing company.

---

[1] I also heard testimony by McComas on July 9, 2025 that he was not aware of why I would be accessing any production documents, Legacy's standard operating procedures ("SOP's"), and its training materials. However, that is an absurd falsity. McComas was aware that I worked with Rachel Kraft ("Kraft"), with whom McComas works closely. Kraft was the director of the production coordination department. I worked closely with Kraft and created educational and training materials for the production rollout. This included using Legacy's SOP's and training materials to create Southern's SOP's and training materials as part of Southern's integration into Legacy's processes. Specifically, this was in furtherance of allowing Southern to use Legacy's production coordinators, which Southern did not have protocols for.

16. I immediately reported this to James Thomas Shaheen ("Shaheen") who said he was reporting it to Greene.

17. I then received an email from Greene saying our meeting was being moved to a hotel conference room as a result of my report.

18. This is the first time I saw Ms. Allen's email in the "CC" field.

19. However, I did not know who she or Sidley was, nor was I informed.

20. The same day, I received an email from Greene asking me to bring my laptop to this feigned "compliance" meeting to "run through various types of documents related to the business cycle at [Southern] that we understand are relevant to [my] day-to-day responsibilities" and that bringing my laptop would be helpful to "walk through the documents."

21. Either that evening or the morning of next day, Allen – without so much as an introduction or explanation of who she was – emailed me the meeting location.

22. On June 12, 2025, expecting to meet with Greene, I walked into the room occupied solely by Allen.

23. To my surprise, Greene was not there.

24. Instead, I was alone in a room with Allen and an associate attorney at Sidley Austin, who attended virtually.

25. As such, I believe the meeting between myself, Allen, and the associate attorney may have been recorded by the associate attorney.

26. When I was mislead into meeting with Allen, I was not told that she was seeking information to prepare a lawsuit against me or any of the Defendants.

27. Allen did not tell me the true purpose for the meeting, either.

28. She hid the fact that her intentions and the purpose of the required "compliance" meeting was to commence this case.

29. I was not represented by an attorney at the meeting, nor was I offered an opportunity to have an attorney present for the meeting.

30. Had I been aware, I would have vehemently declined to meet with Allen without my own attorney.

31. I note that there are a plethora of discrepancies between what I told Allen during that forced meeting and the vile misrepresentations she made in the papers she submitted to this honorable Court.

32. I believe that any recording of our meeting will make clear that I did not misappropriate any purported trade secrets and Allen's submissions to the Court are false.

33. Most critically, I explained to Allen that my job often requires me to access documents stored on a cloud because I work remotely.

34. This includes SharePoint, OneDrive, and cloud storage programs.

35. Often times, for the ease of editing, documents need to be downloaded because they work better with the desktop versions of Microsoft Word and/or Excel rather than the web or online versions.

36. I explained this to Allen in great detail, even noting specifically why it is harder to operate out of the web versions than the desktop versions.

37. Similarly, Allen presented me with a log, which I believe was produced in this case.

38. A particular entry on the log was highlighted in red.

39. This entry contained information concerning a late-night download I made of Southern's file transfer SOP in .pdf format, which I understand is also at issue in this case.

4

40. This particular document solely existed as a PDF file.

41. This SOP explains how Southern transfers files that belonged to people that were terminated or left Southern so that Southern can recoup funds spent on those individuals' salaries which should not have been paid post-termination.

42. I explained to Allen that, in December 2024, in furtherance of Southern's January 2025 restructuring deadline, I was tasked by Shaheen to edit all documents, including SOP's, that would have been affected by employee title changes after the restructuring went live.

43. Notwithstanding, because PDF files cannot be edited in SharePoint, I had to download that SOP which was highlighted in red in Plaintiff's exhibit.

44. This is also why Plaintiff provided us with paid subscriptions to Adobe Acrobat's premium features.

45. I asked Allen for a pen to go through the log and explain my reasons for every single file I downloaded.

46. Allen declined my offer to do so.

47. I offered to at least explain why I downloaded the file related to the highlighted entry, to which Allen replied, in sum, that what I said concerning that entry was "fine."

48. Moreover, I told Allen that I made reports concerning several improprieties at Southern, particularly concerning what I believed to be insurance fraud and employees seeking to open competing roofing companies, and recommended where she should point her investigation.

49. It appears that my report fell on deaf ears as this was not what she was investigating.

50. Despite Ms. Allen telling me that I was safe and we were in a "safe space," I felt uncomfortable and for good reason.

51. Considering the foregoing chain of events, it is clear Allen exerted undue influence upon me at a meeting she held alone with me under false pretenses.

52. Allen is a witness in this case, and I believe she, the associate attorney, and others at Sidley have discoverable material that can, at a minimum, show that I did not misappropriate any trade secrets.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 15, 2025.

Leah Raffles (Jul 15, 2025 00:35 CDT)
Leah Raffles