UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LEGACY RESTORATION LLC,

                Plaintiff,

        v.                          25 Civ. 5319 (LJL)

OSWALDO JUNION BARAJAS, et al.
                                    Hearing

                Defendant.
------------------------------x
                                    New York, N.Y.
                                    July 9, 2025
                                    10:30 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                    District Judge

                        APPEARANCES

SIDLEY AUSTIN LLP
     Attorneys for Plaintiff
BY:  MARGARET HOPE ALLEN
     MELISSA COLON-BOSOLET

SAGE LEGAL LLC
     Attorney for Defendant
BY:  EMANUEL KATAEV

KUSHMAKOV LAW PC
     Attorney for Defendant
BY:  EDUARD KUSHMAKOV

Also Present:

ANIKA KHEMANI, ASSOCIATE (Sidley)
CLAIRE NEVILL, SUMMER ASSOCIATE (Sidley)

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

(In open court; case called)

DEPUTY CLERK:  Counsel for plaintiff, please state your appearances for the record.

MS. ALLEN:  Good morning, your Honor.  This is Margaret Allen from Sidley Austin LLP.

MS. COLON-BOSOLET:  Melissa Colon-Bosolet, also from Sidley Austin.

MS. ALLEN:  And today we have with us a first-year associate, newly graduated from Georgetown, Anika Khemani, who is barred in New York but not before this Court yet.

And there is also Claire Nevill, who is still a law student at University of Texas.

THE COURT:  Welcome.

For defendants.

MR. KATAEV:  Good morning, your Honor.  Emanuel Kataev of Sage Legal LLC for the individual defendants Barajas, Raffles and Wolff.

MR. KUSHMAKOV:  Good morning, your Honor.  Eduard Kushmakov from Sage Legal on behalf of the individual defendants as well.

THE COURT:  We are here for the hearing on a preliminary injunction.  I issued an order to show cause about 13 days ago in a TRO that went with it.  I also received a letter yesterday from defendants asking that the individual defendants appear remotely, and I gather they are able to

listen in, is that correct?

I'm asking defense counsel now.

MR. KATAEV:  That's correct, your Honor.

THE COURT:  Okay.  Before we get started into the substance, let me hear from the plaintiffs what they intend to present and rely upon at the hearing, and their position with respect to defendant's request for remote testimony, and then I'll want to understand defendants' request.

On my mind is whether the parties are prepared to rest on the papers that are in front of me or whether instead they wish a hearing and the terms of a hearing.  Let me hear from plaintiff.

MS. ALLEN:  Thank you, your Honor.  Plaintiff Legacy is prepared to rely solely on the papers provided that the testimony and evidence submitted with the papers is admissible. We also have no objection to witnesses appearing by video or by phone as well.  We have witnesses who are able to appear either in person or by video or by telephone as well.  It's really up to, I think, your Honor's convenience and option.  We're fine resting on the papers, but if your Honor has more questions or would like to hear from witnesses, we are fine doing that too.

THE COURT:  All right.

Let me hear from the defendants.

MR. KATAEV:  Your Honor, the reply papers that were filed by the plaintiff indicate --

THE COURT:  You have to speak up, sir.

MR. KATAEV:  The reply papers filed by the plaintiff indicate that they believe as a matter of law a five-year restrictive covenant period is permissible in the context of a business sale because it's between sophisticated business people.  That is not the case here, and we are prepared to present evidence to that effect.

Mr. Barajas was a 6 to 7 percent shareholder of the company.  He was not involved at all in any of the negotiation process.  He remained on as an employee earning $150,000 a year.  All of these factors indicate that he is not a sophisticated business person as they claim.

We submit that based on the case law that --

THE COURT:  I actually had asked a simpler question, which is whether you are prepared to rest on the papers or whether you are insisting on presenting testimony.  And if it's testimony, I have a decision that I've got to make in terms of whether to have it in person.  It's obviously easier for the Court as the fact finder to judge credibility if the witnesses on both sides are present.

So I am really -- I'm prepared to hear you argument. I understand that there are significant legal issues that are presented with respect to the scope of the non-compete and the question of whether the Court has the authority to limit the scope of the non-compete and should exercise that authority.

There are questions with respect to what inferences I should draw from the evidence that is in front of me.  But I actually would like to know, you know, your position with respect to the body of the evidence that is in front of me and what I should be considering in determining whether to grant a preliminary injunction.

MR. KATAEV:  Well, the case law says that for the Court to issue a ruling granting a preliminary injunction, it's based on the totality of the circumstances.  And so if the Court is inclined to grant the plaintiff relief, I would respectfully submit that we do need a hearing, but I believe on the papers there is not enough for the plaintiff to obtain that ruling.  So it's a hard question for me, but the answer is --

THE COURT:  I mean, maybe it's a hard question for you, but it's actually a question to which I need an answer.  I mean, it's a fair thing to say the plaintiff hasn't shown enough on the papers, therefore, I'm prepared to rest on the papers and let's do it on the papers or it's also an option that you, you know, you've got to say, listen, I want to present testimony, in which case there is cross-examination and the testimony could end up being favorable to you, it could end up being unfavorable to you.  I just need to know your position.

MR. KATAEV:  Erring on the side of caution, a hearing would be necessary, your Honor.

THE COURT:  Okay.  So let's discuss the scheduling of that.  Again, you know, I am -- well, let me ask the plaintiff.  Understanding that the defendant wants to put on testimony, what is the plaintiff's position with respect to calling their own witnesses and with respect to remote or in person?

MS. ALLEN:  Thank you, your Honor.

I think we understand the concern about witness credibility here.  We are fine having witnesses live in person.  We're also fine doing it by video.  Our preference would be to do it live, but we're fine either way.  I think we would be fine if -- we are prepared to move forward today.  I would like that to be very clear on the record, and we have witnesses ready to testify today if needed.

If we are going to adjourn this hearing to another time, I think the only concern plaintiff would have about that is the fact that we need the TRO extended for that duration of time.

THE COURT:  Okay.  And when you say the plaintiff is prepared with witnesses, does that mean that you've got a witness ready right now?

MS. ALLEN:  Your Honor, we have the CEO, Michael McComas, here in New York who is prepared to testify today in person.  We also have, if needed, our expert, Brad Hadamik, who can testify by video or by phone.

THE COURT:  All right.  So I'm prepared to have a

hearing on this. I may be able to get it started today. And then we could continue on until next week. I cannot do it Thursday or Friday, and I think there is good cause for me to extend the TRO into next week so that I can hear the testimony, and then so that I can evaluate the testimony.

Does defendant disagree with that?

MR. KATAEV: No, your Honor.

THE COURT: Okay. Let me look at the calendar and confer with my deputy.

How quickly could plaintiff get the CEO down here?

MS. ALLEN: Your Honor, we told him to stay within 20 minutes of the courthouse, so I hope pretty quickly.

(Pause)

THE COURT: Okay. So I do have a couple of things on my calendar that we can take short breaks for, but we can get started today, and then we'll continue on Monday starting at 9:30. I have a noon conference that's telephonic. That should take only about 15 minutes, and then I have a 2:00 conference that's also telephonic that should take about 15 minutes. So we'll take breaks for those.

Why don't you get your witness here and I'll hear from the plaintiff's CEO first. My guess is that that will be about 11:15. And then from the defendant's perspective, why don't you plan to have your witnesses ready to go in the early afternoon, and we'll continue on until Monday.

MS. ALLEN:  Your Honor, if I may.  Plaintiff is prepared to do an opening statement that organizes the evidence and likely would be helpful.

THE COURT:  Okay.  All right.  I'm prepared to hear you now.  Just give me one moment.

Defendant had something to say?

MR. KATAEV:  Yes.  I have one concern.  I have a conflict for Monday.  I was hoping we could do Tuesday and/or Wednesday.

THE COURT:  It would have to be Wednesday.  Does that work for the plaintiff?

MS. ALLEN:  Yes, your Honor.

THE COURT:  Okay.  So Wednesday at 9:30.  I'm going to extend the TRO then for a two-week time period, two weeks from tomorrow in order for me to consider all of the evidence and to evaluate it and see whether the preliminary injunction is warranted.

I take it no objection from defendants to that?

MR. KATAEV:  No objection.  The only other concern I have, your Honor, is I can't get here at 9:30 on Wednesday.  I would ask the Court's indulgence to come in at 10:30.

THE COURT:  You have to speak up, sir.

MR. KATAEV:  I can't get hereby 9:30:00 a.m. on Wednesday.  I would ask the Court's indulgence to come in at 10:030 like we did today.

THE COURT:  What's the problem with 9:30?

MR. KATAEV:  I'm a single father.  I have to drop my children off at camp at 8:30 in Roslyn, and it's not enough time to get here in one hour.

THE COURT:  Let's see how far we get here today.  I'll take that under advisement.  I'll try to accommodate your schedule.  I want to get this hearing done, but the Court has other conferences and other things it has to deal with --

MR. KATAEV:  Understood, your Honor.  If necessary, I can make arrangements; it's just difficult to do so.

THE COURT:  Let's see how far we get.

Let's start with the plaintiff.  Have you reached out to the CEO to make sure that he's on his way?

MS. ALLEN:  Yes, your Honor.  He's on his way.

THE COURT:  Okay.  Good.

MS. ALLEN:  Thank you.

Thank you, your Honor.

Legacy requests, as you noted, that the Court enforce a preliminary injunction against Barajas and USA Contracting through trial in this matter.

If we could move to slide 3.  The Court already has seen a lot of the evidence that we previously submitted in connection with the original TRO filing and granted the TRO based on those facts.

Since that time, we have been able to spend a little

bit more time digesting the documents and identifying additional evidence, which we submitted in connection with our first amended complaint and our reply brief, as well as the supplemental affidavit from Mr. McComas yesterday.

We put things in a timeline order, and I want to spend the next few moments going through that timeline organizing the facts.

We think that the timeline period very clearly shows that Barajas solicited Raffles, a Legacy employee, in violation of his purchase agreement. It shows that Barajas, Raffles Wolff, and what we believe is their company, USA Roofing, which is USA Contracting, competed against Legacy in the roofing and exterior renovation business.

The evidence shows that Barajas and Wolff have been working with Raffles, Alex Skelton and David Knight to steal company files. And in this regard, Raffles downloaded over 50 company files, including employee rosters they could use for targeting our best salespeople. Alex Skelton downloaded also dozens of documents, also including the employee rosters that he could use for targeting sales teams.

Raffles herself failed to return her computer when requested at her termination meeting, and that was the same day as the TRO. When she did finally return it through counsel, forensic analysis showed she deleted her browser history and factory reset her computer so we cannot tell anything that was

on it for what was stolen.

David Knight, the other person solicited by Barajas, has refused to return his two company-issued computers and they remain in his possession.

If we could move to slide five please. I'm sorry, six.

Barajas is a founder of Southern Roofing. Legacy purchased Southern for over 50 million in 2024. For his part in the sale - move to slide 7 - Barajas received over $4 million in cash plus rollover equity in Southern, the new entity.

Slide 8. There were a group of other sellers along with Barajas, who all signed the agreement. These are some of them on this slide. But I want to kind of preface who these players are. Their names will come up again. We think it's important for the Court to understand the players so the Court can understand the length to which Barajas has tried to hide his conduct.

Here you'll see that Christopher Eubank, who goes by Shi. Shi was a seller's representative in the transaction, which is not uncommon for these types of transactions where there's a large group of shareholders so that they have one point person. And Shi, is, as far as we can tell, the nominal leader of this group. He received much more in the sales than everyone else.

There's also James T. Shaheen.  He goes by JT.  You'll see him

And John Falls.  You'll see him referred to as John.

Then, of course, we have Oswaldo Barajas, who signed the agreement, and received $4 million.  He goes by Junior.  You'll see him referenced as Junior.

Move to slide 9.  The purchase agreement had the standard provisions that we see in most transaction documents like this, where the purchase of equity and good will is happening.  It included non-disclosure provision.  That's at Section 6.6.  Move to slide 10.  It also had -- all of these provisions are at issue here, your Honor.  If we win and can show likelihood of success on one of these provisions, the preliminary injunction should be issued.  We to not need to show success on all of them.

The second provision at issue is a non-competition --

THE COURT:  It does go maybe to the scope of preliminary injunction, doesn't it?

MS. ALLEN:  It can, your Honor.  It certainly can.  I think plaintiff would argue that the breach of the non-disclosure provision, however, goes to their intent to compete, right?  So even if -- I understand if you find an enforceability issue with the non-competition agreement, but I don't think you need to find actual breach of the non-compete as far as actual competition in order to enforce the

non-compete clause against defendants.

The non-compete clause is excerpted here.  We spent some time with it last time.  I think the issues that defendants have raised relate to the geographic scope, and you can see in the last sentence of 6.7, it refers to the obligations being applicable throughout the world.

We also have the definition of business down below. It applies to roofing of both residential multifamily restoration, including siding, gutters, and windows.  And the @non-compete period, your Honor, is five years.  Again, we believe we have ample case law showing New York law enforces five-year restrictions in the context of the sale of a business.

If we can move on to the next slide.  The third key provision is the non-solicitation provision, your Honor.  This relates to solicitation of customers as well as employees, and it also includes a no-hire provision as distinct from a non-solicit provision which had been enforced under New York law.

Next slide, please.

When it comes to the solicitation, I just actually want to pause on there for a moment.  You're going to hear Mike McComas testify - he's the CEO of Legacy - how important the people are to the company.  They put lots of money into training the individuals.  They put a lot of effort and

know-how, and we believe trade secrets into how they organize the company and divide up the roles at the company so we get the best players for each role.  We believe it is very distinct and is special to Legacy.  It is obviously not how the typical roofing company works, but these detailed training and other standard operating procedures that Legacy uses to arm its people to be their best and do the best in the business we believe is trade secret and different and were the things targeted by these individuals, especially when they targeted the training documents, the SOPs, and the personnel.

I also wanted to pause briefly on the indemnification provision in the purchase agreement because I think it will go to help understand some of the text messages and why people kept quiet about certain things.  Here you will see that under the indemnification, the sellers, which, as we just saw, includes JT, Shi, and John Falls and others, as well as Junior Barajas, they have jointly and severally agreed to indemnify and hold harmless the purchaser, who is Legacy, from any and all losses - and losses is very broadly defined to include damages, attorneys' fees, things like that - that they may suffer arising from or in connection with any breach or non-fulfillment of any covenant.

So in this deal, which is not how they always are structured, all the sellers are jointly and severally liable, your Honor, for each other's breaches of a non-compete,

non-solicit, and non-disclosure provisions even if they personally had nothing to do with the breach.

And we can move on to slide 13.

Now I'm going to start going through the timeline now that we've covered the agreement in a little more detail.  I want to start back in 2024.  We have evidence that Barajas and Wolff went into business with each other with a company called USA Fleet Sales.  This is a publicly available news video that's available online from National News 5.  It shows them, you know, literally climbing through a building together arm in arm with flashlights.  That's how closely these two men worked together.  The first company, as far as we can tell that they jointly founded was called USA Fleet Sales.

Moving on to the next side, I also want to introduce a couple other players here while talking about 2024, that's Alex Skelton and David Knight.  This oversaw sales territories across all of Southern's states that was present.

And moving on to slide 15.  Also in 2024, Legacy has now just recently been made aware that David Knight stole $9,692 from a customer by having that customer drive to a bank, withdraw the cash which was supposed to pay for the customer's roof, and give it to David Knight.  Again, we are not alleging that this has anything to do with Barajas at this time, but we just wanted the Court to be aware that this is David Knight; that these are the folks that are being solicited.

We can move on to the next slide.  Keep moving on more quickly.

We also wanted to note that, again, Raffles downloaded over 50 documents from the company's servers onto her local computer, which, again, she later destroyed.  These documents date from December to up through May right before she left.

THE COURT:  So maybe you'll address this through the evidence, but the date of late 2024, is that because that's how far back the searches that you did went or is that when she first started?

MS. ALLEN:  At this time, your Honor, that's just when our searches started.

THE COURT:  So we don't know, for example, whether she was engaged in the same pattern of downloading documents before late 2024?

MS. ALLEN:  We don't, your Honor, but I think when it comes to focusing on the types of documents she started downloading, I think it becomes pretty clear she was targeting certain documents and not others.

THE COURT:  But we also don't know whether she was downloading those same types of documents before late 2024.

MS. ALLEN:  That's correct, your Honor.  And I think her testimony previously by declaration was that this was just her normal practice.  You'll hear from Mr. McComas who said that's not normal practice at the company.

THE COURT:  Is that your client who just stepped in?

MS. ALLEN:  Yes.

THE COURT:  Good.  How much more do you have on your opening?

MS. ALLEN:  I can speed this up, your Honor.

THE COURT:  That would be helpful.

MS. ALLEN:  We will do that.

If we could move on.

Your Honor, of note, again, just speaking what we were just talking about in March, this begins that hot time period she downloaded the branch breakdown to the employee rosters and named all of these key salespeople from all of Southern territories on the same day.  This is the kind of the suspicious behavior I was talking about earlier.

We could move on to 19

THE COURT:  Do you have evidence that ties the March date to the individual defendant here?

MS. ALLEN:  Not that March 3 date, your Honor, but later in March is when they start talking about in earnest in the text messages their plan to compete.

The next slide.  Again, we covered this before in our briefing.  Legacy became aware of this because an employee came forward.

I want to spend some time going through this text message chain.

Barajas admits --

THE COURT:  You should know I have reviewed the evidence.

MS. ALLEN:  All right.  Then you've seen this, your Honor.  I won't belabor it.  The only thing I'll mention is that on this slide Ms. Raffles talks about needing to build the custom AI brain to get smarter and tell it more about the business.

One of her arguments is that none of this is trade secret.  I can just use ChatGPT to do everything.  ChatGPT needs to be trained.  This admits she needed to train it for Fleet USA Sales work.

We can skip this.

She was working for Fleet Sales at the same time she was working for us.  March 24, your Honor, this is new evidence that was not previously presented.  Brian Wolff through one of his companies came to Southern and executed a series of customer agreements for a series of properties in Kentucky asking for us to redo the roofs, asking Southern to redo its roofs.

If we can move on to the next slide.

You will see later on in the timeline, those properties go dark, and he never actually sent us that work for those properties.

On March 28, this is a key date, your Honor.  You've

seen some of these texts before.  In this chain, Leah and Junior Oswaldo Barajas are talking to each other.  She is talking about how she is going to pass her general contracting test, get listed on the LLC.  And then she also then texts Barajas and says:  These are the things I need you to do to get the business up and running that we're talking about.  One of the things on that list that's in this highlight PDF on the right says:  Register your business entity.  So on March 28, 2025, Raffles and Oswaldo are talking about registering the new LLC.

We could move to the next slide.

As part of this conversation, Raffles also texts Oswaldo and asks his permission to use his or the company's, we don't know, AmEx card that's not hers, that he controls to order study materials so that she can get her required licensing for this new entity.

THE COURT:  I want to pause there.  Is what you're saying is that you believe that the AmEx card is Barajas' AmEx card?

MS. ALLEN:  Your Honor, we don't know.  We just know that she had to text him and ask him for the numbers and permission to use it and for the number on the back of the card.

We could move to the next slide.

THE COURT:  I take it, it is your view that is not

just a gift; that that is reflective of he's doing it because he's got an interest.

MS. ALLEN:  Of course, your Honor.  Yes.

They're talking at this point where she is going to get her general contracting license and other licensing necessary to run the competitive roofing business that they're talking about.

We can move past this slide.  This is more of the same, your Honor.

This is again Leah and Junior talking about how they're going to, you know, once you're outside of your non-compete -- again, this is March 28, this is Leah Raffles to Barajas:  Once you're outside of your non-compete, we can get you added to the LLC and go do government contracts, minority veterans and a woman listed on the company, we getting them all.

Move to the next slide.  This next slide is a key slide.

This is another key text.  This is Leah texting with a family member talking about how she just secured myself something that will make me indispensable with Junior and protect me tenfold.  We'll talk about it later.

This is the same day at the same time as the text we just saw with her texting with Junior about getting his AmEx, the AmEx number to get the book so she can study for the

general contracting test. I'm going to sit for my GC license. I'm not going to say the swear words: It's a blank open book test. If I get that any of these blue-collar businesses, he opens if they operate under my license, I have to be listed as an equity partner. Tennessee requires me on the LLC.

We can move to the next part of the chain

THE COURT: Again, you don't need to read these to me because I have read the evidence. But if there are particular points you want to make from them.

MS. ALLEN: Yes. Indulge me one moment on this one, your Honor. This is where we show how they're trying to hide this.

Including from -- including as the other sellers are getting upset about it.

So if we go to the bottom arrow. Raffles says or a family member says: So Junior is asking you to take the test?

Well, he was just venting to me about all the blank that went down last night and this morning. And then I said well, what would you guys do? And he goes, I don't know, maybe this person take the test. And I said, what if I take the test. And then I looked into it, and I would have to be the equity holder. And he said that he would be okay with that if I held a small percent of equity of every business that operated under my license.

If we go to the next slide. I won't read all this to

your Honor because again I don't want to belabor it, but she talks about how she doesn't have a non-compete so she can do this because she doesn't have an contract.

Her family member asks:  So Junior told you about everything that went down.

Raffles:  Oh yeah, he had a massive fallout with Shi over this too as he should.

And Shi is Christopher Eubank, as we saw, the chief seller's representative.

John and JT, now you'll see people who have violated the non-compete and non-solicit and how they're not going to get caught.

John and JT are equity owners of Tempest, the commercial one.  And we caught them poaching our sales salesman because they poached the wrong one who is a big mouth and told Junior everything.

And you've seen this next text so I won't read it to you.

They say they're going to start a roofing business as Brian is the partner because the other guys don't have a non-compete, and signing over the equity to Junior, this is their plan for not getting caught.

Raffles says - this is the key text, your Honor - and she knows he f'd up because he was texting Junior at 5:30 in the morning saying he hadn't even slept.  Junior's fulled - I

think that means fueled - by proving a point right now. And I'm all about that because that's how we make money.

Then her family member asks: Who is she? Pointing above, when Leah says -- and she knows, and then down but low Raffles clarifies what she, she meant Shi. Something happened where Shi found out about Barajas' plan to compete against the company, Shi hit the roof. Shi doesn't just have $4 million at stake here. He has a lot more than that. He was a seller's representative who had a bigger stake, and he understands he was joint and severally liability for Barajas' breach.

Move on to the next slide. Your Honor, I'm going to move much more quickly.

At the same time in March, Knight and Skelton are also being solicited by Barajas. Barajas is the someone referenced in these texts. We don't need this. This is the same thing.

We discovered the plan that Barajas had to compete against us. He was terminated on the 10th. At the same day he called the employee who told Legacy and Southern that he was planning this competing company, and called him and threatened him. We have the call log.

Next page.

THE COURT: Is there a reason why that employee is anonymous to the Court when it appears that he's not anonymous to Mr. Barajas?

MS. ALLEN: We can share his name, your Honor, if

you'd like.  We're trying to protect people's privacy, but we're happy to share it with you.

THE COURT:  I would think you could share it with the defendant because the defendant presumably knows who he is.

MS. ALLEN:  Yes, it's Darryl Jones your Honor.

THE COURT:  Darryl Jones?

MS. ALLEN:  Yes.

THE COURT:  Okay.

MS. ALLEN:  Next slide.

We also want to point out on April 14, this is a new fact we discovered that Ms. Raffles actually executed the company's computer use agreement that acknowledged and agreed that the company had full access to all data on any company devices, which would include her text messages on her company-issued laptop.

If we could move to the next slide.  This is an excerpt of that agreement.

Next slide.  This is another email showing she had notice of a handbook with the same provision.

Next slide.  Your Honor, this is somewhat new evidence.

So in April we now have evidence that those houses we talked about in Kentucky that Brian Wolff had the representative actually do customer agreements with Southern, April 21, 2025, we see in the file a series of those received,

not all of them, but some of them received insurance denials. those all addressed the insurance denials in the files for those houses in Kentucky are addressed to Wolff as the homeowner and policyholder and all addressed to the 711 Providence address.

THE COURT:  What's that address?

MS. ALLEN:  The same address as USA Contracting on the articles of the association, and we will show that to your Honor.

THE COURT:  You don't need to show it to me.  I've seen the articles.

MS. ALLEN:  Then we can keep going.

These are the articles.  The location of the new building.

We can keep going.  Thank you.  Is there anything further?  Oh, just a few more texts, your Honor.

May 14, about two weeks after Wolff formed USA Contracting, Barajas continues to solicit her and work with her.  They're creating a vendor packet.

We can go to the next slide.

These are, again, the more timely downloads.  As you noted, the more timely ones closer to her exit are probably more relevant.

Move to the next slide.

The last texts we have between them, your Honor, are

these two Leah Raffles, again, to the same family member with Junior saying: I'll make it work for you over here. I'll pay you three months. Brian and I have your back.

Move to the next slide.

That same day as Junior sent that text to Raffles, Wolff, David Knight, and Alex Skelton, there was a posted Instagram by Wolff showing them all together on that very same day.

Go to the next slide. We have already covered this. Keep moving.

The last text we have between -- with Raffles about this is on the 11th of earlier last month, saying: He told me plan your exit. He sweetened the deal. He's going to give me a profit share.

After that, your Honor, Ms. Raffles deleted her browsing history on her computer. After the TRO was filed and after she had notice of the TRO -- after she had notice of the application for the TRO, I should say, the TRO is not issued yet. But after she had notice that morning that Legacy was seeking a TRO, she spoliated her computer and factory reset it.

This just lists the things from our papers, your Honor. With that, I think we can rest for now.

THE COURT: Does defendant want to make any kind of an opening statement? You don't need to, and I'll hear you at the end, but if you -- you know ...

MR. KATAEV:  Briefly.

THE COURT:  Okay.

MR. KATAEV:  The plaintiff has failed to present enough evidence to justify a preliminary injunction in this case.  Barajas is a small-time, low-equity holder of Southern Roofing.  He was not involved in any of the negotiations for the purchase.  He always had other business interests and worked in those other businesses while performing work for Southern.

Ms. Raffles was not subject to any non-compete. Mr. Wolff was never part of the company.  The restrictive covenants in the agreement are overly broad, both in geographic scope and temporal scope, such that this Court should exercise the blue pencil provision to shorten it to the maximum allowed under New York law, which is one year.

The plaintiff presented arguments that in the context of a business sale, courts frequently go beyond one year.  This is because oftentimes in such circumstances it's done between sophisticated business people.  Mr. Barajas is not a sophisticated business person.  He's a team player who knows how to bring people together and presented himself as an asset to the company in growing it.  He's not the founder, as they claim.  He received equity due to his hard work and helping build the company.  We have evidence that shows he was a 6.43 percent or thereabouts percentage holder.

We also have text message evidence from DJ, the person that they reference, telling Junior after he raises concerns about the restrictive covenants, oh, don't worry about it. They won't hold you to it.  He raised objections about it. They wouldn't agree to negotiate anything out, and they falsely told him that he won't be held to it.  We know it's false because here we are.

The plaintiff has failed to present any evidence of actual losses of vendors, employees, customers, leads, anything of the sort.

Mr. Barajas did want to assist Ms. Raffles and Mr. Wolff with a new company.  That new company was not to do roofing work.  It's USA Contracting, not USA Roofing.  They have short-term rental properties.  Mr. Wolff has over a hundred.  Mr. Barajas has approximately five and is also growing his portfolio properties.  They are looking for ways to do cost effective renovations work in order to put these properties on the market and put it together.  This is not competitive behavior.

Mr. Barajas had a vested interest in the success of USA, but he was not an owner of it.

Because the plaintiff fails to present any actual evidence of losses, they don't satisfy the requirement of irreparable harm, the single most important element.  This was a fledgling --

THE COURT:  That can't be right.  I mean, it's -- the irreparable harm goes to whether there is a risk that if Mr. Barajas engages in the conduct that would violate the non-compete if it is enforceable would cause harm that's not compensable by money damages, isn't that right?

MR. KATAEV:  That is correct as a matter of law, your Honor, but the evidence that they've presented doesn't show that that's the case.  The evidence that we've presented shows that Raffles wanted to leave of her own accord; that she initiated the conversation.  He did not solicit her.  And once she did so, she started making plans.

Ms. Raffles did not know that she was going to be terminated.  She was terminated in late June.  All the evidence they presented about the files were as late as May while she was still an employee.  Ms. Raffles did delete a laptop, but she did so to protect her personal privacy because, as the Court sees, the messages with her mother were there.  Normally, this would present a big issue of spoliation.  However, Ms. Allen herself personally met with Ms. Raffles with no other company representative present, which raises other issues that will be further briefed down the road, and they obtained during that meeting a mirror image of that computer before it was factory reset.  In other words, there is no spoliated evidence.

They obtained everything they need, and they have whatever was available on the computer on that day, and they've

presented no evidence that anything was deleted on the day that they requested the laptop to be imaged.

In short, while there is a bunch of circumstantial evidence that would make a worried company such as Legacy believe that there was some concerted effort to engage in competitive behavior, the fact of the matter is, and as the Court will hear at an evidentiary hearing, that was just not the case here. Mr. Barajas had no intent of building a new company. It was he that provided the nine properties that Mr. Wolff owns for Southern/Legacy to perform the work. And as conceded by Ms. Allen, those projects did not go forward because insurance claims were denied, and Mr. Wolff would have to pay out of pocket which he was not prepared to do. It's my understanding, although I haven't seen the contracts between Mr. Wolff and Legacy, which plaintiff failed to present, the contracts provide that if insurance doesn't cover it, you don't have to move forward. Insurance didn't cover it. He didn't want to pay out of pocket, and that was that.

They didn't present the next logical step to make their claim work. And the next logical step is Wolff stopped working with Legacy/Southern and instead went to USA or some other company. Nothing happened. There was no solicitation. There was no anticompetitive behavior. Nothing. Mr. Wolff invested $15,000 from another business account he owns into this new company. He did one job which was not based on any

lead that Southern or Legacy had. He subcontracted that job because he had no labor to perform it, and he made a small profit on that one job in Mississippi, and that's all that's happened.

The evidence that they present isn't sufficient to grant this broad relief. And as a matter of law, these restrictive covenants are overly broad. The evidence at a hearing will demonstrate there was extreme overreaching to Mr. Barajas, and they lied to him about the use of the restrictive covenants. And they are now doing all of this to prevent him from being paid, the rollover equity that he's supposed to receive under the contract. We look forward to presenting this evidence at the hearing next week and today.

MR. KATAEV: Thank you.

THE COURT: Plaintiff will call its witness.

MS. ALLEN: Plaintiff calls Michael McComas.

THE COURT: Mr. McComas, please step forward into the witness box and remain standing. My deputy will administer the oath.

MICHAEL JOHN McCOMAS,

    called as a witness by the Plaintiff,

    having been duly sworn, testified as follows:

DEPUTY CLERK: State your full name for the record and spell out your first and last name.

THE WITNESS: Michael John McComas. M-C-C-O-M-A-S.

THE COURT:  Counsel, you may proceed.

DIRECT EXAMINATION

BY MS. ALLEN:

Q.  Mr. McComas, what is your position at Legacy?

A.  My current position is the group president of Legacy Restoration.

Q.  What was your position before that?

A.  Prior to that, it was chief operating officer.  That was as of January 1, 2025.

Q.  What kind of work does Legacy do?

A.  Legacy does exterior restoration for single family and multifamily properties.  We do primarily four trades:  Roofing, siding, gutters and, windows.

THE COURT:  Sorry.  Roofing, siding...

THE WITNESS:  Gutters and windows.

Q.  As part of a roof, does that include ventilation?

A.  Yes, it does.  It's an important part of the roof.

Q.  Does it include components for drainage and water?

A.  Yes.  So -- yes.  Yes.

Q.  How do customers pay Legacy for the work that it does?

A.  It pays either through out of pocket on a retail job or they pay still out of pocket but based upon insurance proceeds. Now whether they pay more than the insurance proceeds depends on the particular contract.

Q.  Does Legacy still do the work if the insurance is denied?

A.  Yes, we still try to do that work and try to work with that customer, particularly if a roof really needs replacing, we want to do it and the customer ought to do that as protecting their house.

Q.  Other than the customer paying directly, if the insurance is denied, what else does Legacy do?

A.  Yes.  That's actually more common.  Nowadays, particularly if you look at Allstate and State Farm, that it's kind of the almost what you would call the United HealthCare model, where it's delay, delay, delay, deny, deny, deny, offer repairs where there should be replacements.  So that's much more common now.

There's also the issue with wind claims that Southern particularly has that most of those by matter of fact get denied at first.  And then it's easier to overturn those later. So at Southern right now there's a huge glut of those jobs that we will be overturning.

THE COURT:  You said wind claims?

THE WITNESS:  Yes, exactly.  So Legacy Restoration in the upper midwest is mainly hail claims, and there's some wind. Southern in the Southern territories, it's mostly wind claims. So creased shingles, blowing shingles off roofs.

Q.  If the insurance is overturned, what does that mean?

A.  It means that they then honor the claim, and the insurance pays for some portion of the roof.

Q.  In what states does Legacy operate?

A.   I would need a list, but I'll go through them best memory. So Colorado, Nebraska, Minnesota.  Talking Legacy Restoration operating gotcha.  That's easier.  So currently it's Colorado, Kansas, Missouri, Nebraska, Minnesota, Wisconsin, Illinois and Iowa.

Q.   And Indiana?

A.   And Indiana, yes.

Q.   Do you know what states Southern operates in?

A.   Yes.  They did operate in Kansas and they still operate in Missouri, but they were in Kansas City, and Legacy took over the Kansas City office.  So going on from Missouri and keep going down the states:  Arkansas, Tennessee, Kentucky, Mississippi, Alabama and they were in Florida, but the Southern sales team was actually put into the Janney Roofing Sales team.

Q.   At the time that Legacy acquired Southern, it was in Florida and Kansas --

A.   Yes, actually.

          MR. KATAEV:  Objection.  Leading.

          THE COURT:  Overruled.

Q.   I'm sorry, did you say Georgia for Southern?

A.   Georgia, yes.  Atlanta, Georgia.

Q.   How did Southern become part of Legacy family companies?

A.   They were acquired back in January 5 of 2024 after eight months of due diligence.

Q.   Was Barajas one of the sellers?

A.   Yes, he was.

THE COURT:  Were you involved in the transaction?

THE WITNESS:  I was involved in a lot of the due diligence and -- not necessarily in the transaction.  However, at a high level, I was involved with, you know, we should do this or we shouldn't do that.

THE COURT:  Can you describe for me what Southern's business was when it was acquired, and what it was that Legacy was acquiring when it acquired Southern?

THE WITNESS:  Yeah.  So what we really liked about it was the geographies that it had.  They also seemed to have a way of approaching new markets that we wanted to do.

So Legacy was all about expanding in multiple geographies, and they were between Missouri and our Janney operations in Florida, so great geographies.  And seemed like really good people as well and really knew what they were doing.

THE COURT:  In terms of the actual business being single family, multifamily roofing, siding, gutters and windows, it sounds like it was pretty much the same business but just different geographies.

THE WITNESS:  Yes.  However, they were mostly concentrated on roofing and gutters and did some siding.  They also had a multifamily division.

Q.   After the transition, Barajas stayed on as an employee?

A.   Correct.

Q.   What did he do?

A.   During that phase, I was the president of Legacy.  So I was not involved with what exactly he did during that time until I was COO on January 1 of 2025.  I believe he was a high-level manager of salespeople or general manager of a region.

Q.   And then as time progressed, what other roles did he hold?

A.   So then in January of 2025 or it may have been February that he was a regional director of sales for Southern, so one of five regions.

Q.   In those roles, would he have had access to the Southern's and Legacy's trade secrets?

A.   Yes, he would.

MR. KATAEV:  Objection, leading.

THE COURT:  Overruled because it's a bench trial.

But leading question are less persuasive to the Court than open-ended questions.

MS. ALLEN:  Understood, your Honor.  Thank you.

BY MS. ALLEN:

Q.   What kind of information would Barajas have had in his role?

A.   So he would have lists of employees.  He would have an idea of how the company was operated at the Legacy and Janney levels through executive team meetings that he would participate in, and then a wealth of information online.

Q.   What makes Legacy better than its competitors?

A.   Yeah.  It's really how we're organized, as well as our SOPs.  So during due diligence of probably 40 to 50 other companies, nobody is organized or has a process as Legacy has.  So we divide up the entire selling and production process into discrete steps and discrete positions.  And it's not just looking at an org chart.  It's the processes of the turnover in between the different functions.  That's the critical part of that.

     The reason we did that is it's really difficult to scale a business based upon a single salesperson that does everything.  And it's what -- this is why the roofing industry is such there's so many small players in it nobody really knows how to scale without this.

Q.   You said that you all put people -- divide out the different positions.  Can you say a little bit more about that?

A.   Yes, I can describe those positions.

     THE COURT:  I should also make the parties aware that while nobody is in the courtroom right now, this is an open proceeding.  So anybody can walk in.  I'm not closing the courtroom.

     MS. ALLEN:  I understand, your Honor.  I think we're drawing a distinction, just so your Honor is aware, between kind of the description of the overall processes and things and the actual what I call a nitty-gritty of them.

A.   So the way Legacy is organized is we have sales representatives.  They are the ones that either get a lead or they knock on a door.  They inspect the roof for damages, and they advise the customer whether to file a claim or not.  And if they file a claim, then we sign a contract, a contingency contract with the homeowner, and then they're done.

The next person that comes in is the field inspector, and they are usually former insurance field people that understand damages and understand the insurance side of the business.  And they'll actually look at the roof and also attend the adjuster meeting with the insurance adjuster actually on the roof.  So they identify the damages, and they also can be more persuasive with maybe some reluctant insurance field adjusters.

Once that happens, then the insurance companies either approve the claim or they deny it.  If it's denied, those people also, if there's really damage there, many times there is, then they will also follow up with the insurance company and get a re-inspect or get an appraisal.

Once that step is done, we actually have a bought job, as we call it, then it goes to a project manager.  This is still a sales position.  What the project manager's role is is both to identify what of the insurance scope does a homeowner want the company to do.  And then also to offer any upgrades that they are recommending to the homeowner, and then any

additional trades. So, say, the roof is bought, but it looks like they need new windows, they'll offer to also do the windows. That's why many of the insurance jobs are actually insurance and retail.

So then the PM creates really the list and the scope of the job and hands that over to our production coordinators, which is another unique part of our process. And they take it from the salesperson and get it -- then -- the PM is a salesperson -- and they put it into a package so we can actually buy the materials and then our production people know what to build. So very, very specific handoff to them.

In that handoff, they check on the margin of the job and to see whether there should be any what's called supplementing, so any increase in price that we're suggesting to the insurance company or maybe some scope issues that the exact estimate that the insurance company has could be off so really, really critical part of that.

So then the supplementers, and we call them estimators because we don't want to look like they're public adjusters, they'll actually go do a re-estimate of it to make sure the insurance company isn't missing things.

As we always say, the insurance company creates a claim. We create the estimate to actually build it. So many times -- actually, almost a hundred percent of the time there is a difference between what our estimate is and what the

insurance company has.

So once that is done, then the PC sends over the package both to our suppliers to get the order ready, and then it's also sent over to our production team to be able to schedule the project, to arrange for the subcontractor, and then it actually goes to a CSR team, a separate team, that talks to the homeowner and tells them when the materials are going to be dropped, what they should expect.  You know, get the cars out of the garage, all that kind of stuff, and then tell them when the build is going to happen.

And the production people then go out to the build. They make sure all the materials are there.  They coordinate with the subcontractor.  They make sure all safety things are done correctly.  They also inspect the job.  And they coordinate with that homeowner all during that project.

Once that is done, then many times for the insurance jobs, we'll see unseen damage, such as rotten decking, and the production project super actually identifies that and sends pictures of that back to the estimators to be able to include that in the supplement.

When the project is done, then the supplementers are done, then it gets invoiced

Q.  Thank you for all of that.

With respect to these roles:  The sales rep, field inspector, project manager, project coordinator, estimators,

production supervisors, how do you make them good at their jobs?

A.   It's really individualized training.  So it's separating and being very, very specific to that role.  So being an expert at that one piece, that really is what our claim to fame is in our organization.  That's why we did it.  That's also why we're able to scale and other companies aren't.  If you're looking at one person to do all that work, you have to have a really unique person, and in the industry they tend to burn out quickly.  So it's really difficult to have a sustained presence in any market.  It's also much easier to get employees to do that individual thing, so your market for employees is much broader.

Q.   With respect to that training you discussed, would that training material be valuable?

A.   Yes, very much so.

Q.   How so?

A.   So it gives you both the playbook as well -- with the SOP and the training, it gives you everything about that handoff because you can have an org chart and people kind of see what you do, but without knowing specifically what they each do, and, much more importantly, the handoff between the positions, which is where most of the issues are, if you're dividing up one job into five, those are where the issues are.

          MS. ALLEN:  Your Honor, if I may there's a lot of

testimony that McComas has already provided in declaration about background facts, proving up authenticity of documents, the employee handbook. Would you like us to go through all of that or can we skip most of that?

THE COURT: I'm prepared, unless there's an objection, to take the declaration into evidence the same as if they were delivered in open court. I'll apply that to both sides, and each side can cross-examine.

Any objection to that technique?

MR. KATAEV: No. It makes sense in a bench trial, your Honor.

MS. ALLEN: This will move faster. Thank you, your Honor.

I'm going to move through my outline here, your Honor, I think that skips a lot of --

THE COURT: We'll take a break at 11:50 and reconvene at 12:30.

MS. ALLEN: Thank you.

BY MS. ALLEN:

Q. Why was Barajas terminated?

A. Due to his solicitation of other employees, as well as his looking like he was arranging to compete with the company.

Q. Did anyone at the Legacy level to your knowledge know about the allegations that Barajas has now made about JT Shaheen?

A. No.

Q.   We saw earlier, and you testified in your declaration, about a series of homes we allege are owned by Wolff.  Does that ring a bell?

A.   Yes.

Q.   Can you tell me about those homes coming to Southern and what happened there?

A.   Yeah.  It looked like they were with Southern to look at, to do a damage assessment on, and also to help obviously the homeowner to file a claim.

Q.   Did Southern end up doing that work?

A.   They did not.

Q.   Do you know why?

A.   I do not know why.  Normally, there would be more after the denial of the claim.  There would be working through that process.  And, again, what I'm seeing on those, it's not a hail claim, although I'm not positive that we would actually work through the overturn process on it.

Q.   If you were to work through the overturn process, what would happen?

A.   Most of the time we would have either a full replacement or repair on those or we would also offer a retail opportunity for the homeowner.

Q.   Let's talk about your salespeople and their training.  How have you seen that your salespeople are more productive than other competitive salespeople?

A.  So Legacy salespeople -- you kind of measure it on contracts per week.  So with our organization, and depending on whether there is a fresh storm or not fresh storm, you always get a few more contracts.  They average six to eight contracts a week.  Without a fresh storm, it's in the five contracts per week.  Companies without that organization, they may average, you know, one and a half to two contracts a week.  So highly, highly productive with this reorganization.

Q.  We talked earlier about denials and overturn rates.  How do your overturn rates compare to competitors?

A.  So having a team, and I believe we have roughly 30 people in our estimation team, that work on that as well as their FIs that our ability to identify and overturn actual real damage is much, much higher than what our competitors are simply having those individuals.  I would have to see what other competitors are, but I would imagine they're extremely low.  Most of them don't go after it, so I would imagine ours are at least double what other people have.

Q.  Let's talk about Legacy and Southern customer contracts.  Do you consider those to be trade secret and proprietary?

A.  Yes.  So there's a division between public adjusters and contractors, and many -- all states have this division, but they have different laws covering it.  And actually Iowa is one of the most stringent states in making sure that we identify ourselves as a contractor, not a public adjuster.  And the

result of the business is we do work with insurance companies, just not as a public adjuster.  So having our forms state this explicitly by state is extremely time-consuming to make sure that we identify what we do for the homeowner as well as being in compliance with the state.  We can go months trying to get a contract to be actually in compliance with the state.  So each state is different and each state needs to be dealt with differently.  We also try to make that contract within two pages; otherwise, if I were a homeowner, I wouldn't sign it.

THE COURT:  The contracts are with the homeowners, is that right?

THE WITNESS:  Yes.

THE COURT:  What prevents the homeowners from sharing the contracts with anybody else?

THE WITNESS:  Nothing.

Q.  What does Legacy do to prevent -- other than obviously customers handing it over, prevent the disclosure of these customer agreements?

A.  We make sure that we basically lock them up as being able to edit being able to change, and it's also on SharePoint so we can see who has downloaded them.

Q.  Let's talk about your standard operating procedure.  Can you tell me about those?

A.  Yeah.  It's unusual in most roofing companies to have SOPs.  And we have extensive SOPs for the sales process, the FI

process, the PM process, the PC process, and again it's really the interactions between them over the overall process.

Q.  How would those be valuable to a competitor?

A.  It would give you a playbook on how to actually do this, how to actually scale a business that other companies have not been able to do.

Q.  Are you familiar with AccuLynx?

A.  I am.

Q.  What would be Legacy -- I'm sorry -- Southern's AccuLynx SOP?

A.  Yeah.  The AccuLynx SOP is really Legacy's SOP, and it's how we -- setting up the CRM, it's our unique way of doing it and identifying what the subtasks are in it so we can get better reporting.  That's in -- so we can actually drive between those different departments that I talked about.  So this is what puts everything together and everybody is working within AccuLynx.  All of those departments, they use AccuLynx to actually do their jobs.  As we say, if it doesn't exist in AccuLynx, it doesn't exist.

Q.  Do other competitors use AccuLynx?

A.  Yes, they do.

Q.  Do they use it in the same way that you do as your SOP?

A.  Absolutely no.

Q.  Help explain that.

THE COURT:  Before he explains that, we're going to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

take a break now.  It's ten to 12:00.  So I'll be back on the

bench at 12:30.  You should all be back here at 12:25.  We'll

go to 1:00, and the afternoon should all be back here at 2:15.

(Recess)

THE COURT:  The witness is reminded he is under oath.

Counsel you may continue.

MS. ALLEN:  Thank you, your Honor.

BY MS. ALLEN:

Q.  Mr. McComas, you've previously seen, when doing your

declaration, Exhibits 1 and 2 of your declaration which

detailed the downloads by Ms. Raffles.  Do you remember that?

A.  Yes.

Q.  What was your reaction to seeing those downloads?

A.  It's unusual to download things onto your hard drive.  That

we set up our system between SharePoint and One Drive so an

employee would not have to download to their hard drive.  We

actually have standards to not allow that, and I believe Leah

also signed off on those standards, and it is to protect our

information because we have access to the One Drive system as

well as SharePoint.

THE COURT:  If you want me to understand the

testimony, then you are going to have to have him elaborate.

THE WITNESS:  Sure.

THE COURT:  But I'm directing that question to -- that

point to your lawyer, and not to you, sir.

MS. ALLEN:  Thank you, your Honor.

Q.  Mr. McComas, can you please explain to the Court and to me what you mean by -- about the proper -- the proper hygiene about the documents as far as the One Drive and the SharePoint.

A.  I'm not an IT expert, but I do use it.  We've developed a Teams environment, Microsoft Teams, and it has a SharePoint also, like an intranet site where all the files can be accessed.  And normally you would never have to download a file.  You simply open it up from SharePoint, and it's online on your screen, and that's how you use it, and it also gets updated that way.  So you never have to worry about using an old document.  So normally you would never download that because if you downloaded it, now it's dead.

So we also have sometimes yes, you do need to download things, but the other Microsoft Teams item is a One Drive.  So every employee has a One Drive system that is part of their setup.  That's where they're supposed to put those kinds of documents.  And we have control over that One Drive.  That One Drive exists in the cloud, not on the hard drive.

Q.  So you're saying that downloading a document to a local computer is different than sharing it onto the -- I'm sorry -- saving it onto the One Drive?

MR. KATAEV:  Objection.  Leading.

THE COURT:  Overruled.

A.  That's correct, it is very different.  It's also unusual.

Q.   Is it allowed by Legacy and Southern's policies?

A.   It is not allowed per the policy.

Q.   To help move things along, we're only going to talk about one of the documents appended to your declaration, that's Exhibit 53.  That's a document titled Single-Family Insurance and Retail Production Chain of Command and Communication SOP. Do you remember that document?

A.   I do.

Q.   Can you tell me about that document?

A.   Yes.  So that document is a culmination of --

THE COURT:  Do you want to post it or...

MS. ALLEN:  Your Honor, we're alleging it's trade secret, so --

THE COURT:  Understood.

MS. ALLEN:  I think we are able to have Mr. McComas testify about its value and all of that without posting it to the Court.

THE COURT:  Okay.

A.   So this document is a culmination of at least ten years' of work with Shayne Havens, my vice-president of production, along with his directors, Rachel Kraft, who runs the PC department, as well as Steve Herzau, who is the director of production, and Paul Morrell, who is the director of training.  So together they organized this complete process of how to run a production department.  It's unusual to have a production department in

the first place in roofing businesses, but to have one with so many pieces that work seamlessly together, that's extremely -- I don't know of another company that actually has that, particularly the way that we do it, that no one else has that to the best of my knowledge.

What that does for a company to be able to do that is it creates more efficiency in the sales rep that instead of having two contracts per week, if you have a well-run production department, it gives you at least four, because the SR is not doing anything about production. What it also does is with that well functioning of a production department, which this all spells out, your margins increase because you have much less cost of poor quality, and that's exactly what we've seen by using this.

Q. Is it generally known to the industry the contents of this SOP?

A. It's definitely not known.

Q. Do you take steps to protect it?

A. Yes, we do.

Q. What do you do?

A. So we keep it under wraps in the sales -- in the SharePoint, and we monitor its usage.

Q. Would it be valuable to a competitor?

A. Yes.

Q. How so?

A.   It gives them a playbook on how to do this themselves.  And like I was saying before, that scaling in the roofing business has been extremely difficult.  This would allow them to scale and compete with us in multiple geographies.

          MS. ALLEN:  No more questions, your Honor.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. KATAEV:

Q.   Good afternoon, Mr. McComas.

A.   Good afternoon.

Q.   During your testimony, you described a process that Legacy uses to do its business, correct?

A.   Correct.

Q.   That's the same process that every roofing contractor does, isn't it?

A.   I would disagree with that.

Q.   What basis do you have to disagree with that notion?

A.   Yes.  So we -- over the last several years, particularly since the Bessemer investment, that we've done meetings with in excess of 50 different companies in the roofing space to describe what their processes are through due diligence and preliminary meetings.  There wasn't a single one that used that sophisticated of a process in production.

Q.   Is Legacy the only --

          THE COURT:  Let me interrupt you for a second.  When

you said since the Bessemer investment, what were you referring to, and what's the timing of that?

THE WITNESS:  Yes, so the Bessemer investment in Legacy was July of 2021.

THE COURT:  Sorry.  Counsel, go ahead.

Q.  Other than working at Legacy, have you ever worked at any other roofing contractor?

A.  I have not.

Q.  After Legacy's purchase of Southern in January of 2024, Southern's employees remained employed by Southern, correct?

A.  That's correct.

Q.  And that's true to this day, correct?

A.  That -- so some of the employees are now actually Legacy employees, and some of those employees are now Janney employees, so we have mixed and matched in different departments, particularly the shared service environment that the multiple employees from Southern, Legacy and Janney all work under a shared service environment.

Q.  In the papers submitted by the plaintiff, Legacy refers to the companies that it requires as a family of companies, correct?

A.  Can you say that one more time?

Q.  In the papers submitted by the plaintiff, Legacy refers to the companies it acquires as a family of companies, correct?

A.  True.

Q. So there's a strategic decision in maintaining separate corporate identities even though they're part of a larger organization, correct?

A. It's not necessarily separate corporate identities. It's the idea of separate brands, and that's important both for customers and for the employees to have a sense of ownership in that.

Q. After Legacy purchased Southern, Legacy did not take steps to integrate Southern into the same business practices that Legacy uses, correct?

A. That's not correct.

Q. To what extent has Legacy taken steps to integrate Southern into Legacy's practices?

A. Yes. So the first step was to integrate the supplementing estimating team within Southern. That was the very first one. The next one was to get AccuLynx installed within Southern with a Legacy process of AccuLynx.

The next one was roughly August of 2024, the PC department was deployed in the Nashville area with a couple of different offices.

Since then we've actually established the FI process. That was roughly November of 2024 and fully established that in 2025.

Q. And those are the only integrations that have been done so far, correct?

A.   So far, yes.  But we're -- we're fully integrating the PC process as of June 9.  And we're fully integrating the production process as well.  So before the -- with the PC integration within Nashville, we were also integrating the production process.  In 2024, that was only the Nashville and a couple of other locations around that.

We are full steam ahead on actually integrating production within Southern right now.

Q.   In other words, because the Southern company was not fully integrated into Legacy's practices at the time that many of these individuals that are subject to this case today were terminated, they could not have access to those trade secrets, correct?

A.   Many of these things were being discussed, particularly the production part was being discussed with them, because we were kind of half integrating with them since August of 2024.

Q.   Now, many employees, if not all employees, have company computers, correct?

A.   Correct.

Q.   Leah Raffles, for example, had a company computer, correct?

A.   Yes.

Q.   Barajas similarly had a company computer, correct?

A.   I believe so.

Q.   Plaintiff has not presented any evidence of Barajas downloading any files from the company computer, correct?

A.   Not that I'm aware of.

Q.   Based on the text messages between Ms. Raffles and her mother, plaintiff claims that Barajas intended to compete with Southern, right?

A.   That's what it seems like, yes.

Q.   But that evidence is Raffles' communications with her mother, right?

A.   That's what that specific communication is, yes.

Q.   Raffles was not speaking for Barajas in those messages, correct?

A.   No, she was not.

Q.   In fact, Raffles recognizes in those text messages that Barajas is subject to a restrictive covenant, correct?

A.   Yes.

Q.   And she indicates in her messages that Barajas should only become involved in any other company doing roofing after the restrictive covenant expires, isn't it true?

A.   That's what it appears in those texts.

Q.   Now, you submitted an affirmation on June 26, 2025 in support of this motion, right?

A.   Correct.

Q.   And your affirmation refers to an interview of Barajas, right?

A.   It does refer to it.  But you can ask your question after that.

Q. You were not present at that interview, correct?

A. I was absolutely not present at that interview, and that is not what my statement says.

Q. And you did not personally conduct that interview, right?

A. I did not.

Q. Who did?

A. I'm not exactly sure who conducted that interview.

Q. The only information about what transpired at that interview that you can provide is secondhand, correct?

A. The written down information, yes.

Q. What written down information?

A. The written down information of the interview.

Q. Legacy has not presented any evidence of any written down information, your words, in this court, right?

A. Not that I'm aware of.

Q. Now, you testified, broadly speaking, that Legacy performs roofing, gutters, siding and exterior renovation work, correct?

A. Correct.

Q. Did I cover all of the types of services?

A. Exterior restoration, yes.

Q. Southern before the purchase did not perform all of those elements, correct?

A. They did not perform windows.

Q. Southern primarily performed roofing and gutters, correct?

A. Yes.

Q.   To what extent, if any, as of today is Southern performing a greater scope of work than it previously performed?

A.   I believe they're doing more in siding than they were before.  I don't have the specifics on that, though I believe that's the case.

Q.   In other words, Southern is still performing less work than the broad scope of work that Legacy does, correct?

A.   Yes, particularly windows have not been rolled out to Southern yet.  We're rolling that out to Janney first.

Q.   Southern does not perform, broadly speaking, exterior renovation work, right?

A.   They do perform it.  They perform it at a much -- not as much of it, yes, but they still perform it.

Q.   Limited base, right?

A.   Limited.

Q.   Now, Legacy plans to expand Southern services to include that additional work eventually, right?

A.   To include more of it, and then also adding the windows trade.

Q.   And it has not done so as of yet, correct?

A.   It is doing more with siding that revenue-wise I can't tell you that's been actually expanded yet.

Q.   Now, in your July 7 declaration filed yesterday, two days ago, you say that Legacy spent time and resources developing trade secrets, correct?

A.   Correct.

Q.   Now, you do not have any evidence with you today that demonstrates the time spent developing the alleged trade secrets, correct?

A.   Other than my testimony, no.

Q.   And same question in terms of the resources or money spent, you don't have any evidence here with you today to demonstrate how much resources or money was spent developing the alleged trade secrets, correct?

A.   Other than my testimony, no.

Q.   What is your testimony as to the time spent?  How much time has Legacy spent developing its trade secrets?

A.   So the production one that we had earlier presented, that's the culmination of over ten years of experience, and I identified Shayne Havens, my VP of production doing that; Paul Morrell, who was a trainer at Best Buy, developing the process; as well as Steve Herzau, the director of production; and Rachel Kraft, the director of PCs.

Q.   But all of that ten years of developing trade secrets has not been funneled from Legacy to Southern yet, correct?

A.   Part of it has actually, so the production process again has been rolled out to Nashville and several markets around that.  That was August of 2024.

Q.   Only a small part of it has, correct?

A.   To those offices, yeah.  As a percentage, yes.  Correct.

Q. Same question though, how much money can you testify Legacy has spent developing its trade secrets overall?

A. I cannot identify a dollar amount, even though I know it's significant.

Q. Can you identify whether it's tens of thousands, hundreds of thousands, millions of dollars?

A. I couldn't be that specific, no.

Q. Okay. Now, you refer to proprietary information in your July 7 declaration, correct?

A. Yes.

Q. That includes contracts, standard operating procedures, and similar documents, correct?

A. Yes.

Q. Those documents were available in a Microsoft Teams channel accessible by all employees, isn't that true?

A. Yes -- no. Not by all employees. So they are shared with specific individuals. Not everybody can access them.

Q. Okay. Broadly speaking, those Teams channels had many employees within them, right?

A. Depending on their function, that's how we identified who they should be shared with.

Q. Can you give me a range for the Teams channels how many employees would be in a channel? What is the most amount of employees?

A. I have no idea.

Q.   You're not involved in the Teams chats or channels, correct?

A.   I have participated in them.  I'm not involved in setting them up or sharing anything.

Q.   Now, the Teams channel itself, other than requiring a user name and password to log into Microsoft is not further password protected in any way, correct?

A.   There's -- the protection is within the document and where those documents are stored.  So certain people would not have access to certain documents or to certain channels.  For instance, I have a channel that's just the president's of the company, and only we can access it.

Q.   You also refer to a secure file sharing platform in your declaration.  Do you recall that?

A.   Yes.

Q.   What is the name of this secure file sharing platform?

A.   So that is the Teams environment with SharePoint.  The SharePoint protects those documents from users who aren't intended to access them.

Q.   Now, the defendants have argued that Legacy/Southern primarily performs in the insurance space and not the retail space, correct, that's what we've argued?

A.   I've heard that argument, yes.

Q.   And in response to that argument, in your declaration you have set forth facts that indicate you perform -- Legacy and

Southern performs both insurance and retail, right?

A.   Yes.

Q.   What is the ratio between insurance and retail for Southern only?

A.   I don't have that specific.

Q.   To the best of your knowledge, approximately.

A.   It's probably 15 percent, just a guess.

         THE COURT:  15 percent of?

         THE WITNESS:  Of total revenue.

         THE COURT:  Is what?

         THE WITNESS:  Retail.

Q.   85 percent insurance, 15 percent retail?

A.   Yeah, approximately.

Q.   Roughly?

A.   Yes.  Yeah.

Q.   What about Legacy?

A.   Legacy is closer to 30 percent retail.  And what I want to do is add in the insurance projects that we have upgrades or additional trades on, that's also what we consider retail.

Q.   Okay.  That's fair.  I appreciate that.

         THE COURT:  So does that mean that if it comes in as an insurance project but you are able to tack on additional work, the additional work that you tack on is considered retail?

         THE WITNESS:  Correct.  That is correct.

Q.   Now, plaintiff alleges in this case that Barajas has solicited employees, right?

A.   Yes.

Q.   Which employees are those?

A.   To the best of my knowledge, it was Leah Raffles.  It was David Knight.  It was Darryl Jones.

Q.   I want to clarify because I believe that may be mistaken, from my knowledge so I'm going to clarify.  You identified three people:  Leah Raffles, David Knight, and you said Darryl Jones?

A.   Yes, because we identified him earlier today.

Q.   When you refer to Darryl Jones, do you mean instead to refer to Alexander Skelton?

A.   I'm sorry, Skelton as well in addition to --

Q.   So four?

THE COURT:  So it's Leah Raffles, Knight, Skelton and Jones?

THE WITNESS:  Yes.  Sorry.

Q.   No worries.  I appreciate you clarifying it.

Focusing -- we're going to put Leah Raffles to the side for now.

Focusing on Alexander and David, the evidence you have to show that they were solicited are text messages about a meeting in Nashville, correct

A.   Correct.

Q.  To your knowledge, was Darryl Jones part of that discussion?

A.  I believe he was at some point, yes.

Q.  And there came a point in time when Darryl Jones was no longer part of that discussion, correct?

A.  I believe that's correct.

Q.  Okay.  So focusing just on David and Alex.  You do not have any evidence that David or Alex were hired by the USA entity that Mr. Wolff formed, correct?

A.  No.

Q.  You only have evidence about a meeting in Nashville, right?

A.  Correct.

Q.  You cannot clearly show that David or Alex met for the purpose of being hired by USA, correct?

A.  Yes.

Q.  You cannot, as you sit here today, identify what the purpose of the meeting in Nashville with David, Alex, and whoever else of the individual defendants were, right?

A.  Other than what Darryl Jones has said.

Q.  Okay.  And what has Darryl Jones said?

A.  He said it was about soliciting, forming a new roofing company together.

Q.  Can you repeat that?  Soliciting who?

THE COURT:  Can you repeat that or say it again?

A.  It was about using these people to form a new roofing

company.

Q. And when you refer to "these people," you mean Alex and David?

A. Yes, correct, along with Junior. Leah's name was not mentioned.

Q. Thank you.

Legacy does not have any evidence that any insurers that it works with have been in contact with Barajas, correct?

A. Correct.

Q. Nor does it have any evidence that Ms. Raffles or Mr. Wolff have been in contact with those insurers, correct?

A. Correct.

Q. Similarly, Legacy has no evidence that its suppliers have been in contact with Barajas, correct?

A. Correct.

Q. Same question with respect to Mr. Wolff and Ms. Raffles.

A. Correct.

Q. Now, in your declaration, you reference there are only three or four suppliers, correct?

A. That is correct.

Q. If I understand correctly, plaintiff has not taken any steps to reach out to and/or investigate whether these suppliers have been in contact with Barajas, Wolff or Raffles, correct?

A. That is correct.

Q.  Now, you testified that it is unusual for documents owned by Legacy to be downloaded rather than edited in the web interface, correct?

A.  That is correct.

Q.  Have you ever personally worked with Ms. Raffles?

A.  Not on any project.  I've had meetings with her on other things, as well as we were implementing AccuLynx many meetings that way, but no sort of project work that we would be working on a document.

Q.  Did you ever personally work with these documents in terms of editing them?

A.  At my position, no.

Q.  Are you familiar with the limitations that a web interface presents compared to revising documents into actual programs?

MS. ALLEN:  Objection, your Honor.  Foundation.

THE COURT:  Overruled.

Q.  Do you need me to repeat it?

A.  I think I know what you mean because we've had the same thing with Excel, particularly working on what I'm really familiar with is a work in process.  But you can use the non-web version, say, in Excel on your laptop, but you do not have to download the file into something other than One Drive.  That's one of the reasons why we operate with One Drive.  One Drive can also be hooked up to be the document that's shared in Teams.  That's why we have it set up that way.

THE COURT:  Counsel, it's just after 1:00.  Should we take our lunch break now.

MR. STPHAO:  Whatever the Court prefers.

THE COURT:  Well, I don't know how much more you have.

MR. STPHAO:  I have plenty.

THE COURT:  So we'll take our lunch break now.  The parties should plan to be back here really at 10 minutes after 2:00 with the hope that we might even get started at 2:15.

Have a good lunch break everybody.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

2:15 p.m.

THE COURT:  All right.  You may continue with your cross-examination.

MR. KATAEV:  Thank you, your Honor.

MICHAEL JOHN McCOMAS, resumed.

CROSS-EXAMINATION CONTINUED:

BY MR. KATAEV:

Q.  Good afternoon, Mr. McComas.  Welcome back.

A.  Thank you.

Q.  Before we ended, I started asking you about the SOP's name and the other documents that you referred to as trade secrets in this case, do you recall that?

A.  Yes.

Q.  The standard operating procedures, for example, though were created by defendant Raffles, correct?

A.  The standard operating procedure that I was discussing that was in production was not created by Leah.

Q.  She was -- withdrawn.

Notwithstanding the fact that she did not create those specific documents, she was tasked with revising them, wasn't she?

A.  Not that specific one, no.

Q.  To your knowledge, were there not other documents that you contend are trade secrets that Ms. Raffles was tasked with

creating and/or revising?

A.   There are specific Southern ones that, yes, she was tasked with creating.

Q.   And those are the documents that she downloaded, aren't they?

A.   Those are some of the documents she downloaded.  Those are not all the documents she downloaded.

Q.   Have you ever personally observed Raffles working on those documents?

A.   No.

Q.   Now, you did not personally run the audit log that shows that Ms. Raffles downloaded the documents, correct?

A.   I did not personally do that, no.

Q.   And you agree with me that she downloaded those documents during the time period that she was employed by plaintiff, correct?

A.   She was employed during that time, yes.

Q.   The last document she downloaded was in late May of 2025, correct?

A.   The last one we know about, yes.

Q.   And Ms. Raffles was terminated in late June, wasn't she?

A.   Yes.

Q.   Now, who ran the audit log of the documents downloaded by Raffles?

A.   I'm not exactly sure.  However, I believe it was likely Luc

who works for Legacy, so Luc Rubin.

Q.   And did you direct Mr. Rubin to do that?

A.   I did not.

Q.   Who did?

A.   I have no idea.  I did not do the investigation.

Q.   Understood.

To your knowledge, was there any direction within Legacy or to its forensic expert, Mr. Hadamik, I believe his name is, to also run an audit log of all documents uploaded to Legacy?

A.   Not to best of my knowledge, although, again, I wasn't involved.

Q.   If a document was downloaded, revised and then uploaded, that in and of itself would not be evidence of improper conduct, correct?

A.   The only thing I could say is that would be unusual because you wouldn't have to download it to be able to revise it.  So the idea it's a live document using it on SharePoint, so you could actually revise it without having to download it.  That's normally how we do that.

Q.   Many of the documents in the audit log are PDF files, correct?

A.   Many of them are, yes.

Q.   PDF by their nature are not editable, correct?

A.   You actually can edit a PDF.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.  But you would have to do so in the Adobe Acrobat program and not a web interface, correct?

A.  Correct, I believe, although I'm not an expert at that either.

Q.  Accepting that premise as true, the only way to edit a PDF document would be to download it first, correct?

A.  I don't know that fact.  I don't know.

Q.  You don't know one way or the other, correct?

A.  I have no idea.

Q.  One of the documents you claim Ms. Raffles downloaded was the employee roster, correct?

A.  Correct.

Q.  And you assert that it was improper for her to do that, right?

A.  Correct.

Q.  And you assert that because your clam is she would have no reason to work with that document in the course of her duties, is that right?

A.  It's not work with it.  It's download it.  There's no reason for her to download it to be able to work with it.

Q.  You don't dispute -- withdrawn.

You have no basis to dispute Ms. Raffles sworn testimony in her declaration that she downloaded the files in order to revise them and then re-upload them, correct?

A.  I would question that.  It seems a stretch for what I know

our standard operating procedure was within the company, that would be unusual.

Q.  Shifting away from the documents for just a moment, turnover is a major problem at Southern, correct?

A.  Correct.

Q.  There were instances where Legacy or Southern had trouble identifying its existing employees due to the turnover, correct?

A.  Identifying as existing employees?  No.

Q.  Is it not true that Ms. Raffles was tasked with keeping an updated log of all employees at Legacy or Southern?

A.  Definitely not at Legacy.  I'm not aware of what her role was with that at Southern.

Q.  Okay.  Now, the crux of the claims here are that Barajas was trying to open a competing company, correct?

A.  Yes.

Q.  Now, based on plaintiff's investigation into this, when is it that you believe Barajas started doing so?

A.  Based upon both the evidence, as well as discussions with other leadership at Southern, it may have started long before that March timeframe.

Q.  But the earliest date that you can reference based on the evidence is March, correct?

A.  Yes.

Q.  March of 2025?

A.   Other than discussions, I've had, yes, that is correct.

Q.   And that's the evidence that you've presented in court, correct?

A.   Yes.  Correct.  Correct.

Q.   Now, you've also testified and provided sworn -- a sworn declaration about nine roofing jobs that Mr. Wolff would have been a customer of Southern for, right?

A.   Correct.

Q.   And he's the other defendant -- one of the other defendants in this case, correct?

A.   Yes.

Q.   Mr. Wolff's nine prospective jobs were referred by Barajas, weren't they?

A.   I believe that's the case.

Q.   And Mr. Barajas referred these nine properties of Mr. Wolff for Southern to perform work in March of 2025, isn't that true?

A.   I believe that's correct.

Q.   So am I understanding your testimony correctly that Barajas was opening a competing company, stealing trade secrets, customers, vendors and suppliers from Legacy while at the same time referring work to Southern, the company that he's stealing from?

A.   The transaction is more what happened after they came into Southern hands.  So that's what is suspicious activity, what happened to those jobs afterwards.  A denial from the insurance

company, and we don't even know if all of them were denied. Normally, there would be followup with trying to get those denials overturned. So that's the suspicious activity on those jobs.

Q.  But you haven't presented any evidence about any attempts by Legacy or Southern to follow up, have you?

A.  I don't believe we have anything that way right now.

Q.  And you would agree with me that it doesn't jive that Barajas was opening a competing company while referring work to the plaintiff, correct?

A.  I don't think it precludes that based upon what happened to those jobs --

Q.  You would agree with me it's inconsistent, correct?

A.  It wouldn't be inconsistent if that's when he was formulating the idea to actually do that, and having those jobs could be the impetus for having him to actually want to go out on his own.

Q.  But your testimony is based on your own conjecture, correct?

A.  Correct.

Q.  Going back to the documents that Raffles downloaded, the only evidence plaintiff has is that Raffles downloaded those documents, correct?

A.  Yeah, the -- yes.

Q.  Plaintiff does not have, for example --

A.  Well, just a second.  So obviously it's downloading it, as well as the text messaging of what she intended to do with some of those, so both of those things together.

Q.  Fair enough.  But I'm referring to just the files themselves.

A.  Yes.

Q.  The only evidence you have with respect to the files is that they were downloaded, right?

A.  Correct.

Q.  You don't have any evidence to show that Raffles disseminated those documents, correct?

A.  We do not other than the intent.

Q.  In your forensic imaging of Raffles computer, you did not uncover any evidence that Raffles emailed those documents to anybody outside of Legacy or Southern, correct?

A.  I did not do that forensic testing.  I don't know.

Q.  You're not aware of any such --

A.  I'm not aware of that.

Q.  Same thing with respect to her phone, you're not aware of any evidence that Raffles sent text messages or any other medium containing Legacy's documents outside of Legacy or Southern?

A.  I'm not aware of that, but I would not -- I am not aware of that but also was not investigating that.

Q.  And you have not offered any such evidence in your papers

or in your direct testimony, correct?

A.   Not in my testimony, no.

Q.   Now, going back to your July 7 declaration, isn't it true that you implicitly acknowledge that Raffles used artificial intelligent tools, such as ChatGPT to perform her work?

A.   She did.

Q.   And Legacy as a company was aware that Raffles used ChatGPT to draft and revise documents, correct?

A.   Yes.

Q.   It was aware prior to the filing of this lawsuit, correct?

A.   Yes.

Q.   And you know that despite the fact that your interactions with her were limited, correct?

A.   My interactions were more than limited.  We did have a one-on-one session, which is roughly an hour every two weeks.  We didn't always make it.  We were also in many meetings together, so it definitely was not limited.  The only thing I was saying earlier is that we did not work on her project together.

Q.   Understood.  It's fair to say that Legacy condones the use of artificial intelligence tools such as ChatGPT, correct?

A.   When it's to the advantage of the company to do so, yes.

Q.   Legacy did not enter into any confidentiality agreement with the owners of ChatGPT, correct?

A.   Correct.

Q.   Did you answer?

A.   I said correct.

Q.   Sorry.  And by using a tool such as ChatGPT, Legacy inherently agreed to the terms of use, correct, for ChatGPT?

A.   Assuming we understood that.

Q.   Now, ChatGPT would be obligated, for example, if it was subpoenaed, to produce any information in its possession by legal process, wouldn't it?

A.   I don't know.  I don't know what their terms are.

Q.   Okay.  Logically speaking, by uploading documents to ChatGPT, Legacy's documents would lose its trade secret status, wouldn't it?

A.   I'm not an expert in that area.

Q.   So you don't know?

A.   I don't know.

Q.   By uploading documents to ChatGPT, those documents would become known and publicly available, wouldn't they?

A.   I don't know how ChatGPT works.

Q.   By uploading the documents to ChatGPT, those documents were no longer kept under lock and key, correct?

A.   I don't know how ChatGPT works.

Q.   Are you aware of an email address used at Southern to communicate with all employees of Southern?

A.   I believe that there is one available, and I think there's one -- there is a specific one for each of the three companies.

Q.  Do you know the one for Southern?

A.  I don't.

Q.  If I could refresh your -- attempt to refresh your recollection, would TeamSouthern@SRNR-US.com be that email address?

A.  I don't remember.

Q.  To the best of your knowledge, would such -- withdrawn.

To the best of your knowledge, is there such an email that you can send to an email address where it would go to all employees of the company?

A.  No.  To the best of my knowledge, no.

Q.  You don't know one way or the other?

A.  Correct.

Q.  Are you aware that Ms. Raffles sent emails to such an email address where these standard operating procedures and other documents were disseminated to the entire company, rank-and-file employees, managerial employees, so on and so forth?

A.  I'm not aware of any sensitive documents that would have been sent that way.

Q.  Are you the recipient of any emails from such an email address where it's sent to that email address and it goes to everybody?

A.  I'm not aware of any that go to the entire company.  I am aware of the one that goes to Legacy.

Q. Okay. Who currently owns Southern?

A. So that would be Legacy Restoration.

Q. So the plaintiff is the owner of that company?

A. Correct.

Q. It's the sole owner?

A. Yes.

Q. Would Legacy be considered a parent company or parent corporation of Southern?

A. It's both an operating and a parent company.

Q. There was a time period towards the end of the year going to the new year, '24 to '25 where Legacy was doing what was called restructuring. Does that ring a bell with you?

A. Where Legacy was restructuring? No, it does not.

Q. What about Southern, was Southern restructuring?

A. Southern was restructuring into their current regional titles and structure, yes.

Q. Is it fair to say that the restructuring of Southern was what you earlier testified about, making Southern's policies and procedures identical or similar to Legacy's?

A. No. It was more dealing with how Southern had been structured before the acquisition and not doing well with kind of the weird structure it had in between and trying to focus more on the sales process and then focusing that structure into the sales director roles which Mr. Barajas was one of them.

Q. And in doing that restructuring, was part of the process

converting Southern policies and procedures to Legacy's?

A.   It had nothing to do with that structure, but yes, we had been already on the integration of separate Legacy things into Southern.

Q.   And Raffles was tasked with doing that work that you just described, right?

A.   Doing some of that work, correct.

Q.   And Legacy remained separate from Southern for branding purposes and other reasons, right?

A.   For branding purposes, yes.

Q.   Now, if Raffles revised a Legacy document that is in the cloud maintained by Legacy, and she was revising that document to make a Southern document, wouldn't she have to download the document to revise it?

A.   I don't believe so.  Again, I'm not an IT expert.  I would imagine you could simply go to SharePoint, open it up online, rename it online, and then revise it.  But I'm not an IT expert.

Q.   Is it fair to say that if she did not rename it and just revised it, you would lose the Legacy document when it would be converted to a Southern document?

A.   I believe you can actually go backwards in time so you could recover that.  Again, I'm not an IT expert, but I don't think you would lose the original.

Q.   Does Legacy perform any work with respect to heating,

ventilation and air conditioning?

A.  We do ventilation and mainly ridge vents and soffit vents, mainly that which are close to components of the roof, and then the soffit would be more siding.

THE COURT:  Can you explain that to me?

THE WITNESS:  Yes.  So the ventilation of a roof is one of the critical components of a roof.  So in order to maintain your shingle warranty, they need to be properly vented.  So the heat that comes down on shingles that if you don't have the air flow through the attic to cool them down, it ruins the shingles.  So having that ventilation is really, really critical.

Q.  That type of ventilation work has nothing to do with the mechanical work involved?

A.  It has nothing to do with HVAC, correct.

Q.  And, similarly, Legacy does not perform any plumbing or water irrigation work, correct?

A.  We do no yard irrigation work, and we do no plumbing.  And I should actually -- plumbing, that could be considered the soil stack.  So we do work around the soil stack or when we have to replace that if it's damaged, so we do, I guess, some of that.

Q.  It's fair to say that Legacy does not do new construction, correct?

A.  We did new construction in 2015 and did discontinue that.

Q.  But no longer does, correct?

A.  Correct.

Q.  In the course of this lawsuit, this case, you did not personally interview Ms. Raffles, correct?

A.  I did not.

Q.  Can you explain the alleged irreparable harm that plaintiff has suffered?

A.  Yes.  So the main harm is obviously the documents being out there, being able to compete against us.

The other significant harm is thinking about the people that are organizing to take people away.  So we reestablished a more sales focused structure at Southern having that regional sales director role.  So the people that were solicited was the person they all reported to, Alex Skelton, along with the regional directors, Mr. Knight and Mr. Jones, as well as the lead one being Mr. Barajas.  So that is three-fourths of their regions, plus their director who was over those regions.  So it almost guts the company that way.

Q.  Ultimately, none of those individuals were actually solicited to work elsewhere, were they?

A.  What?

Q.  Ultimately, none those individuals were actually solicited to work elsewhere, were they?

A.  I believe they were based upon the documentation I saw.

Q.  To your knowledge, those individuals are not currently

working in any competing company, are they?

A.  I don't know where they're working.

Q.  And you don't know whether they're working at all, correct?

A.  I do not.  I have seen their pictures together with Mr. Barajas and Mr. Wolff significantly over the last month.

Q.  Those pictures were at social functions, correct?

A.  That is correct.

Q.  And plaintiff terminated those individuals, correct?

A.  Correct.

Q.  You don't have knowledge as to who created the standard operating procedure, correct?

A.  Can you be more specific?

Q.  The standard operating procedures that you refer are trade secrets in this case, do you have knowledge as to who created them?

A.  So there are many different ones so the one that I particularly identified, the production one, I do know exactly who created that.

Q.  Who was it?

A.  And I gave the names earlier, which I'll repeat.  Shayne Havens, my VP of production; Rachel Kraft, my director of PCs; Paul Morrell, my director of training; and I mentioned Steve Herzau, my director of field production.

Q.  What was Ms. Raffles title job title at Southern?

A.  I believe she was -- there was a couple of different titles

also, but national director of admin, I believe that was one of them.

Q.   During the course of Raffles employment, isn't it true that she recorded various instances of misconduct by other employees?

A.   I'm not aware of any instance of that.  She never reported that to me even when we had significant one-on-ones.

Q.   I believe I may be done.  Actually, one minute.

A.   Excuse me?

Q.   I was telling the Court I believe I may be done.  I just need one minute.

THE COURT:  Okay.

Q.   Other than the requirement to log in with a user name and password, plaintiff Legacy did not in any other way protect its alleged trade secrets or documents, correct?

A.   There is an additional step with an authenticator that you have to have on your cellphone that when you log in, and sometimes it does this every so often, that you actually have to go to your phone and type in the numbers that your screen has in order to continue.

Q.   That feature that you're discussing only relates to accessing email, correct?

A.   No, it actually accesses the Teams environment in general, which includes email.

Q.   In submitting papers on July 7, there's an exhibit that

contains Google reviews USA, correct?

A. One more time? I'm sorry.

Q. In submitting exhibits with your July 7 declaration, there's an exhibit that contains Google reviews, correct?

A. Yes.

Q. And those Google reviews are of USA, the alleged competing company, right?

A. Yes.

Q. Those reviews do not mention Mr. Barajas in any way, do they?

A. I don't know what those reference.

Q. To your knowledge, who created the training materials that Southern uses?

A. So there are many different training materials. So some of them I'm sure Leah created. There are other training materials that were included and downloaded that Legacy had created, and they were created by Josh Conrad, who is a Legacy director of training.

Q. You've seen the defendant's declarations in opposition to the motion, correct?

A. Roughly.

Q. In those declarations, there's an assertion that Legacy knew that Raffles was performing work "on the side for other companies," right?

A. I've seen that, yes.

Q. You have no reason or basis to dispute that Legacy knew about that, correct?

A. Legacy did not know about that in -- with the exception of, I think it was in late April, where Leah talked about doing that with Junior's business, his trucking business, and which raised John Wysseier's eyebrows. That's the first time I knew she was doing work for other businesses. I did know that Leah was doing some interior work at Junior's house as well, which I also brought to the attention of John Wysseier.

Q. When Legacy learned that Ms. Raffles was performing work separate and apart from her work at Southern for other people, including Mr. Barajas, in April, Legacy did not terminate her in April, correct?

A. She was put under extreme watch to try to figure that out. So higher alert. We simply didn't disregard it.

Q. Are you testifying that your investigation into Ms. Raffles' conduct extended from April of 2024 until her termination in late June of '24.

A. We look at all employees that have things like that happen. So, yes, we -- yeah, again, we look at all employees that have suspicious activity.

Q. You testified on direct, I'm quoting: "It looked like Barajas was competing."

        How did it look like Mr. Barajas was competing? What specifically gave you that conclusion?

A.   So the most damaging part of that is recruiting people from the roofing world, as I was talking about, the regional directors.  Why would you recruit experts in roofing if you were not going to compete?  There's also the house in Mississippi.  There's also the questionable nine properties that Mr. Wolff, owned as well as texts.

MR. KATAEV:  Thank you.  Just one more second.

Thank you, McComas.  I have nothing further.

THE COURT:  Redirect.

MS. ALLEN:  Just a short one, your Honor.

REDIRECT EXAMINATION

BY MS. ALLEN:

Q.   Mr. McComas, earlier you said that retail was 15 percent of the business.  Do you remember that?

A.   Yes.

Q.   What does 15 percent of the business equal in terms of annual revenue?

A.   Around 30 million.

Q.   You said 30 million?

A.   Yeah.

Q.   We spoke earlier about Exhibit 53 to your declaration, the single-family insurance and retail production chain of command and communication SOP.  Do you remember that?

A.   Yes.

Q.   Did Raffles work on that document?

A.   Not to best of my knowledge, and -- she would have had no knowledge to be able to work on that, as far as I know as well.

Q.   Do you know if she put that document into ChatGPT?

A.   She definitely did not.

Q.   For those nine properties of Wolfe that we had signed contracts for, how much -- if Southern had done those jobs, how much would those jobs have been worth?

A.   Our rule of thumb at Southern, it's slightly lower than Legacy.  $16,000 per roof, roughly.

Q.   And how much is the margin -- is the profit $16,000 per roof or is that the --

A.   No, that is the revenue.

Q.   How much is the margin profit on $16,000 per roof for Southern?

A.   It's about 41, 42 percent.

Q.   So it's a 41, 42 percent margin on those roofs?

A.   Correct.

Q.   If Barajas had referred those jobs to Southern in March 2025 when Barajas was still at Southern as an employee, how much would he have made on those roofs?

          MR. KATAEV:  Objection.  Hypothetical.

          THE COURT:  What's the objection?

          MR. KATAEV:  Hypothetical.

          THE COURT:  Overruled.

A.   Can you say that again?

Q.   So if Barajas -- earlier we talked about Barajas referring those roofs, those nine properties of Wolff's to Southern.

A.   Yes.

Q.   How much would he have made on those while he was an employee?

A.   Zero.

Q.   And those jobs went dark in Southern's system after April 10, 2025 after he had been terminated, right?

A.   Correct.

Q.   You earlier mentioned on cross notes of an interview between JT and Barajas.  Do you remember that?

A.   Yes.

Q.   What notes were you talking about?

A.   There aren't notes of the meeting.  It was just a note that the meeting took place.

Q.   Do you remember sitting here today if that was an email or something else?

A.   I don't remember specifically what that was.  I didn't remember seeing it in writing.

Q.   When Legacy purchased Southern in 2024, did Southern do interior renovation?

A.   They actually did.  So it's common in roofing companies to also do drywall and painting because you have a lot of roof leaks that leak into the house, and then you have to repair that.  Also, many houses have skylights that you have to repair

around the skylights, so being inside the home is not uncommon.

Q.  When Legacy purchased Southern in 2024, did Southern do new construction?

A.  There was at least one job identified in the Nashville area because we were identifying our insurance needs for new construction, which is different than restoration, so there was one project I remember Jeremy Eubank specifically talking about that project.

Q.  You mentioned that Legacy learned in April 2025 that Leah Raffles had done interior work for Junior?

A.  Yes.

Q.  What did she do?

          MR. KUSHMAKOV:  Objection.  Sorry.

          THE COURT:  I'm only going to take objections from one lawyer.  You may proceed.

Q.  Can you tell us about that?

A.  About Leah telling --

Q.  I just didn't -- I had not heard of this before, so you had said Leah had done interior work for Junior, and this was discovered in April of 2025?

A.  So there's two separate things.  One was during a meeting with me Leah was talking about doing interior work for Junior. So I had quickly mentioned that to John Wysseier, who had Leah kind of under scrutiny based upon writing SOPs that he found out from Leah directly, Leah writing SOPs for Junior's trucking

business.  Both of those raised our eyebrows on what she was actually doing.

Q.  But the trucking and interior thing were two different issues?

A.  Yes.

Q.  And both of those were discovered in April 2025?

A.  Roughly, yes.

Q.  Okay.  You mentioned on your cross soil stack?

A.  Yes.

Q.  What is that?

A.  So it's the -- every toilet has kind of an air stack so the fumes from the sewer don't get into your house.  That's why you have the water and -- I don't know plumbing, but it's the drain that the water is in.  And so instead of the air from the sewer coming up through the toilet, it actually goes up the stack, and that stack is actually the soil stack too where the waste products go down.

Q.  Do Legacy and Southern work on soil stacks?

A.  If it's damaged, it goes through the roof, so we need to work around it or we need to sometimes repair it.

Q.  I'm going to show you quickly the definition of business from the purchase agreement.  I'll just start reading it while we're waiting.

It reads:  Business means -- this is from your affidavit Exhibit A in the first amended complaint, Exhibit A.

Business means the business of exterior residential and multifamily restoration.

Does Legacy do that?

A.   Yes.

Q.   Does Southern?

A.   Yes.

Q.   It then says:  Including, but not limited to, the repair or replacement of roofing.  Does Legacy do that?

A.   Yes.

Q.   Does Southern?

A.   Yes.

Q.   Siding?

A.   Yes.

Q.   Do they both do that?

A.   Yes.

Q.   Gutters?

A.   Yes.

Q.   They both do that?

A.   Yes.

Q.   And windows?

A.   Legacy only.

Q.   Did Southern ever do windows at or around the time that you purchased it?

A.   I don't know.

Q.   Then it says:  Residential and multifamily renovations?

A.   Mmm-hmm.

Q.   Do Legacy and Southern both do that?

A.   Yes.

Q.   Interior and exterior residential and multifamily maintenance?

A.   Legacy exterior.  And I don't know about multifamily interior for Southern.  I would imagine they likely did, but I don't know.  I don't have the facts.

          THE COURT:  Anything further?

          MR. KATAEV:  Just one question.

RECROSS EXAMINATION

BY MR. KATAEV:

Q.   To your knowledge, those nine roofing jobs that Mr. Wolff had, they were never performed by a different contractor, were they?

A.   I have no knowledge of what happened afterwards.

          MR. KATAEV:  Nothing further.

          THE COURT:  I've got a couple of followup questions.

          Just let me ask and then see if the parties have some followup they want to ask.

          I'd like to understand a little bit better the business of Legacy and the business of Southern.  You mentioned exterior renovation.  Can you explain to me what you meant by that?  What's involved with exterior renovation?  How does that differ from roofing?  What's roofing?

THE WITNESS:  Yes.  So exterior is the complete envelope of residential property:  So, siding, soffits, gutters, windows, everything that you would see on the outside. That's really what it is.

THE COURT:  And the siding is the exterior wall, is that correct?

THE WITNESS:  Yes.  So you could have -- so thinking of a normal residence, obviously, you could have masonry, we don't really do that.  Most of it is siding, metal siding, wood siding, aluminum siding, that kind of stuff that would be the siding.

THE COURT:  Am I understanding you correctly that the -- tell me what Legacy's customer base is like.

THE WITNESS:  So mainly suburban.  So the age is usually from 35 to 65 years old, medium-sized homes, and I won't do square counts for you.  Roofing size dollar-wise around 20, 22,000 for Legacy.  It's a little bit lower for Southern based on their properties.

THE COURT:  And are these jobs that come in through natural disasters or through the ordinary decay of roofs and siding through weather over the course of years?

THE WITNESS:  It is both.  And the disasters don't have to be a huge disaster.  You could have a little hail storm, you know, three-quarter inch size hail that nobody thinks about can damage both siding, windows, roofing, and

gutters.  And also wind over 50 miles an hour can also damage shingles.

THE COURT:  So do your salespeople go out and try to locate properties?  How does business come in?

THE WITNESS:  Yeah.  So they're actually -- there's software that we use that actually locate where heavy hail has been, and actually gives you the properties under that to go out and door knock.  So it has both wind speed, as well as hail size, and it gives you what's called a swath, so we have Spotio which directs our salespeople into those areas to do door-knocking as well as canvassing.

THE COURT:  Now explain to me what the Southern business was at the time of acquisition and how it differed from, if at all, from the Legacy business.

THE WITNESS:  So the customer acquisition was extremely similar.  So doing both canvassing and hard door knocking, and mostly insurance related with some retail.  So very, very similar businesses.

THE COURT:  What about the actual work that would be done by Southern as opposed to done by Legacy?

THE WITNESS:  Yeah, Southern was complete -- the work done was completely by a single sales rep.  So it would be from knocking on the door, getting the contract, going to the adjuster meeting, probably doing some of the supplementing, arranging for the production, ordering materials, watching the

job site, and invoicing at the end. So they did the whole thing.

THE COURT: Okay. Has the Southern business changed since it's been acquired by Legacy, not in terms of how it's done, but in terms of what types of projects are done?

THE WITNESS: We've eliminated some of the one-off projects where we have interior things that we can't do very well or some margin issues that we have. I'm trying to think of what your question actually entails.

THE COURT: I'm trying to really understand the business. And I guess the question is: Are there projects that Southern previously did that it no longer does under the Legacy business and types of projects that Southern previously didn't do that it now does under the Legacy?

THE WITNESS: Yes. So there aren't a lot of projects that they do now that they didn't do any of in the sense they did most of the sense that Legacy does. The difference of what Legacy does now and what Southern does now is really the windows component, which we are going to blow out to Southern.

The business or the types of business that Southern did that we're hoping to stop with the Legacy-style production has been the interior work, has been the new construction, has been all the one-off construction things, probably even some flooring and other things in there.

THE COURT: All right. Any followup questions from

plaintiff?

MS. ALLEN:  No, your Honor.

THE COURT:  What about from defendant?

MR. KATAEV:  A few.

RECROSS EXAMINATION

BY MR. KATAEV:

Q.  Southern provides warranties for its work upon completion, correct?

A.  Correct.

Q.  And Southern performs quality work that is supposed to last for years and years, if not decades, right?

A.  Sure.

Q.  That said, logically speaking, virtually all the projects are one-and-done.  In other words, there's not a lot of room for repeat business from the same customer, right?

A.  That's incorrect.  Usually in hail -- primary hail spots, primary wind spots, we've actually done the same home several times over the course of several years.

Q.  That's the only exception, right?

A.  It's actually more frequent than one would expect.

Q.  You referenced an application called HailTrace, right?

A.  That is one of the applications, yes.

Q.  That is not a proprietary application of Legacy, right?

A.  Not at all.

Q.  Publicly available to all roofing contractors, right?

A.   Yes, for a cost.

Q.   There is no protectable interest in leads and/or customers of Legacy, is that correct?

A.   So I would separate HailTrace from leads.  Obviously, leads there would be, that should be protected, because leads are separate from HailTrace.

Q.   And leads are obtained by going door-to-door primarily, correct?

A.   Leads are done by referrals.  Leads are done by internets, websites, call center as well as door-to-door.

          MR. KATAEV:  I have nothing further.  Thank you.

          THE COURT:  All right.  Thank you, sir.  You're excused as a witness.

          (Witness excused)

          THE COURT:  Is there anybody else that plaintiff is calling as a witness?

          MS. ALLEN:  No, your Honor.

          THE COURT:  So plaintiff rests.

          Is defendant prepared to call its first witness?

          MR. KATAEV:  If the Court is prepared to have it appear by remotely.

          THE COURT:  We're going to take a ten-minute break for the technology to be arranged.

          (Recess)

          THE COURT:  Before I forget, I would like to ask the

parties to order a copy of the transcript on an expedited

basis.  That will be helpful for me.  Defendant will call their

first witness.

MR. KATAEV:  Your Honor, defendants called Oswaldo

Junior Barajas.

THE COURT:  Okay.  Mr. Barajas, can you hear me?

THE WITNESS:  Yes, your Honor.

THE COURT:  Please raise your right hand.  My

courtroom deputy will administer the oath to you.

OSWALDO BARAJAS,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

DEPUTY CLERK:  Can you again state your full name for

the record, and spell out your first and last name.

THE WITNESS:  Oswaldo Barajas.  O-S-W-A-L-D-O.

B-A-R-A-J-A-S.

THE COURT:  Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. KATAEV:

Q.  Mr. Barajas, good afternoon.

A.  Good afternoon.

Q.  You were an owner of Southern prior to its purchase,

correct?

A.  Correct.

Q.  What percentage of interest did you own in Southern?

A. 6.43 percent.

Q. And were you the founder of Southern?

A. No, I was not.

Q. How many other shareholders were there in Southern prior to Legacy's purchase of it?

A. It was a total of 11 operations partners, all which started from the sales force and worked ourselves into an operations partner.

Q. How did you come to work at Southern?

A. I got recruited by the founder, Christopher Eubank.

Q. Mr. Eubank a/k/a Shi, is that right?

A. Correct.

Q. When Shi recruited you, did you immediately obtain an ownership interest or did that come later?

A. No, absolutely not. I went about 18 months before I got the opportunity to become a partner.

Q. So when you first started, you were just an employee, correct?

A. Correct.

Q. There came a point in time when Legacy purchased Southern, right?

A. Correct.

Q. How did you first learn about that?

A. Just a couple months before the transaction actually occurred.

Q.   And to your knowledge as you sit here today, when were discussions first held between Legacy and Southern about the purchase of Southern?

A.   I was told by Shi after he got off of his NDA that it had been about a year of putting it in the works.

Q.   The closing date was in January of 2024, right?

A.   January 6 of 2024, correct.

Q.   If I understand your testimony correctly, you only learned about the sale in November of 2023?

A.   Correct.

Q.   When were you first presented with any contracts or agreements related to the purchase?

A.   A couple weeks before the transaction closed, we all got oriented in a room, and it was actually announced.  Nobody knew of it up until that day.

Q.   Did you sign the document that same day?

A.   Correct, which was my 6.43 percent, that is when I found out that we had just changed all our lives.

Q.   Did you sign documents the same day you learned about it and at the closing or just one of those dates?

A.   No, we found out about the sale, and then we didn't know numbers.  We didn't know a full transaction date up until we had the -- what would have been the disclosure to the rest of the operations partners.  I was one of the first guys to get told it, but I didn't know any insights on it just like till we

had that meeting.

Q.  If I understand your testimony correctly, in November of 2023 you learned of the purchase just -- and just the fact that Legacy is purchasing Southern, correct?

A.  Correct.

Q.  But in November of '23, you were not told how much you would be getting or anything along those lines, right?

A.  No.

Q.  When did you first learn how much compensation you would be getting for selling your 6.43 percent interest in Southern?

A.  I would say probably mid December is when those conversations started to be had.

Q.  Just two weeks prior to the closing or thereabouts?

A.  Correct.

Q.  Did you attempt to negotiate the price that you were offered for your interest?

A.  There was no negotiation.  It was more sign, sign the line.

Q.  Are you saying that you attempted to, and the purchaser, Legacy, refused?

A.  No.  There was really no negotiation.  The deal had already been wrapped up when those contracts got presented.

Q.  Did you have the option of leaving your employment with Southern prior to the purchase?

A.  No.  We were all instructed that we needed to be there at least a year.

Q. And who instructed you to do that?

A. That's what it was relayed as the -- what the private equity firm requested; that's how it was disclosed to me.

Q. Did you hire your own attorney to review the agreements?

A. I did not.

Q. Did you seek the advice of an attorney at the company to review the agreement?

A. No.

Q. Did you inquire about obtaining an attorney to review the agreement?

A. No. I thought about it, but it was such a trusted system that -- it was a life-changing moment, so I didn't think about it.

Q. When you were presented the documents, did you read them?

A. Yes.

Q. Did anything in the documents give you cause for concern?

A. I thought we were valued more as a company, that's all that came to my mind at the time.

Q. Did the re -- withdrawn.

Did you come to learn of the restrictive covenants in the agreements during your review of it?

A. Yes.

Q. Did those restrictive covenants cause you concern?

A. Yes.

Q. What, if anything, did you do about your concerns

concerning the restrictive covenants?

A. Restricting the -- the attempt of going five years, and -- it was so broad at the time that I just wanted the opportunity to get back in the industry and not have to wait five years.

Q. Did you raise that concern with anybody?

A. I think it was everybody's concern. Once again, when the sale got started and we all signed, it was more sign here. We didn't really have a say-so on that end. So whether you had a disagreement or not, everybody signed the line.

Q. Did you ever discuss the restrictive covenants with anyone else at Southern?

A. No.

Q. Do you recall any discussions with an individual named Darryl Jones about the restrictive covenants?

A. No.

Q. Did you ever exchange any text messages with Darryl Jones about the restrictive covenant?

A. No.

Q. During the time you worked at Southern prior to Legacy's purchase of it, were you involved in any other businesses?

A. Can you repeat that?

Q. During the time you worked at Southern prior to Legacy's purchase of it in January 2024, were you involved in other businesses?

A. Yes, I was.

Q. Can you briefly describe those businesses and when you first started working in them?

A. I started off with real estate, both selling what I call dirt but piece -- parcels, selling it to investors, and that further became me developing those plots of land into new development, having strategy deals, turning some of those developments into long-term rentals, and along that time I also got into the commercial fleet business, which sells work vans and work trucks for multi-trades.

Q. When did you first get involved in the real estate development business?

A. The end of 2023 going into 2024.

Q. What about USA Fleet Sales?

A. That didn't go into operation until this year.

Q. When did you first start discussions about USA Fleet Sales?

A. It would have been about a year ago.

Q. You've had an opportunity to read the plaintiff's papers in this case, correct, generally speaking?

A. Correct.

Q. In one of the affirmations of Mr. McComas, there's a discussion about an interview conducted of you in April of 2025. Do you recall that?

A. No.

Q. Do you recall having an interview with anyone or discussion with anyone at Southern or Legacy in April of 2025?

A.   Yes, I did, but not with McComas himself.

Q.   Okay.  Who interviewed you?

A.   It was John -- John Falls and James Shaheen.

Q.   What are their titles or roles at Legacy or Southern?

A.   At the time James Shaheen was the president and John Falls was the vice-president.

Q.   And what happened during -- withdrawn.

The papers that plaintiff filed refer to this meeting as an "interview."  Was it an interview or something else?

A.   No.  It was an accusation.

Q.   Okay.  Can you describe in sum and substance what they said to you and what you said to them during that meeting?

A.   I waited about a day.  It initially started with a group text message that was sent out by James Shaheen referring to something bad that had happened.  I then got a link to the call.  And the conversation ensued that there were talks and rumors that I was creating a competing company.  And I took a lot of pride within the Southern platform, and everybody knows the pride that I have, so I immediately, I combusted.  I told them why would I have sacrificed my entrepreneurship and development for an additional year because I was only mandated to stay there for a year.  So my response to their accusations was why would I destroy something that I'm not even getting paid to do because the salary didn't cover my expenses of what I was doing for the platform.  It was more so trying to reach

the finish line of what we all promised each other as business partners, so the conversation presumed to and continued to pry information about me competing against the company which, once again, more so led to nobody really agreeing and the call getting terminated, which then led to later call by James Shaheen saying that they had got what they needed, and obviously that they were going to terminate me.

Q. Did you admit during that conversation or the subsequent conversation that you opened a competing company?

A. Absolutely not.

Q. Have you opened any competing company?

A. No, I have not.

Q. To your knowledge, what is USA Contracting?

A. I couldn't tell you because it's a business that I'm not associated with.

Q. Isn't it true that Brian Wolff, your partner in USA Fleet Sales, opened up USA Contracting?

A. Yes, correct.  There was talks about him doing that, and we coexisted in some real estate aspect, so the intent was in the talks were about him creating a multi-trade contracting company.

Q. And why is it that he discussed this with you?

A. Because, once again, we have and are wanting to create an extensive rental portfolio.

Q. And why was USA Contracting important to the real estate

portfolio?

A.   It would keep internal costs lower margins so as to where, you know, we're building for a $180 a square foot, we could have brought it down to $140 a square foot.  So cost efficiency, along with HVAC and plumbing to orient that.

Q.   What role, if any, would you have had with this entity called USA Contracting?

A.   No relationship besides benefiting my development costs.

Q.   Assuming USA Contracting got off the ground, would you have been a customer of it?

A.   Yes.

Q.   Do you have any thoughts or beliefs as to why Legacy is coming after you with this lawsuit?

A.   Yes, I do.  I feel that there was discussions prior that I -- which came to fruition, but it began in November where the restructure came, and they were condensing the vice-president positions down to a regional director roles, and I feel that Legacy was trying to push me out of the portfolio.  There were conversations in regards to that.  There was actually a surprise when the re-org happened, and I was still in the portfolio.  And I feel that it's also a reason to come after a situation that they didn't get what they wanted out of it, and to create a half-baked (static) and not having to pay the back-end money that's involved with our transaction.

Q.   In other words, they have further obligations to you under

the purchase agreement, right?

A. They do. They have 50 percent remaining stock in my investment.

Q. And they have not complied with that contractual obligation, is that right?

A. Correct.

Q. You are accused of soliciting employees of Southern away from Southern. Have you solicited any employees of Southern?

A. No.

Q. There are text messages about a meeting in Nashville with David Knight and Alex Skelton. Are you familiar with that?

A. Yes.

Q. What can you tell us about that meeting?

A. They actually came to town on a Southern instructed situation in regards to some management switches that they were going to do at the Nashville location. I happen to live in Nashville. I have good connections in Nashville, so any time they come into town, I'm usually the first point of contact. So they came into town, and we had a mutual meeting around lunchtime when they got into town.

Q. Was the purpose of your meeting to discuss any business with them?

A. No.

Q. Based on what I'm hearing, you're saying that David and Alex came over from Mississippi for work purposes and just

wanted to socialize?

A.   Correct.

Q.   What, if anything, did you, David and Alex do socially when they came to town?

A.   We went and had -- went to a typical spot, Blanco that we usually meet at, went there and had some food and a few drinks.

Q.   Other than going to that restaurant, did you, David and Alex do anything else socially?

A.   No.  I left after we met and concluded meeting at Blanco.

Q.   Blanco, B-L-A-N-C-O?

A.   Correct.

Q.   Do you recall how many drinks that each of you had at Blanco

A.   Probably had around four, five drinks.

Q.   Each?

A.   Correct.

Q.   Did David and/or Alex ask you for help with any other social outing while they were in Nashville since you know the area?

A.   Yeah, I believe they went out after we departed, all three of them actually did.

Q.   To your knowledge, where did they go, and did you facilitate that in any way?

A.   No, I did not, and I don't know where they went.

Q.   What about Ms. Raffles?  Do you deny soliciting her as

well?

A.   Correct.

Q.   How did it come to be that Ms. Raffles exchanged text messages about your dealings with each other -- withdrawn.

What was the nature of Ms. Raffles' discussions with her mother about your dealings with each other?

A.   I was unfamiliar with anything at that time besides what she was helping out with my dealership.

MR. KATAEV:  Hold on.

MS. ALLEN:  Objection.

THE COURT:  The objection is sustained.  That answer is stricken.

Q.   What was the nature your discussions with Ms. Raffles?

A.   In what reference?

Q.   Let me take a step back.  Withdrawn.

You deny soliciting Ms. Raffles.  How did it come to be that you two connected?

A.   I've known Leah for about seven years.

Q.   Did you initiate contact with her?

A.   No.

Q.   Did she initiate contact with you?

A.   Yes.

Q.   What did Ms. Raffles say to you when she initiated contact?

A.   There was multiple things going on within the organization at the time from the restructure of the vice-president

positions down to regional directors, and there were a lot of false promises at the time that were going on with bonus structures, and they were starving the staff with bonuses that people were entitled to that they weren't getting paid out.  So it became the conversation with Leah that she was actually putting herself in a financial bind working but not getting compensated accordingly to it.  I mean, that's how those conversation discussions came about in regards to being able to try to supplement some of that income because she was an asset to the company who couldn't afford to lose her.

Q.  Did you ever ask Ms. Raffles to obtain any documents of Legacy or Southern?

A.  No.

Q.  Is there anything else that you believe the Court should know about facts of this case and the allegations made by the plaintiff?

A.  I didn't spend the last seven years of my life building something to tear it down.  I played a big key component in always hearing people out within the organization, and then to be complete self-sabotaged to destroy something that I helped build that everybody knows me for.  This was a far reach of a witch hunt from several individuals within the organization that didn't like the outspoken person that I was at the time which was fighting for those compensations and those bonuses that never got paid out.  That it become a point proven when I

left they weren't going to let me do anything, whether it was roofing, anything trade-related. They didn't get their way, and I feel that I've been (indiscernible) put my family, put multiple people in a situation that they shouldn't be in because I was never any -- I'm never part of any business. I'm a developer. I'm an investor. I'm just a father trying to create a legacy for his kids and not destroy one that he just built for the last seven years. That's it.

MR. KATAEV: I believe I may be done. I just want to check with my co-counsel. Two brief lines of questioning.

THE COURT: Okay.

Q. During the time that you continued to work at Southern after Legacy purchased it, what knowledge, if any, do you have about Ms. Raffles moonlighting and doing work other than her work at Southern?

A. Leah was an individual that was used by several individuals from pre-transaction to post transaction of being a very valuable person and someone that was always willing to help. So she was always doing work or helping or assisting in some type of way. Whether it was a small venture or a big one, she was always there to help.

Q. Can you briefly describe the type of work she did to assist you and Brian at USA Fleet Sales?

A. It was primarily creating a business packet, so we could distribute to our clients for outfitting vehicles and creating

an employee handbook for us.  And that was it.  It was those two things.

Q.  To your knowledge, was anyone at Legacy or Southern aware that Ms. Raffles was performing this work?

A.  Absolutely.

Q.  Did you hide the fact that Ms. Raffles was helping you and Brian at USA Fleet Sales from Legacy or Southern?  Do you need me to repeat that?

A.  Yes, please.

Q.  Did you hide the fact that Ms. Raffles was helping you and Mr. Wolff at USA Fleet Sales from those individuals at Legacy or Southern?

A.  No, I did not.

MR. KATAEV:  I have nothing further.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

MS. ALLEN:

THE COURT:  For planning purposes, my hope is that we will finish this witness today, and then we will do the other two witnesses on Wednesday.

MS. ALLEN:  Thank you, your Honor.

BY MS. ALLEN:

Q.  Hello, Mr. Barajas.  Can you hear me?

A.  Hello.  Yes.  Yes, ma'am.

Q.  You described yourself as an investor, is that right?

A.   In some form or fashion, yes.

Q.   You invest in businesses?

A.   I do not unless they're my own.

Q.   But you invest in your own businesses?

A.   Correct.

Q.   You own multiple businesses?

A.   Correct.

Q.   You own part of USA Fleet Sales?

A.   Correct.

Q.   You own 50 percent of USA Fleet Sales, and Brian Wolff owns the other 50 percent?

A.   Yes.

Q.   But it's your testimony today that you do not own USA Contracting, right?

A.   Correct.

Q.   Have you ever seen the LLC agreement for USA Contracting?

A.   No.

Q.   You were defined as one of the major sellers as that term was defined in the purchase agreement between Legacy and Southern, right?

A.   Yes.

Q.   And the sellers, as that term was defined in the purchase agreement, were represented by legal counsel in the negotiation and execution of that purchase agreement, right?

A.   Yes.

Q.   And your legal counsel was Bass Berry & Sims PLC?

A.   If I could remember correctly.

Q.   I could show you section 11.4 of the purchase agreement, if you'd like.  Let's do that?

A.   We met them one time.

Q.   Okay.  Do you have any reason to dispute that it was Bass Berry & Sims PLC?

A.   I do not.

Q.   And you met with them, right?

A.   Correct.

Q.   And you said the sale was a life-changing moment, right?

A.   Correct.

Q.   And that's because you received over $4 million in cash as a result of the sale of your equity in Southern's Legacy, right?

A.   Correct.

Q.   And you also received rollover equity as a result of that sale, correct?

A.   Correct.

Q.   But you still own equity to this day in Southern and its affiliates, right?

A.   Correct.

Q.   And how much is that rollover equity worth today?

A.   I'd have to reference to the agreement, but it should be 50 percent of what we received.

Q.  So you think it's worth over $2 million?

A.  Yes.

Q.  And you said that Legacy has not complied with its contractual obligations.  Do you mean it has not released the escrow to the sellers?

A.  I'm saying I've not received the back transaction of what I'm owed.

Q.  And when you say the back transaction of what you're owed, I'm trying to understand what that is, Mr. Barajas.  Is that the release of the escrow?

A.  I couldn't tell you.  What I could tell you is what I signed for was the 8 point something million, and we got paid half of that.

Q.  Are you aware that there are -- that Legacy has made several notifications to the sellers for claims of indemnification under the purchase agreement?

A.  No.

Q.  And are you aware that it's because of those claims for indemnification that the escrow has not been released.  I'm sorry, I don't know if you answered my question?

A.  Okay.  Yeah.  Yep.

Q.  So are you aware that the escrow has not been released because there are pending claims for indemnification against the sellers?

A.  No, I was not aware of that.

Q. How much are the other sellers expecting to receive?

MR. KATAEV: Objection. Relevance.

THE COURT: Overruled.

A. I don't maintain communication with them.

Q. You don't talk to Chris Eubank?

A. Yes, I do, but you said investors as a whole, so I don't speak primarily to any of them besides a couple.

Q. Okay. Well, who do you talk to?

A. Primarily just Chris Eubank.

Q. How much does Chris Eubank stand to make?

A. I couldn't tell you. We don't speak about that.

Q. Is it more than you?

A. Yep.

Q. Is it a lot more than you?

A. I would assume so.

Q. What about JT Shaheen, does he still stand to make a lot of money out of the sale of Southern to Legacy?

A. Yes.

Q. How much does he stand to make?

A. I couldn't tell you.

Q. What about John Falls?

A. Same. Yes, to answer your question. But once again on the number, I couldn't toll you.

Q. Okay. Let's move off of that.

Let's talk about your relationship with Alex Skelton.

Q. You first met Skelton at Southern, right?

A. Correct.

Q. When was the last time you talked with Alex Skelton?

A. Mmm, a couple weeks ago.

Q. Before or after the 4th of July?

A. Before.

Q. How far before?  A week before?  Two weeks before?

A. I couldn't tell you.  I handle a lot of calls.

Q. Did you talk with him on July 3?

A. Not that I recall.

Q. What about David Knight, when was the last time you spoke to David Knight?

A. I couldn't tell you.

Q. Did you talk to him on July 3?

A. No, not that I could recall.

Q. Do you have any inkling of when the last time is you talked to David Knight?

A. No.

Q. Have you ever talked to Alex Skelton or David Knight about this lawsuit?

MR. KATAEV:  Objection.

THE COURT:  Basis?

MR. KATAEV:  Common interest privilege.

THE COURT:  Overruled.

Q. You can answer the question.

A.   Yes.

Q.   Let's talk about Alex.  So this lawsuit was filed on June 25.  So you've talk to Alex since this lawsuit has been filed?

A.   Yes.

Q.   What did you talk about with Alex about this lawsuit?

A.   Nothing at all besides saying you can't believe what Southern's doing yet again.

Q.   What about David Knight, did you talk to David Knight about this lawsuit?

A.   I did not.

Q.   What about Christopher Shi Eubank, did you talk to Christopher Shi Eubank about this lawsuit?

A.   No.

Q.   Did you text with him about this lawsuit?

A.   No.

Q.   Have you and Alex Skelton ever talked about working together outside of Southern?

A.   At what way?

Q.   At any time.

A.   In other business ventures, that's correct.

Q.   Have you ever talked to Alex Skelton about working in other business ventures while Alex Skelton was an employee of Southern?

A.   No.

Q.  It was only after he was terminated?

A.  No.  It was more so investing into real estate; that was the extent of it, of my conversations with Alex's generational wealth.

Q.  Did you ever talk to Alex Skelton about starting a roofing company?

A.  No.

Q.  Did you ever talk with Alex Skelton about starting a construction company that did exterior renovation?

A.  No.

Q.  Did you ever talk about David Knight about starting a roofing company?

A.  No.

Q.  Did you ever talk with Leah Raffles about starting a roofing company?

A.  No.

Q.  Wolff's business did a roofing job in Mississippi, isn't that right?

A.  I couldn't tell you.

Q.  You don't know if Brian Wolff's company did a roofing job in Mississippi?

A.  No, I do not.

Q.  You're aware that he's admitted that one of his companies did a project in Mississippi, right?

A.  Yes, but I don't know the knowledge of the job that was

done.

Q. Where is David Knight from?

A. I couldn't tell you. I think it's either Memphis or Mississippi. I couldn't tell you.

Q. Does he live in Mississippi now?

A. Either Memphis or Mississippi. That's really our connection. I don't know the insides of his residence.

Q. Do you know if that Mississippi project done by Wolff's business was referred by David Knight?

A. I couldn't tell you.

Q. Do you know who the customer was in Mississippi that was the customer of Wolff's business?

A. I don't know anything in regards to Wolff's business or his dealings with this company.

Q. You allege that JT knew that you were soliciting Raffles for your other businesses, is that right?

A. Correct. It was not soliciting. It was doing work that was known. It was never to solicit full time. This was an additional source of income for Ms. Raffles.

Q. What did you tell JT about Raffles working for you at your other businesses?

A. It was a conversation, it was really nothing. We would talk about what he had going on or what -- how the business was doing, because it took us about a year to acquire the building that we were bidding, so there were renovation aspects to it,

so when we really started trying to open the doors on it, there was a few tech things that I needed.  I'm not too resourceful when it comes to that, and I asked Leah for a favor, and she did it.  It was never to solicit.

Q.  But what did you tell JT?

A.  She was never compensated.

Q.  But what -- but she was also on Southern's payroll though while you were having her do that work, correct?

A.  Yes.  But, once again, it was known by everybody on the Southern platform that she was doing this.

Q.  And sometimes she would pull an all-nighter for you and Brian doing work for your businesses, right?

A.  I couldn't tell you.  If that's what she did to get the job done, but it was never in direct issue with Southern's platform.  So however she got it done, I couldn't tell you.

Q.  But she would spend all night working on Adderall to get her job done for you, right?

MR. KATAEV:  Objection.  Argumentative.

THE COURT:  Overruled.  The objection is overruled. You can answer the question.

A.  Yeah.  I couldn't tell you.

Q.  Well, let's pull up the text message.  I'm going to show you, Mr. Barajas, a text message between you, Brian Wolff, and Ms. Raffles where she tells you that she spent all night on Adderall to complete a handbook for USA Fleet Sales?

(Pause)

MS. ALLEN:  Bear with us, Mr. Barajas.

BY MS. ALLEN:

Q.  What did you tell JT Shaheen about Ms. Raffles working for your other businesses?

A.  It was just a passing conversation.  It wasn't much detail to it, which it was just assisting at the time, that's it. There's not much more context than that.

Q.  When did the conversation with JT about Ms. Raffles working for your other businesses occur?

A.  It was over a year ago.

Q.  And your testimony is that JT Shaheen had Ms. Raffles do work for his side businesses too?

A.  That's -- I believe so.

Q.  Did JT Shaheen tell you that?

A.  No -- he -- yes, he did.

Q.  When did he tell you that?

A.  Once again, around that time over a year ago when she was getting some other stuff started.

Q.  Did any other sellers of Southern have employees of Southern do side work for them?

A.  Not that I'm aware of.

Q.  Did John Falls?

A.  Not that I'm aware of.

Q.  You were never made aware that John Falls had solicited

salespeople to do work for Tempest?

A.  There was discussions, but it was all hearsay.

Q.  Any other discussions or hearsay about other sellers having employees of Southern do work for their side businesses?

MR. KATAEV:  Objection.  Relevance.

THE COURT:  Overruled.

A.  Not that I can recall.

Q.  That is an important question, Mr. Barajas.  I'm going to ask it one more time.  You're under oath.  Any other discussions or hearsay that you have heard about other sellers of Southern having Southern employees do work for their side businesses?

MR. KATAEV:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  No.

Q.  Mr. Barajas, you and Ms. Raffles are very close, aren't you?

We can go back to that document if it's ready.

THE COURT:  Do you want to identify for the record what you are showing him?

MS. ALLEN:  In should be Hadamik declaration, Exhibit B.  I'm sorry, Melissa.  Scroll up a little bit so we can see the top of it.  Show the first page.  That will confirm it's Exhibit B.

Q.  It's Exhibit B of the Hadamik declaration.  If we scroll

down, the first part says:  Conversations one participants three.  And the participants are Brian Wolff, it says Junior has small feet and Leah Raffles.  Do you see that, Mr. Barajas?

A.   Yes.

Q.   Scroll down further.

So this is a text chain taken off of Ms. Raffles' computer.  Ms. Raffles says:  On my way.  I haven't been to bed thriving off Adderall and Vyvanse.  I don't know how to pronounce that word.  Went down a rabbit hole last night and starting to build a welcome presentation for your sales guys when they start, a sales training base plan.  I can't read that other thing because there's a screen in the way.  And an employee handbook.  Do you see that?

A.   Yes.

Q.   So Ms. Raffles worked all night for you and Brian Wolff on this handbook sales training base plan model and other documents, right?

A.   If that's what she stated, then yes.

Q.   Are you and Ms. Raffles close personal friends?

A.   Yes.

Q.   Did you offer her equity in your new company?

A.   No.  There was not ever a company.

Q.   Did you offer her equity at any time?

A.   No.

Q.   Did you offer her three months salary up front if she

joined you?

A.   No.

Q.   Did you ever tell Raffles that Brian Wolff and you had her back?

A.   No.

Q.   Who is Shaggy?  Who is Shaggy?  Sorry, this is my mid Western accent.  Shaggy?

A.   Shaggy she is -- she works for are our auto dealership.

Q.   When you say "our auto dealership," whose auto dealership is that?

A.   It's mine and Brian's.

Q.   What is the name of the auto dealership?

A.   USA Fleet Sales.

Q.   Does Shaggy do any work for a construction company of yours?

        MR. KATAEV:  Objection, foundation.

A.   No.

        THE COURT:  Overruled.

Q.   Do you have a construction company?

A.   No.

Q.   In your declaration, you refer to a team of individuals you were putting together.  Do you remember that?

A.   Yes.

Q.   Who are those individuals?

A.   One is primarily George Berber.  He is out from Buckeye,

Arizona. He has been testing for his license for HVAC and plumbing now for what I would say about six months and in building a management team around him.

Q. Is that related to USA ProFlow?

A. Correct.

Q. What is USA ProFlow?

A. Nothing.

Q. What is USA ProFlow to you?

A. One second. Sorry. I was getting a call. It was USA ProFlow was my HVAC and plumbing company that I plan on starting.

Q. Does it still exist?

A. It never got created.

Q. But USA ProFlow was another company that you thought about creating but didn't actually create?

A. Yes, there's nothing. It was never created.

Q. But you had plans to do it, correct?

A. Yes.

Q. Who are the other individuals in your team of individuals who you put together to work for your company?

A. Just me, myself, my brother. When I say a team of network, once again, I'm in real estate, a wide network of individuals, so I made just a simple list of guys, whether they hit me up or contacted me on social media or stuff like that, but there was no precise individuals besides my friend that I wanted to bring

down here from Arizona to run a division for the HVAC and plumbing.

Q. No one in Tennessee?

A. No. They would have to be licensed techs and certified individuals to run the business.

Q. Anyone in this team of individuals or side network of individuals you just mentioned, were any of them Southern employees or former Southern employees?

A. No.

Q. After Southern was sold in January 2024, did Chris Shi Eubank ever do any residential roofing jobs outside of Southern?

A. No.

Q. Do you know of any of the other sellers doing any residential roofing work outside of Southern after the sale of January 2024?

A. No.

Q. I've seen text messages, Mr. Barajas, that discuss a dispute between Christopher Eubank and you. Have seen those text messages?

A. No.

Q. Can we put up Hadamik Exhibit B -- sorry -- Exhibit D as in delta. I'm going to show a text that talks about -- I'm going to leave out the swear words -- that went down last night and this morning.

And then Ms. Raffles says:  And she knows he f'd up because he was texting Junior at 5:30 in the morning saying he hadn't even slept.  Junior's fueled by proving a point right now, and I'm all about that because that's how we make money.

Did you have texts with Christopher Eubank at 5:30 in the morning on March 28?

A.  No.

Q.  Did Christopher Shi Eubank reach out to you on March 28 in any way?

A.  Not that I recall.  We speak a lot.

Q.  Do you text?

A.  Yeah.

Q.  But you did not text on March 28?

A.  I couldn't tell you.  We have constant communication, once again.

Q.  You're in constant communication.  I must have missed what you said?

A.  Yes, constant communication.

Q.  Do you keep your texts with Shi Eubank?

A.  Yes.

Q.  Do you keep your texts with Leah Raffles?

A.  Yes, I keep all my stuff open.  Yes.

Q.  I just want to make sure I understand what you by open.  By open, you mean you preserve them?  You don't delete them?

A.  Correct.  I mean, yeah, every year or so when it gets too

out of control, I do, but for the most part I do.

Q.  When was the last time things got too out of control and you deleted texts?

A.  Probably right around the time of the transaction, honestly, when I was deleting it.  They just are all on my phone in regards to the transition of old subs contacting me and stuff like that.

Q.  By the transaction, you mean back in January 2024?

A.  Correct.

Q.  So you should have all your text messages from January 2024 forward?

A.  Yeah, I mean, if they're there.  I couldn't tell you.  I don't know technology very well.

Q.  You have not intentionally deleted any text messages since January 2024?

A.  No.

Q.  I'm sorry, was that a no?

A.  No.

Q.  How many cellphones do you have?

A.  Just one.

Q.  And you just have one number for that one phone?

A.  Correct.

Q.  Do you have any other personal computers or devices like tablets?

A.  I don't.  I'm the opposite of tech, so I don't have any

computers, anything. Not even when I was with the company. I just wasn't a computer guy.

Q. And you don't have a iPad or another tablet?

A. No.

Q. Do you ever use -- so the only device you use for work is your phone?

A. Correct.

Q. How do you access your email?

A. My phone.

Q. You never access your email by computer?

A. No.

Q. Do you ever use anyone else's computers?

A. No.

Q. We talked a little bit today about the properties referred by Brian Wolff to Southern in March of 2025. Do you remember those?

A. Yes.

Q. Did insurance claims get made on those houses?

A. I couldn't tell you. I went and referred Brian. As he didn't even want to go the insurance route, I went ahead and told Darryl Jones to take care of him, and I stopped following the process from there. All I did was refer, as I was no longer in that region. I was over the Missouri markets. I was no longer working the Tennessee-Kentucky areas, so those jobs actually just got funneled through to Darryl Jones.

Q.  Did you ever talk to Brian Wolff about those jobs?

A.  No.

Q.  How did you refer those to Southern if you never talked to Brian Wolff about those jobs?

A.  In regards to the process of the jobs, all he told me was he had properties that may need a roof, and I referred him over to Darryl.  That was it.  Not the extent of the damages.  And that's always been a practice of ours, whether it's a customer calling us, we're going to have our guys go out there and see if it's even a claim to be processed.  So I knew no information about it besides, once again, funneling it through, giving it to Darryl for region one to take care of those roofs because I was not in that market.

Q.  Did insurance ever get paid out on those roofs owned by Brian Wolff?

A.  I couldn't tell you.

Q.  Who would know that?

A.  Darryl Jones or the sales guy that worked that claim.

Q.  Would Brian Wolff?

A.  He's the insurance holder, so yes.

Q.  Did any of your businesses ever work as vendors of Southern?

A.  No.

Q.  We have seen a news report showing that the building that housed USA Fleet Sales was broken into.  Do you remember that?

A.   Yes.

Q.   Was an insurance claim ever made on that break in?

MR. KATAEV:  Objection.  Relevance.

A.   No.

THE COURT:  What is the relevance?  The objection is sustained.

MS. ALLEN:  Can we scroll down on Exhibit D real quick?  And I'll ask the question see if this jogs his memory.

Q.   So this is a text message between Ms. Raffles and a family member.  And she's talking about getting her GC license.  What does GC license mean?

A.   To me it means general contracting license.

Q.   Did you ever talk with Ms. Raffles about getting her GC license?

A.   She was inspired to do so.  I never communicated with that. She was adamant about trying to get into that aspect of business.

Q.   Did you ever communicate -- you never communicated with Ms. Raffles about her getting her general contractor license?

A.   Yes, we did.

Q.   Did you talk about it in connection with having her have her general contracting business and helping you -- her general contracting license and helping you with your businesses?

A.   No.  It was in the context of getting into development.

Q.   What does development mean?

A.   Building houses.

Q.   Is building houses construction?

A.   Correct.

Q.   How is a development business different than a construction business in your mind?

A.   There's multiple avenues.  You have to have strategy on finding the dirt to develop, ensuring that the cost is right, the demand is there, a lot of different avenues of just getting someone say we're going to build a house, a lot of stuff, a flip.  There's a lot of different avenues in that market.

Q.   Do you have a development business?

A.   No, I do not.

Q.   And do you have a construction business?

A.   No, I do not.

Q.   And, I'm sorry, it's just a little unclear to me.  Did you ever talk to Ms. Raffles about her getting her general contracting license to help you out with your businesses?

A.   It was a conversation in passing, but no -- no to a business venture or any sorts for it.

Q.   Did you pay for a book for her to study for her general contracting license?

A.   No.

Q.   Did she ask you to -- for your AmEx number to pay for a book?

A.   I couldn't tell you.  She's got my AmEx to purchase

furniture for my personal home. That's the only thing that I recall.

Q. Can we put up the next exhibit in this. I think it's the AmEx one. I'm sorry, it's either before or after this.

Did Ms. Raffles ever ask you for your credit card number so she could order a book to study for her license?

A. Not that I can recall.

Q. Did you have plans for a development business?

A. I'm already -- I've already been developing. I've been developing his since 2023.

Q. Do you have a development business or not?

A. Yes, but it's not an established LLC. It's an investor aspect. So I buy the dirt. I find a GC to build. I sub everything out. It's not a development business.

Q. So let me be clear. I think -- when I think of a business, it can be anything. It doesn't need to be an LLC. It means you are doing the work. Are you doing development regardless of whether there's LLC?

A. Yes.

Q. Are you doing development work, Mr. Barajas?

A. Yes.

Q. And how long have you been doing that?

A. Since end of 2023.

Q. Does development work include siding?

A. I don't like siding. I'm a hardy board masonry kind of

guy.

Q.  Has your development work --

THE COURT:  What does that mean, when you say you don't like siding, you're a hardy work -- explain that to me.

THE WITNESS:  Yes, your Honor.  Out here in the Southeast, we have high winds, high hail.  Just high wind stuff and debris tends to puncture siding.  So when I'm building my houses for what I would project to be my future client, I like brick or hardy board.  I stay away from siding.  It's just not aesthetically pleasing to me, and it's not long-term functional for the customer.

THE COURT:  Thank you.

Q.  In your development, work have you ever used siding?

A.  No.

Q.  What about gutters?

A.  Every home needs a drainage system, so yes.

Q.  What about windows?

A.  Yes.

Q.  What about roofing?

A.  Yes, I sub that as well.

Q.  Does your development work include renovations?

THE COURT:  What's your answer, sir?  Does your development work include renovations?

THE WITNESS:  No, your Honor.

Q.  Do you have any other work that includes renovations?

A.   No.

Q.   Melissa, can we scroll down to Exhibit C from the Hadamik declaration.  Sorry, scroll back up.

          This is a chain, Mr. Barajas, between, it says Junior and Ms. Raffles dated March 28.  If we can scroll down.

          If you look at the text from March 28, 2015, it says: Can I use an AmEx to order this book?  It's 88 bucks, and I just found out the first test is open book.  Do you see that?

A.   Yes.

Q.   Down below, at 12:18, you say:  LMAO, yeah, it's open book.

A.   Correct.

Q.   Then after you say:  Yes, you can order it, is that right?

A.   Correct.

Q.   So does this help you remember that you paid for Ms. Raffles' book to help pass this licensing test?

A.   Yes, I would say that, but it was more context to that conversation.

Q.   Is it context about Kirtis Green?

A.   No.  That was more so of getting that for her furnishing and doing me the favor of shopping on Amazon for my home furniture.

Q.   While she was doing this favor for you in March 2025, she was still at Southern employee, right?

A.   Correct.

Q.   And you're not denying that you paid for the book so that

she could study to get this license, correct?

A.   Never seen the transaction, but not that I was aware of.

Q.   Who pays for this AmEx?

A.   My girlfriend.

Q.   What's your girlfriend's name?

A.   Bailey Green.

Q.   And you don't see the statements for that AmEx?

A.   I do not.

MS. ALLEN:  Your Honor, can I have a quick moment?  I think we might be done.

No more questions.  Thank you, Mr. Barajas.

THE COURT:  How much do you have on redirect?

MR. KATAEV:  I don't think I have anything.  I want to confer with my co-counsel.

THE COURT:  Okay.  Fine.

MR. KATAEV:  I have nothing further, your Honor.

THE COURT:  Sir, you're excused as a witness.

(Witness excused)

THE COURT:  That concludes the presentation of evidence for the day.

So the record is clear, I am going to be taking as evidence on the preliminary injunction hearing the declarations that have been submitted so far and the exhibits to the declarations.

Is there anything else that the plaintiff has to raise

right now?

MS. ALLEN:  No, your Honor.  Thank you.

THE COURT:  What about from the defendant?

MR. KATAEV:  I'd like to make an oral application to dissolve the temporary restraining order.

THE COURT:  That application is denied.  I extended it on consent for the additional two weeks in order so that the parties could present all of the evidence and so I could consider the evidence.  I found good cause, and I indicated that good cause included my need to consider all of the evidence, so I'm denying the application.

But I do have a question for defendant, unless defendant has other things for me.

MR. KATAEV:  Just to reserve the right to do so after conclusion of the evidence.

THE COURT:  Who are the remaining witnesses from defendant?

MR. KATAEV:  Only the two remaining defendants, which is Ms. Raffles and Mr. Wolff.

THE COURT:  How long do you expect their testimony to be each?

MR. KATAEV:  I think Mr. Wolff will be, I'd be surprised if direct takes more than ten minutes, but Ms. Raffles I think is a lot more extensive because there's a lot of allegations about her, so I would anticipate somewhere

30 minutes to an hour for her.

THE COURT: Right now, does plaintiff anticipate any rebuttal case?

MS. ALLEN: Not at this time, your Honor. I think we're reserving our right to call our forensic expert if needed, but right now we think his affidavit is sufficient.

THE COURT: All right. Let me look at the calendar. I'm keeping in mind, counsel, your request with respect to Wednesday.

Does it help you at all if I could do 10:00 as opposed to 10:30?

MR. KATAEV: I got here at 10:00 today, your Honor. I might be two minutes late, but I think it could make it work.

THE COURT: Okay. Hold on. Let me look at the calendar. So we can do 10:00. We'll do 10:00 on Wednesday. My plan would be to take the testimony of the two witnesses for the defendant, any rebuttal case from the plaintiff, and then I would like to hear from each of you short summations what you think has been established through the testimony. And then I'll take the case under submission.

Is there anything else that plaintiff has to raise today?

MS. ALLEN: No, your Honor. Thank you.

THE COURT: Anything else from you, Mr. Kataev?

MR. KATAEV: Yes, your Honor. Will the Court consider

supplemental briefing, post hearing briefing?

THE COURT:  Tell me what you have in mind.  I may, depending on what it is.  I generally -- my challenge with respect to supplemental briefing is that I have a timetable to get you an opinion on the preliminary injunction.  So if I were to take it, I would want it to be relatively short and prepared pretty quickly.

Do you have a sense right now as to what you would want to brief supplementally?

MR. KATAEV:  Yes.  For example, the existence of trade secrets, the enforceability of the broad clause, the lack of bargaining power by Mr. Barajas, and so on and so forth.  I think it's important to brief those points.  I do think that we would be willing to extend the TRO for the time it would take for briefing and/or for the Court's decision.  But we don't have to make that decision now.  We can sort of see how things play out on Wednesday and then sleep on it and consider it then.

THE COURT:  Let's do that.  I mean, I don't want to cut off your ability to bring to my attention any arguments that are relevant or any legal authority that is relevant.  I just want to make sure that we do it on a basis that gives me the time to read and think about what you are giving me.  So --

MR. KATAEV:  Understood.

THE COURT:  Okay.  I do expect that you will both be

proficient with the technology. My hope is that you have become proficient today. But if you need a couple minutes with my courtroom deputy to help you with the technology before you leave, I'm sure he could spend a couple minutes; otherwise, you can arrange it next week or the remainder of this week.

And have a good afternoon everybody. Thank you.

MR. KATAEV: I apologize, your Honor. I have two minor points that I'd like to raise.

THE COURT: Okay.

MR. KATAEV: In terms of the hearing on Wednesday, my remaining two witnesses are in Tennessee. We did a decent job with remote testimony today. I hope that we can continue that.

THE COURT: My understanding was the plaintiff consented to remote testimony, and plaintiff is shaking their heads yes, so that had been my intent in my earlier rulings, and you can present those two witnesses remotely.

MR. KATAEV: The last thing is that I wanted to inform the Court after the Court encouraged the parties to talk to each other, we have had some discussions, and it does not look like we can work something out, but we will continue to have those discussions.

THE COURT: Having heard some of the testimony, I do think it's a valuable thing for the parties to continue discussions, and so I very much encourage that.

MR. KATAEV: Thank you, your Honor.

P7QL25H

THE COURT:  Okay.

(Hearing adjourned to July 16, 2025 at 10:00 a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

MICHAEL JOHN McCOMAS

Direct By Ms. Allen  . . . . . . . . . . . . . . .32
Cross By Mr. Kataev  . . . . . . . . . . . . . . .51
Redirect By Ms. Allen  . . . . . . . . . . . . .86
Recross By Mr. Kataev  . . . . . . . . . . . . .92
Recross By Mr. Kataev  . . . . . . . . . . . . .96

OSWALDO BARAJAS

Direct By Mr. Kataev . . . . . . . . . . . . . .98
Cross Ms. Allen  . . . . . . . . . . . . . . . 113