UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

LEGACY RESTORATION LLC,

                Plaintiff,

        v.                      25 Civ. 5319 (LJL)

OSWALDO JUNIOR BARAJAS, et al.

                          Decision

               Defendant.

------------------------------x

                      New York, N.Y.
                      July 23, 2025
                      11:30 a.m.

Before:

                HON. LEWIS J. LIMAN,

                      District Judge

                 APPEARANCES

SIDLEY AUSTIN LLP
     Attorneys for Plaintiff
BY:  MARGARET HOPE ALLEN
     ANDI GRECO
     CLAIRE NEVILL (Summer Associate)


SAGE LEGAL LLC
     Attorney for Defendant
BY:  EMANUEL KATAEV

KUSHMAKOV LAW PC
     Attorney for Defendant
BY:  EDUARD KUSHMAKOV

(In open court; case called)

THE COURT:  Starting with counsel for plaintiff, please state your appearance for the record.

MS. ALLEN:  Good morning, your Honor.  Margaret Allen from Sidley Austin LLP on behalf of Legacy Restoration LLC.  I have with me Claire Nevill, a summer associate, who your Honor met before at a previous hearing.  She is with us from University of Texas.  I also have Andi Greco, who is my associate here in Dallas, who's been admitted pro hac vice.

THE COURT:  Good morning, Ms. Allen.  I will note for the record that you are appearing today remotely at your request.  If at any point you cannot hear me or cannot see me, you'll let me know.  Is that okay?

MS. ALLEN:  Thank you, your Honor.  Yes.

THE COURT:  And for defendant?

MR. KATAEV:  Good morning, your Honor.  Emanual Kataev, Sage Legal LLC for defendants Mr. Barajas, Mr. Wolff and Ms. Raffles.

THE COURT:  Good morning, Mr. Kataev.

Let me ask you, as I have in the past, to try to either speak into the microphone or keep your voice up.  I was able to hear you, but just barely before.

Okay.  I'm prepared to give you my ruling on the application for preliminary injunction and to discuss with all of you the proposed case management plan.

Plaintiff Legacy Restoration LLC seeks a preliminary injunction enjoining defendant Oswaldo "Junior" Barajas and USA Contracting, as well as anyone acting in concert with them, from breaching any of the covenants of the Contribution and Securities Purchase Agreement entered into between Plaintiff and Barajas and from misappropriating Plaintiff's proprietary confidential and trade secret information.  Defendants oppose the motion.  The Court held a hearing on July 9, 2025 and July 16, 2025, at which testimony was heard from Michael McComas, Group President at Legacy, and defendants Oswaldo "Junior" Barajas, Brian Wolff and Leah Raffles.  The Court has also examined numerous exhibits submitted by the parties in support of or in opposition to the motion.  The parties have fully briefed the motion and offered opening and closing arguments at the hearing.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Practice P.C.,* 120 F.4th 59, 79 (2d Cir. 2024). "In the Second Circuit, a party seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest." *Smith v. City of*

*New York,* 754 F.Supp.3d, 581 (S.D.N.Y. 2024); *see Pharaohs GC Inc. v. United States Small Bus. Admin.,* 909 F.3d 217, 225 (2d Cir. 2021)

The Court first turns to a brief discussion of the facts and of the likelihood of success on the merits.

Legacy is in the business of exterior residential and multifamily restoration, including the repair and replacement of roofing, siding, gutters and windows.  It does business primarily in the Midwest.  Barajas was an employee and equity holder of Southern Roofing and Renovations, or "Southern," an exterior remodeling company with operations in the south of the United States.  In January 2024, Legacy acquired Southern for $50 million pursuant to a Contribution and Securities Purchase Agreement.  Barajas was paid over $4 million in cash and received additional rollover equity as part of the sale.  He remained an employee of Southern and, in January 2025, as part of a reorganization of Southern by Legacy, he was named Regional Sales Director for a territory including Missouri.

Barajas is subject to non-compete, non-solicitation, and confidentiality obligations under the Contribution and Securities Purchase Agreement.  On April 10, 2025, his employment with Southern was terminated on the basis that he had started or was planning to start a company that would compete with Legacy and Southern.  On April 18, 2025, Southern terminated two other employees - David Knight and Alex

Skelton-on suspicion that they were involved with the competing company.  Skelton was Director of Sales in all of Southern's territories and Knight was a Regional Sales Director.  On June 25, 2025, Southern terminated another employee - Leah Raffles - on suspicion that she was involved with the competing company, and also filed this lawsuit, seeking and obtaining a TRO against Barajas.  Raffles, Knight and Skelton are not subject to non-competes or non-solicits.  It is Plaintiff's theory that Barajas violated his non-compete by secretly agreeing to start a competing company - USA Contracting-with Brian Wolff, a friend with whom he had started other businesses, and that in furtherance of that business he recruited Raffles, Knight and Skelton.  It is undisputed on this record that USA Contracting competes with Southern and Legacy - it completed a roofing project in Mississippi before this lawsuit was filed and, if allowed to, it would continue to engage in the roofing business.  It also is undisputed that Wolff operates USA Contracting and that Knight and Skelton worked on the roofing project with USA Contracting, although they did so after their employment was terminated by Southern.  There is no evidence of Raffles working for USA Contracting.  Plaintiff also does not allege any work that Barajas did for USA Contracting except for, it claims, recruiting Raffles, Knight and Skelton to work for the company.

Plaintiff has established a likelihood of success on

the merits only with respect to its claim that Barajas induced Raffles to leave her employ with Southern and interfered with Southern's relationship with Raffles in violation of the non-solicitation provision of the Contribution and Securities Purchase Agreement.  Plaintiff has not established a likelihood of success on this record with respect to its claims of violations of the non-compete or confidentiality provisions or that Barajas induced Skelton and Knight to leave Southern.

As an initial matter, the evidence which Plaintiff did not offer is telling.  At the TRO stage, Plaintiff asserted that in an interview on April 10, 2025, Barajas did not deny that he had started a competing company.  Barajas denied that assertion, and the affiant who reported it to the Court had no first-hand knowledge of the statement in the interview. Plaintiff did not call the person who conducted the interview with Barajas and to whom Barajas allegedly made the statement. The Court thus gives no weight to the evidence that Barajas admitted to have started a competing company.  Also at the TRO stage, Plaintiff alleged that a fellow employee, later identified as Darryl Jones, had reported overhearing Skelton discussing in March 2025 that he with Raffles and Knight planned to leave Southern and start a company with Wolff to compete with Southern.  The conversation allegedly was relayed to Legacy in April 2025 by Jones, who stated that Barajas had told him that he intended to keep his name off the company

formation documents to avoid detection and that Barajas had instructed Raffles to draft standard operating procedures for the new company, which Raffles moreover admitted to doing. But Plaintiff did not call Jones to testify and did not even reveal his name until prompted by the Court. His account was impeached by Raffles who stated in essence that Jones had a grudge against Barajas and was trying to get him fired. There is no evidence of Raffles drafting standard operating procedures for USA Contracting.

The evidence at the hearing in support of Plaintiff consisted mainly of text messages recovered from Raffles' computer after her employment was terminated and inferences Plaintiff asks the Court to draw from the declarations of Barajas, Knight and Wolff. Plaintiff also offered evidence that Raffles downloaded more than 50 unique documents belonging to Southern and Legacy from the company's Sharepoint system between December 2024 and June 2025. In addition, after her employment was terminated, Raffles did a factory reset of her computer, effectively erasing all data and settings. Legacy was able to recover Raffles' messages before the factory reset.

In early March 2025, Raffles texted Wolff and Barajas about building a welcome presentation for salespeople and an employee handbook for USA Fleet Sales, a vehicle company owned by Wolff and Barajas that does not compete with Legacy.

**On March 28, 2025, Raffles texted Barajas about**

**gaining her general contractor license and being "listed on the LLC" so that "everybody could use my license." Dkt. No. 23-3. Barajas paid for Raffles to buy a test preparation book for the license.** *Id.* **Raffles then stated "once you're outside of your non compete we can get you added to the LLC and then we can do gov contracts ... minority veteran and a woman listed on the company."** *Id.* The same day, Raffles texted her mother about the general contractor license and stated that "they're gonna start a roofing business as Brian is the partner because the other guys don't have a noncompete. Only Junior does so we're just gonna do it as Brian be the partner and then he'll sign over equity to Junior as soon as his noncompete runs out." Dkt. No. 23-4.

On June 6, 2025, after Barajas had left Southern but while Raffles was still employed by Southern, Raffles texted her mother that Barajas had told her "if they try to push you out ... I will make it work for you over here. I'll just pay you 3 months upfront of your current salary." On June 11, 2025, Raffles texted her mother that Barajas had called her and said "start planning your exit," that he needed her sooner than he thought, and "he just sweetened the deal that he's gonna figure out how to pay me the salary that I want and he's also going to give me profit share." Dkt. No. 2-13.

In his declaration, Barajas admits that, as part of a short-term rental property business in which he is engaged, he

remodels properties that he purchases and rents or sells them and that, in connection with that work, he has put together a team of individuals to engage in HVAC, plumbing, water irrigation and related trades.  In her declaration, Raffles admits that Barajas offered her multiple side jobs to make money while she was employed by Southern.

The evidence establishes a likelihood of success that Barajas violated the non-solicit agreement between Legacy and Barajas.  This provision, which is at Section 6.9 of the Agreement, states that each seller agrees not to:

(i) induce or attempt to induce any employee, officer, director or manager of any Company Group member or the Purchaser Group member to leave the employ of any Company Group member or Purchaser Group member, or in any way interfere with the relationship between any Company Group member or Purchaser Group member, on the one hand, and any employee, officer, manager or director thereof, on the other hand, (ii) solicit to hire or hire any Person who was an employee, officer, manager or director of any Company Group member or Purchaser Group member until twelve months after such individual's employment or other relationship with any Company Group member or Purchaser Group member has been terminated.

Barajas is a seller under the Agreement.  The Company Group includes Southern, in which Barajas owned equity at the time of the Agreement.  The Purchaser Group includes Plaintiff

and its affiliates, which purchased Southern pursuant to the Agreement.

Raffles was employed by Southern as general manager and then as Director of Administration. Dkt. No. 14-4 paragraph 5. The messages provide strong evidence that Barajas induced Raffles to leave Southern and interfered with the relationship between Southern and Raffles. Barajas encouraged Raffles to get a general contractor license so that she could work with him on a separate LLC, offered her three months upfront of her current salary, and encouraged her to start planning her exit. The obvious reason for Raffles to tell her mother that Barajas told her to plan her exit and offered her salary and equity is that Barajas in fact made these statements. Raffles' testimony that the messages were just "venting" and not "based off facts" is not credible and does not coherently explain why she would have lied to her mother about Barajas' statements. See Hearing Transcript 232:17-24. Plaintiff has established a likelihood that Barajas violated the non-solicit provision by soliciting Raffles.

The evidence does not establish a likelihood of success that Barajas violated the non-solicit by soliciting Skelton and Knight. Dkt. No. 22 at 9. The evidence that Barajas violated the non-solicit with respect to Skelton and Knight consists of the hearsay statements of Jones, text messages between Skelton and Knight in March 2025 discussing an

upcoming meeting, the fact that after being fired by Southern in April 2025, Skelton and Knight did work for Brian Wolff's general contracting and roofing business USA Contracting, and a picture posted on June 6, 2025 to Wolff's Instagram account showing Wolff, Knight and Skelton together at a country music concert in Nashville.  However, the Court discounts Jones's statements for the reasons previously discussed, and the fact that Skelton, Knight, and Wolff were together in Nashville and that Skelton and Knight did work for Wolff does not establish that Barajas solicited them to leave Southern or to do work for USA Contracting while they were employed by Southern.  Wolff testified that Barajas introduced Skelton and Knight to him socially.  Wolff testified that Barajas did not refer Skelton and Knight to him for employment, and that after Skelton and Knight were fired by Southern he spoke to them independently about doing roofing work.  There is no evidence that Skelton and Knight were working for USA Contracting while they were working for Southern.  Plaintiff relies on texts between Skelton and Knight in late March 2025 about an exciting appointment, but the texts do not obviously refer to Barajas or any solicitation.  Dkt. No. 2-8.  On the current record, where the evidence is in equipoise, I cannot find that Southern is likely to prevail on this claim.

Plaintiff has not shown a likelihood of success on its claim that Barajas violated the noncompete provision of the

Securities and Purchase Agreement.  The noncompete provision states that to protect Plaintiff's trade secrets and relationships and goodwill, "for the applicable Restriction Period," the Sellers "shall not ... in any manner, directly or indirectly, participate or engage in, or manage, operate, consult with, render services for or represent or own, directly or indirectly ... any entity that is engaged in, the Business." Dkt. No. 11-1 § 6.7.  The Business is defined as "exterior residential and multi-family restoration (including but not limited to the repair or replacement of roofing, siding, gutters, and windows), residential and multi-family renovations, interior and exterior residential and multi-family maintenance and related services, sales, and lead generation activities."  *Id*. § 1.1.  The Restriction Period is defined as five years for Barajas, and the provision applies "throughout the world."  *Id*.

Defendants argue that the noncompete is unenforceable and that, at a minimum, the Court should blueline it to limit its duration to one year.  The Court need not reach those arguments.  Even assuming the noncompete is enforceable as drafted, Plaintiff has not established a likelihood of success.

The evidence supports the conclusion that Barajas considered doing work for USA Contracting which would breach the non-compete provision, but it does not establish that he in fact did any work for USA Contracting.  The Raffles' text

messages already discussed establish a likelihood that in late March 2025, Barajas and Wolff planned to start a roofing business or a contracting business that would do roofing. Raffles stated that they were "gonna start a roofing business as Brian is the partner ... then he'll sign over equity to Junior as soon as his noncompete runs out."  Dkt. No. 23-4. The Court does not credit that this was just venting; the better conclusion is that Raffles stated this because Barajas had said it.  Later, on April 28, 2025, Wolff formed a company, USA Contracting, that is in the business of general contracting, including a roofing job in Mississippi.  Hearing Transcript at 195:24.  If Barajas was involved with the job in Mississippi or directly or indirectly managed, operated, or rendered services for USA Contracting, he would be in breach of the non-compete provision.  Dkt. No. 27 paragraph 4, 6-7; Dkt. No. 14-23.

However, the evidence that Barajas followed through on his plan to become involved with USA Contracting is tenuous. Wolff is the only member of USA Contracting.  Wolff and Barajas testified that Barajas is not involved in USA Contracting. Wolff also testified that Barajas did nothing to assist with USA Contracting's sole job, and testified in some detail as to how the work was performed by Skelton and Knight.  For example, when asked if Skelton and Knight lined up subcontractors, Wolff testified that he believed only Knight did so.  Hearing

Transcript at 184:16.  Plaintiff's only evidence that Barajas was in fact a shadow operator of USA Contracting or assisted with its sole job in April or May 2025 is Raffles' texts from March 2025.  The evidence could be read to suggest that Barajas worked for USA Contracting and competed with Southern and Legacy by recruiting employees for USA Contracting.  However, Raffles testified unequivocally that the job Barajas discussed with her was not for USA Contracting and that the documents she created for Wolff were for USA Fleet Sales.  And there is no evidence that she ever did any work for USA Contracting - undermining the inference that Barajas recruited her for USA Contracting.  And as the Court discussed, the evidence that Barajas recruited Skelton and Knight for USA Contracting is not so strong that the Court can find a likelihood of success.

That leaves that Barajas intended to join USA Contracting.  The fact that a person planned to do something may support an inference that the person in fact did that thing.  However, this inference is weakened here by the fact that between the March texts and the actual formation of USA Contracting, Southern terminated Barajas due to his apparent plan to violate the noncompete.  Dkt. No. 2-3 at 8.  While it is possible that Wolff's testimony was false and that Barajas assisted him in forming and operating USA Contracting after he was terminated from Southern, it is at least equally possible that after the plan was discovered, Wolff decided to go ahead

with the contracting company but keep Barajas out of it, at least until the end of his noncompete.  Therefore, Plaintiff has not established a likelihood of success on its claim that Barajas violated the noncompete provision.

Plaintiff also has not established a likelihood of success that Barajas breached the confidentiality provision of the Contribution and Securities Purchase Agreement or misappropriated Legacy's trade secrets.  These two claims fail for similar reasons.  Plaintiff argues that its confidential information consists of contracts, pay structures, training materials, and standard operating procedures.  Defendant contests that this material is kept confidential or constitutes trade secrets.  But even assuming that this material is confidential or constitutes trade secrets, there is no evidence that Barajas disclosed it.

There is no evidence that Barajas downloaded any of the purportedly confidential documents or sent them to anyone. Plaintiff relies on a theory that Raffles downloaded confidential files with a plan to use them in the new business started by Wolff and Barajas.  However, Raffles testified that she used the relevant files in her role as Director of Administration and did not send them to anyone.  This testimony was detailed and effectively rebutted Plaintiff's arguments that Raffles would have had no need to download the documents other than to use them for a competing company.

There is also minimal evidence to support an inference that Raffles would have downloaded the documents at Barajas' request or for his use.  Raffles text messages discussing work for Barajas' new company do not mention downloading or using any of Plaintiff's documents.  Raffles texted her mother, who is also in the roofing business, asking if we "can just rebrand your training content and sell it to them when they quit and start their own roofing thing."  Dkt. No. 23-4; see Dkt. No. 14-4 paragraph 31.  This suggests that if Raffles did create content for the new company, it would have been based on her mother's content not Southern's content.  Additionally, the timing of Raffles' downloads of confidential material lack a clear connection to the planning of the new company.  Raffles downloaded a variety of documents at a variety of times between December 2024 and June 2025, with no apparent change in activity at the time she was texting her mother and Barajas about the company.  Dkt. No. 27-2.  Raffles now works for a different marketing company, and it is undisputed that she never in fact created anything for USA Contracting. Plaintiff's argument that Raffles disclosed Southern's confidential information to USA Contracting at Barajas' request or used it on USA Contracting's behalf is entirely speculative. The Court draws no negative inference against Defendants from the fact that Raffles downloaded documents from the Sharepoint system or that she reset her computer.  Raffles effectively

explained away those decisions.  Plaintiff has thus not shown a likelihood of success on its claims against Barajas for breach of confidentiality of misappropriation of trade secrets.

To summarize, Plaintiff has only shown a likelihood of success on its claim against Barajas for breach of the non-solicitation provision.

Let me turn to irreparable harm.

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm*, 120 F.4th at 80. "That is because a preliminary injunction strives to maintain the status quo in order to protect the plaintiff from irreparable injury while awaiting final decision on the merits." *JTH Tax, LLC v. Agnant,* 62 F.4th 658, 672 (2d Cir. 2023).

To establish irreparable harm, "the moving party must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.,* 969 F.3d 42, 86 (2d Cir. 2020).  Monetary "compensation need only be 'adequate' for preliminary relief to be unwarranted, not perfect." *Daileader v. Certain Underwriters at Lloyds London Syndicate* 1861, 96 F.4th 351, 358 (2d Cir. 2024).

The Second Circuit has recognized that "non-compete and non-solicitation covenants strive to protect various difficult-to-quantify interests, for example, reputation,

goodwill, and client relationships, that generally are not easily redressable through an award of money damages." *JTH Tax,* 62 F.4th at 673. However, "there is ... no automatic assumption that irreparable harm must inevitably be assumed in breach of covenant cases." *Id*.

"A plaintiff must present the district court with actual evidence ... that the plaintiff will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. Thus, in both *JTH Tax* and *Baker's Aid*, preliminary injunctions were denied - and that decision was affirmed by the Second Circuit - in breach of covenant cases where the plaintiff failed to offer evidence it would suffer irreparable harm before judgment was entered. In *Baker's Aid*, the Circuit affirmed the denial of injunctive relief even though the plaintiff had shown a likelihood of success on the merits. *See Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.,* 830 F.2d 13, 15 (2d Cir. 1987). It did so because the claim that the plaintiff would suffer a loss of goodwill from the defendant's competition was undermined by the facts that the plaintiff enjoyed a strong market position and the defendant had made no effort to pass its competing goods off as those of the plaintiff, and the only other evidence of irreparable harm was the conclusory statement of the plaintiff's president. *Id*. at

15-16.   In *JTH Tax*, the court affirmed the decision that the plaintiff did not show irreparable harm from the defendant's violation of non-compete and non-solicitation covenants where the plaintiff had presented no evidence that the defendant's continuing operations would irreparably harm its goodwill, client relationships, or ability to compete in the geographic area.   62 F.4th at 672.

Plaintiff has not offered evidence to establish a likelihood of irreparable harm in the absence of an injunction. As a preliminary matter, the Court has no basis on this record for enjoining USA Contracting, Wolff, Skelton, Knight, or Raffles.   Skelton and Knight are not parties to this case at all.   Wolff and Raffles were not parties to the Contribution and Securities Purchase Agreement, and therefore were not subject to noncompete or non-solicit provisions.   USA Contracting also was not subject to any contract with Plaintiff and has not been connected to any misappropriation of trade secrets.   Thus, there is no cause for the Court to prevent Wolff, Skelton, and Knight from continuing to operate USA Contracting, so long as Barajas is not involved.

Plaintiff's witness, Mr. McComas, the group president of Legacy, testified that the main irreparable harm that Plaintiff has suffered is the theft of trade secrets and that the other significant harm is the solicitation of Southern's employees.   Hrg. Tr. 81.   But Raffles testified that she did

not provide the documents to anyone, Wolff testified that Raffles did no work for USA Contracting, and there is no evidence that any of the documents ended up in the hands of Wolff or USA Contracting.  There is no evidence tying the download of documents to Barajas.  Even assuming that Raffles downloaded documents she was not supposed to download and that Barajas was responsible for those acts, there is no evidence that USA Contracting would be able to exploit those documents in the period from now until trial or that its exploitation of them would be irreparable by money damages.  *See Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118-19 (2d Cir. 2009) (holding that "where a misappropriator seeks only to use trade secrets-without further dissemination or irreparable impairment of value-in pursuit of profit ... an award of damages will often provide a complete remedy for such an injury"); *FXRobott LLC v. Noetiq Research Inc.,* 2025 WL 1874888, at \*19.  No evidence was offered at the hearing that USA Contracting was in a position to damage Southern or Legacy's goodwill or ability to compete irreparably before a trial could be held.  *See Baker's Aid,* 830 F.2d at 15.

Plaintiff argues alternatively that Barajas' mere knowledge of Southern's trade secrets, combined with his interest in Wolff's business as, at minimum, a customer, creates a risk of inevitable disclosure.  Dkt. No. 22 at 13. But this argument is unavailing.  The doctrine of inevitable

disclosure generally applies when the defendant is an employee of a competitor company. *See Payment All. Int'l, Inc. v. Ferreira,* 530 F. Supp. 2d 477, 481 (S.D.N.Y. 2007).  One factor in applying the doctrine is whether the employee is working "in a similar capacity," such that even with the best of intentions, he might unintentionally transmit trade secrets. *Payment All.,* 530 F. Supp. 2d at 482.  The Court's holding that Plaintiff is not likely to show that Barajas is working for USA Contracting thus precludes a finding of irreparable harm on this theory.

There also was no convincing evidence offered at trial that Barajas would cause irreparable harm to Plaintiff through the solicitation of employees if he were not enjoined until a trial was held.  The loss of employees can constitute irreparable harm if the employee is "unique." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.,* 2024 WL 3093542 (N.D.N.Y. May 16, 2024), aff'd, 131 F.4th 102 (2d Cir. 2025); *see Ticor*, 173 F.3d at 70.  An employee may be considered unique if "the employee's services depend on the employee's special talents" or if the employee is a "broker, trader, or salesperson; courts have found such employees' services to be unique based on their unique relationships with the customers with whom they deal." *Reed Elsevier Inc. v. Transunion Holding Co.,* 2014 WL 97317, at *11 (S.D.N.Y. Jan. 9, 2014); *see AM Medica Commc'ns Grp. v. Kilgallen,* 90 F.App'x 10,

11 (2d Cir. 2003).  Otherwise, the loss of employees is compensable by money damages.

Assuming without deciding that Barajas interfered with the relationships Raffles, Knight and Skelton had with Southern, those acts are completed.  All three were fired by Southern.  Raffles is not working with USA Contracting, and the Court cannot restrain Knight and Skelton from doing so.  Importantly, there is no evidence that Barajas has plans to raid Southern for other employees or that USA Contracting would be in a position to absorb those employees before a trial was held in this case.

It does not change this conclusion that the sellers agreed in the Contribution and Securities Purchase Agreement that "any breach or threatened breach by such Seller ... will result in irreparable and continuing damage ... for which there is no adequate remedy at law."  Dkt. No. 11-1 § 6.12.  "While such clauses may be entitled to weight, they do not control the question whether preliminary injunctive relief is appropriate, even in a case involving breach of a non-compete covenant." *JTH Tax*, 62 F.4th at 674.  The clause applied equally to all the Sellers, regardless of their unique skills or relationship to the business.  Holding that it entitled Plaintiff to a "per se finding of irreparable harm" would be "contrary to the sort of case-by-case analysis courts engage in to determine whether an employee is unique and whether an employer is faced with

imminent, irreparable harm." *Int'l Creative Mgmt.,* 2007 WL 950092, at *7. Breach of the noncompete or nonsolicitation provisions might constitute irreparable harm in many cases. But the same cannot be said of the solicitation of a single employee, resulting in the turnover of no confidential information or trade secrets, for a company that both Barajas and the solicited employee decided not to join. This is all Plaintiff has shown here, and it does not justify injunctive relief. Were there substantial evidence that Barajas in fact is presently working for, assisting, or soliciting employees for USA Contracting or another competitor company, Plaintiff could renew its motion for injunctive relief at that time.

Turning to public interest.

Because Plaintiff has not established irreparable harm, and an injunction therefore cannot issue, the Court need not consider the remaining preliminary injunction factors. *See Connecticut State Police Union v. Rovella,* 36 F.4th 54, 68 (2d Cir. 2022).

In summary, Plaintiff's motion for a preliminary injunction is DENIED. The temporary restraining order entered by the Court on June 26, 2025 is dissolved.

That's the order of the Court.

Let me turn to the case management plan. It is my hope and expectation that given the limited number of witnesses in this case, the case could proceed expeditiously. I am not

sure who to address first, but the case management plan proposed by the parties has dates that are more extended than the dates in my standard case management plan.

For example, I would ordinarily have the motion to amend or join additional parties be filed no later than August 22, 2025. The proposal that you've given me has the motion to amend due on October 15, 2025. I would ordinarily have all discovery completed by January 4, 2026. That would ensure that, for example, if an injunction were appropriate to issue in this case on a permanent basis, it could do so expeditiously.

The parties have suggested all discovery be completed by July 31, 2026. The parties have suggested a date for a motion for summary judgment of August 7, 2026, over a year from now. I would have a motion for summary judgment be filed on January 18, 2026.

So I guess I will turn first to plaintiffs, to you, Ms. Allen, to ask whether the dates in the proposal are yours and why they're so extended?

MS. ALLEN: Your Honor, they were by agreement, largely by agreement with plaintiffs and defendant's counsel. I think we would be fine with the hurried-up schedule that you propose. I think we see two issues, potentially, to highlight for the Court. One is my partner, Melissa Colon-Bosolet, who appeared before you before, she has a four-month trial starting

May 2026 in the Eastern District of New York. So we are trying to very much avoid, you know, May to September for a trial deadline with your Honor because of that, especially due to the previous history of the motion for disqualification. We think it's important that Melissa Colon-Bosolet be available for trial.

THE COURT: You know, on the motion for disqualification, that can be teed up at some point. You may have gotten some hint of this from my ruling earlier, but I did not think much of the motion for disqualification.

It may be, Ms. Allen, that you are going to disabuse me of that, and maybe you'll tell me right now, that you anticipate being a witness in this case. But it strikes me that you don't have any percipient knowledge with respect to any of the facts of this case, at least as I have been told by the parties to date, and that the only information you have is information that perhaps could be used in a cross-examination to impeach, but I suppose, you know, you are going to impeach with whatever you get from a deposition transcript.

So do you have any expectation that you will be called about as a witness by yourself in this case?

MS. ALLEN: None, your Honor.

THE COURT: So there is the trial date issue. What are the other reasons for the dates being so extended?

MS. ALLEN: The only other date that I discussed with

defendant's counsel, and maybe it would be helpful to understand your Honor's view toward this, is the deadline to amend the complaint. At this point defendant's deadline to answer is not until September 15, 2025, and so our thought is that our motion to amend the complaint should be at least after we see their answer.

THE COURT: I think that's a fair point. That doesn't to me mean that all discovery should be extended beyond the presumptive date that I ordinarily would have, which would be January of 2026, does it?

MS. ALLEN: No, your Honor. I think we are fine with that schedule.

THE COURT: All right. Let me hear from defense counsel.

MR. KATAEV: Your Honor, I agree with the Court about the October 15 date. That's what we agreed to originally. They wanted a much longer time period to amend, which we were not okay with. As far as the fact discovery deadline, I --

THE COURT: Hold on for a second. Well, so what I had originally said was that October 15 for the date to amend was different from the presumptive date in my case management plan. But I just have heard from Ms. Allen a view that sounded convincing to me that the deadline to amend should be after your date to answer or otherwise respond to the complaint, and, therefore, she was supporting the date of October 15. Do you

have a problem with the October 15 date, you know, for the date to amend?

MR. KATAEV:  I don't, your Honor.  That's what we agreed to.

THE COURT:  All right.  So let's then talk about the close of all discovery and anything else you want me to know about the proposed case management plan.

MR. KATAEV:  I'm supportive of the extended discovery schedule also because I will be traveling out of the country for two weeks at the end of August, and then I'm starting a trial in Florida the first week of September after Labor Day. I anticipate that it will interfere with my ability to get the discovery timely done.  Does it need to go way out into 2026? No. But is January 2026 a little too soon given that I'll be out of commission for three weeks?  I think so.  So I need a medium in between.

THE COURT:  I'll ask Ms. Allen, but from your perspective who are the witnesses that you are going to depose in this case, and what are you going to need in terms of fact discovery?

MR. KATAEV:  Well, your Honor, I don't know the witnesses we're going to depose on the plaintiff's side.  There are a number of people.  There's 11 major sellers, there's the C-suite level of people who made the decisions and then made the investigations.  As the Court heard Mr. McComas testify, he

doesn't have firsthand knowledge. So I don't know who interviewed these individuals. I anticipate there will be at least five, six people that we will need to depose at a minimum. So the answer is I won't know until I get the Rule 26 disclosures, but I anticipate that there is going to be a lot of discovery being done here.

THE COURT: What I hear you saying is that you are going to need to take depositions of the people that the plaintiff anticipates identifying as their witnesses in their initial disclosures.

MR. KATAEV: Correct. And it's my understanding we have not received those yet.

THE COURT: Okay. And in terms of documents? I mean, this is, you know, the plaintiff, it seems to me, would be the one producing -- who is going to need to produce documents demonstrating the theft of trade secrets. Maybe you'll have some discovery requests with respect to whether these things really are trade secrets, but it doesn't strike me as being a document heavy case.

MR. KATAEV: I don't disagree with that, your Honor, but I've been surprised before, so we are just going with a cautionary approach here.

THE COURT: Okay. Ms. Allen, how many witnesses do you anticipate in this case? I assume you are going to want the depositions of the folks who appeared as witnesses in the

hearing before me.  There's Skelton and Knight who are not parties.  And then how many people from the company do you anticipate?  More than a handful?

MS. ALLEN:  I think it would probably be no more than three.  I do think we would probably have a couple third-party subpoenas, like you noted, for Skelton and Knight and probably for Krista Gamblin as well since she is the one who primarily had knowledge of Mississippi job and the nine houses that were completed by Wolffe.  I think also as far as document discovery, we are very interested in receiving the text messages between the defendants about these issues.

THE COURT:  I understand that request, and it doesn't strike me as terribly time-consuming.

MS. ALLEN:  We agree, your Honor.

Your Honor, for what it's worth, I would have no objection to moving the end of discovery deadline from the first week of January to a couple of weeks, if that accommodates defendant's counsel.

MR. KATAEV:  Defendants were considering or proposing end of February.

THE COURT:  Okay.  You both are a little more accommodating than I am, but since you are willing to be, accommodating I'll be a little bit more accommodating than when I came out on the bench.  Give me a second to look at the calendar.

Here is what I am thinking about doing.  I'm thinking about setting a few dates on the case management plan and leaving the rest of it for the parties to negotiate.

I'm going to set the date for initial disclosures as August 6, 2025.  Those can be amended after a responsive pleading.  I understand the reason why October 1 was put in your case management plan given the time for a response, but there is no reason why initial disclosures can't be exchanged now with the two weeks given the fact we've had a preliminary injunction hearing and you each have some sense of the other's case.

I am also going to set the date of the motion to amend or to join additional parties as October 15, 2025.  That means that if there is a motion to amend after October 15, 2025, it will have to be supported by good cause under Rule 16, as well as by principles under Rule 15.

I'm going to set the date for the close of all discovery as January 23, 2026.  My deputy will give us a date for post discovery status conference after January 23, 2026. He will do so in a moment.

And I'm going to set the date for summary judgment motions as February 6, 2026.  The post discovery status conference you'll deliver to me the joint letter one week before the post discovery status conference with the information required by my case management plan and required as

set forth in your proposal at Docket No. 46.

With respect to the interim dates, the dates for the service of initial requests for production of documents, interrogatories, contention interrogatories, depositions, requests to admit and expert discovery, I'm going to leave that all to you all to negotiate between yourselves. I'll set a deadline, but I'll hear in a moment about a reasonable deadline for you to submit to me what you've agreed upon as the interim dates within the outline that I've set that will ensure that all discovery is completed by January 23, 2026.

Any response to any of that from the plaintiff, Ms. Allen?

MS. ALLEN: That sounds great, your Honor. Thank you.

THE COURT: Mr. Kataev?

MR. KATAEV: Nothing, your Honor. Thank you.

THE COURT: All right. Let me turn to my deputy for a date. January 29 at 11:00 a.m. in this courtroom for the post discovery status conference.

Ms. Allen, do you want me to refer you to the court annex mediation program for discussion of potential settlement?

MS. ALLEN: I have no objection to that, your Honor.

THE COURT: Mr. Kataev?

MR. KATAEV: We would agree to that. Thank you.

THE COURT: I will do that.

And then, Ms. Allen, tell me how much time you need to

discuss with Mr. Kataev interim dates and to get me a more robust case management plan with the interim dates.

MS. ALLEN:  I think a week would be helpful, your Honor, just to give us a little bit of time.

THE COURT:  That's fine with me.

Mr. Kataev, can you make that work?

MR. KATAEV:  I'm sorry, your Honor, the date?

THE COURT:  Well, today is July 23.  It will be by July 30 you will submit to me a joint proposed case management plan consistent with all discovery being completed by January 23 and summary judgment motions by February 6, and with the other dates that I've indicated as being set but filling in the remainder of the dates in the proposed case management plan.

MR. KATAEV:  That should work.  I would only ask plaintiff's counsel to take lead on that with us before the end of this week, so we could get it timely done.

THE COURT:  Ms. Allen, any problem with that?

MS. ALLEN:  None, your Honor.  We can do that.  Thank you.

THE COURT:  Ms. Allen, anything else we should discuss today?

MS. ALLEN:  No, your Honor.

THE COURT:  Mr. Kataev?

MR. KATAEV:  Yes, your Honor.

I believe we should discuss, because I don't think it's in the submission we made, a confidentiality stipulation and order.

THE COURT:  So I do have a form protective order, and you can discuss that with Ms. Allen and then submit it to me. With respect to anything that has already been publicly disclosed, including in this courtroom, I think the parties have actually been quite careful with respect to that, but I -- you know, you will have to do a lot of work to convince me that anything that has already been disclosed should be put back in the barn.  Is there anything in that category.

MR. KATAEV:  I don't think so.  I'm just thinking prospectively trade secrets.

THE COURT:  Yeah.  I do have a standard form protective order.  Look at that.  The only thing that I ask is that if you want to make changes from that, redline it so that I can see what the changes are and make sure that they're acceptable to me.

MR. KATAEV:  Understood, your Honor.  I believe my colleague may have one other point, so I'll let him speak.

MR. KUSHMAKOV:  Just to confirm, Judge.  Would you like expert to be completed within the deadline for fact discovery?

THE COURT:  Yes.  When I say all discovery, it means all discovery.  Everything is done by January 23.  The only

thing that remains after that is summary judgment motions and for me to set a trial date, assuming this case survives summary judgment and goes to trial.

          MR. KUSHMAKOV:  Thank you.

          THE COURT:  Have a good afternoon everybody.  Thank you.

          (Adjourned)